**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 1:23-CR-00118-DMT |
| | ) | |
| Plaintiff, | ) | |
| | ) | DEFENDANT'S MEMORANDUM IN |
| Vs. | ) | SUPPORT OF MOTION TO SUPPRESS |
| | ) | EVIDENCE, REQUEST FOR HEARING, |
| CAMERON MONTE SMITH, | ) | AND REQUEST FOR <u>FRANKS</u> |
| | ) | HEARING |
| Defendant, | ) | |

COMES NOW, the Defendant, Cameron Monte Smith, by and through his counsel Kevin J. Chapman, and submits this Memorandum in Support of Motion to Suppress Evidence, Request for Hearing, and Request for <u>Franks</u> Hearing.

**FACTS**

[1]    On May 13, 2023, at approximately 9:45 A.M., law enforcement was called out to a shared Mountrail Williams and Basin Electric Power Cooperative substation in rural Williams County after a report of shots fired into the equipment.  (Exhibit A, Williams County Sheriff's Department Report I, p. 5, Primary Narrative of Sgt. Justin Roberts)  Sgt. Roberts arrived at the substation at about 10:21 A.M.  (<u>Id</u>. at p. 6)  Sgt. Roberts spoke with several employees of Basin Electric Power Cooperative (BEPC) and Mountrail Williams Electric Cooperative (MWEC). (<u>Id</u>.)  MWEC's safety person, Alan Billehus, "did not want law enforcement to enter the fenced in area before his arrival," so Sgt. Roberts searched for evidence outside the fence.  (<u>Id</u>.)  Sgt. Roberts noted an overcast sky with steady rainfall, and a strong, sustained wind" and "the ground (gravel) to be soft with standing water in low areas."  (<u>Id</u>.)  During Sgt. Robert's investigation of the east fence of the substation, he found "(4) .450 Bushmaster shell casings," among other items.  (<u>Id</u>.)

1

[2]     Detective Amber Dickerson and Detective Derek Bernier arrived at the scene later.  Det. Dickerson saw a vehicle southeast of the substation.  (Id. p. 8)  Sgt. Roberts estimated that the vehicle was about "1/2 to 3/4 of a mile east of 121st Ave. NW" on the north side of the prairie trail section line otherwise known as 63rd St. NW.  (Id.)  Sgt. Roberts and Corporal Tanner Tougas each drove their patrol units to the location of the vehicle.  (Id.)

[3]     "Cpl. Tougas and Sgt. Roberts proceeded to the vehicle" and "access to the vehicle was by a section line/prairie trail that border (sic) two fields.  On maps, the section line/prairie trail showed 63rd St. NW."  (Id, at p. 10, Supporting Narrative of Corporal Tanner Tougas)  "Four wheel drive was required to not get stuck."  (Id. p. 8, Roberts Narrative)  Cpl. Tougas and Sgt. Roberts found the vehicle, a 2005 Honda Element with Oregon plate 273LXW, to be unoccupied and Cpl. Tougas "heard radio traffic from dispatch advising the registered owner was Marie Liu Miller."  (Id. at p. 10, Tougas Narrative)  "The Honda was found to be unoccupied but contained several items throughout the entire interior of the Honda visible from the windows.  (Id. at p. 8 Roberts Narrative)  Corporal Tougas saw "male clothing items were inside, namely large shoes/boots that appeared to be for hiking."  (Id. at p. 10 Tougas Narrative)  The vehicle was locked and "stuck on the north side of the prairie trail in a crop field, facing west."  (Id. at p. 8 Roberts Narrative)  In fact, the vehicle was stuck in the mud about 15 feet off of the middle of the public section line.  (Exhibit B, Law Enforcement Photograph of the Honda Element Near the Section Line, dated 5/13/2023).  "Sgt. Roberts observed floor mats under the front tires in what appeared to be an attempt by the driver to get the Honda unstuck."  (Exhibit A, p. 8, Roberts Narrative)

[4]     "Sgt. Roberts and Cpl. Tougas returned to 121st Ave. NW to advise detectives of their findings."  (Id.)  It was determined "a search would be conducted of the abandoned Honda

Element." (Id.)  "Sgt. Roberts along with Detectives Dickerson and Bernier, and Cpl. Tougas drove out to the Honda." (Id.)   It is stated in the report that "[t]he landowner was contacted and permission was granted to investigate the Honda on his property." (Id.)   The timing of this alleged contact is questioned and is mysteriously not documented in the Command Log or phone calls log, or cell phone records or screen shots or anything.   According to Det. Bernier's Affidavit in Support of Search Warrant for the Honda "CRV," the property owners "explained to law enforcement the vehicle was not on their property prior to the rainstorm this morning." (Exhibit C, Index # 31, Case No. 53-2023-CR-00716, Det. Derek Bernier's Affidavit in Support of Search Warrant, p. 1 No. 6)

[5]      "After verifying the vehicle was secured and no key was visible nearby, Cpl. Tougas forced entry by breaking the driver's door window with his breaching tool.  Cpl. Tougas unlocked the vehicle by pressing the driver's side door unlock button. Cpl Tougas secured his breaching kit in his patrol vehicle while detectives, conducted their search. Cpl Tougas later photographed the destroyed window, broken glass on the floorboard, and broken glass on the ground in in the field." (Exhibit A, p. 10 Tougas Narrative)  It should be noted that in Det. Bernier's Affidavit in Support of Search Warrant for Microtel Room 123, he states "law enforcement **checked** inside the vehicle and located an empty rifle case, documentation with the name of Cameron Smith, (DOB 9/30/1974) and located a receipt for the same caliber of ammunition/casings which matched the 450 Bushmaster Rifle casings found at the power station shooting site." (Exhibit C, Bernier Affidavit, No. 7 (emphasis added))  Detective Bernier's Affidavit did not indicate that law enforcement had broken in to the locked Honda to gain knowledge of those items.

3

[6]     Sgt. Roberts went to his vehicle to warm up and later "was informed correspondence was located bearing the name Cameron Smith with a year of birth, 1974" in the Honda. (Exhibit A, p. 9 Roberts Narrative)  "Sgt. Roberts was also advised an empty soft shell gun case was located, a owners (sic) manual for a Bushmaster rifle, and a 'Cheaper Than Dirt' receipt for the purchase of .450 Bushmaster ammunition with name Marie Miller as the purchaser." (Id. )  Medication documentation for a Cameron Smith was also found in the Honda.  (Exhibit D, Williams County Sheriff's Department Report II, p. 8, Supporting Narrative of Detective Amber Dickerson)  Purportedly, it was then that law enforcement believed the Honda to be involved in the crime at the power station and had Sgt. Roberts contact a tow company "to tow the vehicle to a secure location pending a search warrant," even though law enforcement had already illegally broken into the vehicle and illegally searched it.  (Id.)   These statements by law enforcement are highly suspicious and don't make sense because law enforcement would not have diverted attention and resources off of the power station and travel to where the Honda was located unless they suspected it was connected to the crime.  As explained throughout this Brief, we believe that much of the statements and activities surrounding the Honda are inaccurate, misleading, and essentially a ruse to avoid a clearly illegal breaking into the Honda and searching without a warrant.

[7]     Sgt. Roberts contacted Richard at UR Next Towing.  (Exhibit A, p. 9 Robert's Narrative)  Richard indicated he had been contacted to tow the Honda earlier in the day from the same area, that he could not tow him until Monday when it dried up, and that he had given a male a ride to the Microtel Inn and Suites in Williston.  (Id.)  Richard agreed to come and tow the vehicle and Cpl. Tougas waited with the vehicle while "[d]etectives and Sgt. Roberts responded to Williston in an attempt to locate the male that was given a ride from Richard." (Id.)

[8]     The command log for this case from the Upper Missouri River Regional Dispatch Center ("Dispatch") contains large gaps in the investigation at the power substation and surrounding area.  (Exhibit E, Upper Missouri River Regional Dispatch Center CFS Command Log for CFS # 2023025616)  The Command Log ("Log") lists twelve law enforcement officers as responders in this case. (Id. at pp. 2-3).  The Log shows that Sgt. Roberts (4796) arrived on scene at 10:21:25 A.M.; Det. Dickerson (4958) and Det. Bernier (4956) arrived on scene at 12:31:01; and Cpl. Tougas (4794) arrived on scene at 13:33:23 and again at 13:57:32.  (Id.)  In the proceeding hour and fifteen minutes, unnamed law enforcement reported the following to Dispatch:  "east of 121st possible suspect vehicle about 1/2 miles east" at 14:01:21; the vehicle was identified as a Honda CV or 273LXW 14:03:46; the vehicle was unoccupied at 14:06:31; and that Sgt. Roberts left the scene at 15:14:23.  (Id. at p. 3[1])  No time for leaving the scene of the area of the power substation was reported for Cpl. Tougas, Det. Dickerson, and Det. Bernier.

[9]     Mysteriously, no times exist within the evidence to show when Det. Bernier contacted the landowner; we still do not know the name or contact info.  Likewise, no exact time exists within the evidence as to when the Honda was broken into by law enforcement, i.e. when Cpl. Tougas, illegally broke the driver's side door window of the Honda to gain entry, or the illegal search of the Honda situated within the section line road.  Additionally, no time or report was listed on the Log of a landowner allegedly calling in to complain of a suspicious vehicle on his/her land.  In fact, according to Detective Bernier, he contacted the landowner and law enforcement had not received any complaint from the landowner of an abandoned vehicle.   The alleged landowner who owned the field beside the section line road was not identified in either Sheriff's Report I or II.  Report II, which contained Det. Bernier's narratives over several days, had absolutely no

---

[1] It should be noted that on the Log the names Perkins, Gabrielle and Moellenkamp, Kelly are dispatchers at the Upper Missouri River Regional Dispatch Center, and Woltjer, Laura is the supervisor at the Dispatch Center.

mention of the landowner's name;  how Det. Bernier identified the landowner of that field, what time the detective contacted him/her, whether contact was made by phone or in person, or even a summary of what the conversation was.   There are no phone records, screen shots or anything to prove the timing of the alleged phone calls and conversations with the landowner and when they broke into the Honda.  These are important facts that should be documented and the fact that they were not documented shows the bad faith involved in the investigation and ruse regarding the illegal breaking and entering into the Honda, all in violation of the Defendant's Fourth Amendment rights.

[10]      In fact, for such an important investigation with multiple agencies and officers responding, there were very few entries on the command log.  Never has the undersigned seen such a short, incomplete command log and incomplete law enforcement narratives and overall documentation as in this case.  Many DUI reports and command logs are more detailed and complete than in this case, containing specific times and descriptions of each small phase of the investigation.  Such gaps and deficiencies give rise to serious questions about when the landowner was contacted, before or after law enforcement's illegal break-in to the Honda Element.  Were dispatchers told not to include the times and descriptions of certain events or did the law enforcement officers involved purposefully not report the content and time of their actions?

[11]      Key law enforcement reports lack specific times and details of the investigation on the section line road in particular.  Det. Bernier's first narrative describes items found in and around the substation with two photos.   (Exhibit D, Bernier's narrative at pp. 3-5)  Det. Bernier's second narrative is his report of starting a search warrant for the Honda Element and details of what was in the Honda Element.  (Id. at pp. 5-6)  It is unclear from Det. Bernier's short, 7-line

narrative whether the details of the contents of the vehicle were from law enforcement's search of the Honda Element after they broke the driver's side window to gain entry, or if the list was from the later search of the vehicle at cold storage after a warrant was obtained. Det. Bernier never wrote a narrative detailing where, when, and how he contacted the landowner of the field beside the section line; what the landowner told him; the break-in and search of the Honda Element beside the section line; or a full inventory of what was found in the search of the Honda Element by the section line. (Exhibit D) This became an issue since the law enforcement narratives and affidavits in support of the search warrants in this case conflict.

[12]    The first warrant obtained by law enforcement was for Room 123 at the Microtel in Williston, North Dakota. (Exhibit F, Search Warrant No. 2023-01180, signed by Williams County District Court Judge Kirsten M. Sjue on May 13, 2023, at 6:31:27 P.M. Central Time) Detectives Dickerson and Bernier executed the search warrant of room 123 at "approximately 5:40pm" and the "warrant was closed at approximately 6:10pm." (Exhibit D, Dickerson Narrative, p. 9) The evidence inventory also indicates the warrant was executed at 5:40 P.M. (Exhibit G, Evidence Inventory and Receipt for Search Warrant No. 2023-01180; also entered into Williams County Case No. 53-2023-CR-00716, Index # 29) Thus the detectives illegally searched the room at 5:40 P.M. before Judge Sjue even issued the warrant at 6:31:27 P.M.

[13]    Det. Dickerson's Affidavit in Support of Search Warrant for Search Warrant No. 2023-01180 has deliberate misrepresentations and inaccuracies (highlighted in bold), as follows:

> 3.   The property owners indicated to law enforcement that the damage to the Ray power station from the shooting is estimated between one million and four million dollars in damage.

> 5.   **That a vehicle, which appeared to be abandoned, was located on the property where the shooting occurred** was a **Grey Honda CRV**, with Oregon Plates: 273LXW.

**6.    That the property owners notified law enforcement the vehicle was suspicious and should not have been on the property**.

**7.    That the property owners also explained to law enforcement the vehicle was not on the property prior to the rainstorm**.

**9.    That law enforcement checked inside the vehicle and located an empty rifle case, documentation with the name of Cameron Smith, (DOB 9/30/1974) and located a receipt for the same caliber of ammunition/casings which matched the 450 Bushmaster Rifle casings found at the power station shooting site**.

**10.    That law enforcement contacted a tow truck company to come and remove the vehicle from the property, and the tow truck driver told law enforcement that he picked up a male around 10:30am this morning and gave him a ride to Microtel Inn due to his vehicle being stuck in the mud approximately one mile from the site of the shooting**.

**11.    That law enforcement responded to the Microtel Inn and spoke with hotel management. Management provided a roster of all of its guests, and Cameron Smith is listed on the roster as a guest in Room 123 at the motel**.

14.    That law enforcement is seeking a warrant to search the person of Cameron Smith; DNA evidence from Cameron Smith; the Microtel Inn & Suites, Room #123, located 3820 4th Avenue W, Williston, Williams County, ND, for the following: 450 Bushmaster Rifle; ammunition for the 450 Bushmaster Rifle; ID cards, spray paint, documents, and correspondence.

(Exhibit H, Affidavit in Support of Search Warrant dated May 13, 2023, signed by Detective

Amber Dickerson)

[14]    The term "property owners" in no. 3 and no. 6 are not the same individuals / entities.  The

property owners in no. 3 are the power substation owners, BEPC, MWEC, and their employees

in charge of the substation.  The term "property owners" in no. 6 are the landowners who own

the field next to the section line road, not the property owners of the substation.  In no. 5, the

Honda was **not** on the power station property, per her own narrative, nor was the Honda a CRV,

but an Element model.  Det. Dickerson's own narrative reports, as well as Sgt. Roberts' and Cpl.

Tougas' narratives, contradict important sworn statements in her Affidavit as highlighted above,

as well as the other Affidavit wrote discussed below.  These will be explained in detail and analyzed below.

[15]    The second warrant obtained by law enforcement on May 13, 2023, was for the Honda Element.  (Exhibit I, Search Warrant No. 2023-01181, signed by Williams County District Court Judge Kirsten M. Sjue on May 13, 2023, at 7:39:52 P.M. Central Time)  Detective Bernier, Det. Dickerson, Special Agent Randy Larkin, Special Agent Daniel Lewis, Special Agent Adam Topping, Special Agent Sarah Joyce searched the vehicle from 5/13/23 – 5/19/23.  (Exhibit J, Evidence Inventory and Receipt for Search Warrant No. 2023-01181; also entered into Williams County Case No. 53-2023-CR-00716, Index # 32)

[16]    Det. Bernier's Affidavit in Support of Search Warrant for Search Warrant No. 2023-01181 has deliberate misrepresentations and inaccuracies (highlighted in bold), as follows:

> 1.    That he has knowledge and information regarding a search warrant recently executed by law enforcement at the Microtel Inn & Suites, Room #123, occupied by Cameron Smith (DOB 09/30/1974) located at 3820 4th Avenue W, in Williston, Williams County, ND, and testifies as follows:

> 2.    That a shooting incident occurred at the Ray power station located at 121st Ave NW, in Ray, Williams County, ND.

> 4.    That a vehicle, **which appeared to be abandoned, was located on the property where the shooting occurred**, and is a Grey in color 2005 Honda Element, with Oregon Plates: 273LXW, VIN# 5J6YH28615L010424.

> 5.    **That the property owners notified law enforcement the vehicle was suspicious and should not have been on the property**.

> 6.    That the **property owners** also explained to law enforcement the vehicle was not on their property prior to the rainstorm this morning.

> 7.    **That law enforcement checked inside the vehicle and located an empty rifle case, documentation with the name of Cameron Smith, (DOB 9/30/1974) and located a receipt for the same caliber of ammunition/casings which matched the 450 Bushmaster Rifle casings found at the power station shooting site**.

10.   That That law enforcement is seeking a warrant to search the Grey in color, Honda CRV, bearing Oregon Plate #273 LXW, **located on the property of the Ray power station, in Ray, Williams County, ND**, for the following: **450 Bushmaster Rifle; ammunition for the 450 Bushmaster Rifle; DNA evidence; electronic devices that can depict GPS locations and devices with the ability to sync data to the vehicle; ID cards, spray paint, documents, and correspondence**.

(Exhibit C, Bernier Affidavit)

[17]    No. 1 of Det. Bernier's sworn Affidavit is to be stricken from the document.   Det. Bernier searched Microtel room 123 at 5:40 P.M. on May 13, 2023, and Judge Sjue did not sign the warrant until 6:31:27 P.M. on May 13, 2023.   As in Det. Dickerson's Affidavit, Det. Bernier's sworn Affidavit No. 4 states an "abandoned" vehicle on the site of the shooting, which is totally incorrect, as the Honda  was within the section line beside a landowner's field, at least a half mile from the power station.   No. 10 of Det. Bernier's Affidavit again states that the Honda CRV, which was identified as a Honda Element in No. 4, was "located on the property of the Ray power station."   Det. Bernier cannot possibly believe this to be true the vehicle had been towed to a police cold storage unit and the detective was one of the law enforcement officials who searched the Honda Element **not** located on power substation property, but situated within the section line road at the time Cpl. Tougas broke into the vehicle by shattering the driver's door window.

[18]    Nor can Det. Bernier possibly claim that the property owners of the Ray power station notified law enforcement that the Honda Element was suspicious and should not have been on the property, as he stated in No. 5.   According to Det. Dickerson's narrative, Det. Bernier himself contacted the landowner who owned the field beside the section line where the vehicle was located.   It should also be noted that Judge Sjue's Warrant directs the search of a grey Honda

Element on the "premises known as Williams County Sheriff's Department Cold Storage," not at the site of the power station as requested by Det. Bernier's Affidavit. (Exhibit I, p. 1)

[19]    The third warrant was obtained by law enforcement on May 15, 2023, and was for production of DNA from the Defendant and a second search of Microtel room 123 and for a DNA swab from the Defendant. (Exhibit K, Search Warrant Nos. 2023-01185 and -01187, signed by Williams County District Court Judge Josh B. Rustad on May 15, 2023, at 11:40:28 A.M. and 11:40:48 A.M.Central Time, respectively) Det. Ward and Task Force Officer (TFO) Shaun Shatz executed the search warrant on Microtel room 123. (Exhibit L, Evidence Inventory and Receipt for Search Warrant No. 2023-01185)

[20]    As in the Affidavits in Support of Search Warrant for Search Warrant Nos. 2023-01180 and 2023-01181, Det. Dickerson's Affidavit has deliberate misrepresentations and inaccuracies (highlighted in bold), as follows:

> 5.    That a vehicle, **which appeared to be abandoned, was located on the property where the shooting occurred**, and was identified as a Honda Element bearing Oregon Plates: 273LXW. **The property owners notified law enforcement** that **the vehicle was suspicious and should not have been on the property.** Law enforcement observed that the vehicle appeared to have gotten stuck in the mud.
>
> 6.    **That law enforcement observed the vehicle to contain an empty rifle case with correspondence/documentation of the name "Cameron Smith", as well as a receipt for the same caliber of ammunition/casings which matched the 450 Bushmaster Rifle casings found at the power station shooting site**.

(Exhibit M, Affidavit in Support of Search Warrant dated May 15, 2023, signed by Detective Amber Dickerson). We doubt that the landowner notified law enforcement of anything and likely did not even know of the presence of the Honda until law enforcement contacted them.

[21]    As a result of law enforcement illegally searching and then subsequently towing the Defendant's vehicle and information detectives illegally garnered from breaking into the

11

Defendant's vehicle and searching it, law enforcement later spoke with Microtel staff; obtained surveillance footage from various businesses; warrants for the Defendant's vehicle (which law enforcement had already illegally broken into), Microtel hotel room (2), DNA, and residence; and located and detained the Defendant, Cameron Smith, at Microtel, later arresting him on felony charges.

[22]    After obtaining surveillance videos from Microtel and various businesses in the area, all of which were products of the illegal break-in, search and seizure of the Honda Element within the section line, at least a half mile away from the power station, Detectives Dickerson and Bernier retrieved 30 items from a dumpster in the Williston Gardens Apartments.  (Exhibit N, Evidence Inventory and Receipt for Williston Garden Apartments Dumpster NE Parking Lot, executed at 2:18 P.M. May 14, 2023)

[23]    Federal authorities later obtained five additional warrants based upon items found as a result of Williams County North Dakota law enforcement's illegal break-in of the Defendant's locked vehicle and evidence stemming therefrom.  The first warrant was issued May 22, 2023, was to search electronic equipment, devices, and data storage devices.  (Exhibit O, Search and Seizure Warrant signed May 22, 2023, by Judge Clare Hochhalter; Affidavit in Support of an Application Under Rule 41 for a Warrant to Search and Seize signed by FBI Special Agent Randy Larkin; Attachment A, the electronic items to be searched; and Attachment B, the information to be obtained from those devices)

[24]    The second federal warrant was issued May 26, 2023, and was directed to the Southern District of Florida.  (Exhibit P, Search and Seizure Warrant signed May 26, 2023, by Judge Clare Hochhalter; Affidavit in Support of an Application Under Rule 41 for a Warrant to Search and Seize signed by FBI Special Agent Randy Larkin; Attachment A, the property to be searched;

and Attachment B, the particular things to be seized)  Attachment A required AT&T to provide records of all mobile devices within a 10 mile radius of the substation from 5/12/2023, 10:00 PM through 5/13/2023, 2:00 AM CDT.  (Id.)  Attachment B listed certain information and records about each device identified in Attachment A.  (Id.)

[25]    The third federal warrant was issued May 30, 2023, and was directed to the District of New Jersey.  (Exhibit Q, Search and Seizure Warrant signed May 30, 2023, by Judge Clare Hochhalter; Affidavit in Support of an Application Under Rule 41 for a Warrant to Search and Seize signed by FBI Special Agent Randy Larkin; Attachment A, the property to be searched; and Attachment B, the particular things to be seized)  Attachments A and B required the same information for the same time frame as the second warrant, except it was directed to Verizon. (Id.)

[26]    The fourth federal warrant was issued May 31, 2023, and was directed to the District of New Jersey.  (Exhibit R, Search and Seizure Warrant signed May 31, 2023, by Judge Clare Hochhalter; Affidavit in Support of an Application Under Rule 41 for a Warrant to Search and Seize signed by FBI Special Agent Randy Larkin; Attachment A, the property to be searched; and Attachment B, the particular things to be seized)  Attachments A and B required the same information for the same time frame as the second and third warrants, except it was directed to T-Mobile.  (Id.)

[27]    The fifth federal warrant was issued June 2, 2023, and was directed to the District of Oregon.  (Exhibit S, Search and Seizure Warrant signed June 2, 2023, by Judge Clare Hochhalter; Affidavit in Support of an Application Under Rule 41 for a Warrant to Search and Seize signed by FBI Special Agent Randy Larkin; Attachment A,  Property to be Searched; and

Attachment B, Property to be Seized)   The property to be searched was the Defendant's rental home in Astoria, Oregon and the items to be seized were numerous.  (Id.)

[28]    The "Probable Cause" portion of all five of Special Agent Larkin's Affidavits contained almost the same word-for-word information concerning the investigation as did FBI Special Agent Daniel Lewis' Affidavit in support of the federal Complaint in this case.  (Exhibit T, Affidavit of FBI Special Agent Daniel Lewis in support of Complaint, dated May 25, 2023)  The agents' Affidavits have different information than is contained in the state law enforcement narratives and vary significantly from Detective Dickerson's and Detective Bernier's  three Affidavits in Support of Search Warrant.  The fifth warrant contains a great deal more information in the "Probable Cause" section, and includes information garnered in subsequent law enforcement investigations conducted as a result of the items illegally obtained from the Defendant's vehicle when it was parked by the section line road and the fruits thereof.

[29]    All evidence gathered in this case, both from state and federal agencies, must be suppressed.  The evidence was gained directly and from the fruits of an illegal, warrantless break-in and search of the Defendant's vehicle and sworn Affidavits in support of search warrants containing the evidence from the illegal break-in, search and seizure of the vehicle, as well as false information and highly misleading details of the search and seizure so as to make it sound like legitimate police actions.

## LEGAL ARGUMENT

### I.  Law enforcement illegally broke into the Defendant's vehicle and illegally searched the vehicle.

[30]    The Fourth Amendment protects against unreasonable searches and dictates that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable

14

searches and seizures, shall not be violated."  U.S. Const. Amend. IV.  "The basic purpose of this Amendment, as recognized in countless decisions of [the Supreme] Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." Camara v. Mun. Ct. of City and Cnty. of San Francisco, 387 U.S. 523, 528 (1967).  "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment —subject only to a few specifically established and well-delineated exceptions."  Katz v. U.S., 389 U.S. 347, 357 (1967).  "The government bears the burden of demonstrating that an exception to the warrant requirement applies."  U.S. v. Loines, 56 F.4th 1099, 1105 (6th Cir. 2023) (citing United States v. Jeffers, 342 U.S. 48, 51(1951)).

[31]     "The interior of a vehicle is a constitutionally protected area, into which a government official is not permitted to intrude without probable cause."  Loines, 56 F.4th 1099 at 1106. "While the interior of an automobile is not subject to the same expectations of privacy that exist with respect to one's home, a car's interior as a whole is nonetheless subject to Fourth Amendment protection from unreasonable intrusions by the police."   New York v. Class, 475 U.S. 106, 114–15 (1986).  "It is beyond dispute that a vehicle is an 'effect' as that term is used in the [Fourth] Amendment."  U.S. v. Jones, 565 U.S. 400, 404 (2012).  If law enforcement search and find evidence within a vehicle without obtaining a warrant, "[a]ccordingly, for the search to be reasonable, an exception to the warrant requirement must apply."  Loines, 56 F.4th 1099 at 1106.

[32]     Some exceptions to the warrant requirement include exigent circumstances, plain view, probable cause, search incident to arrest, consent, and inventory search.  None of those apply in this situation.  There were no exigent circumstances in this case. Exigent circumstances apply

"when 'the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable.' " Lange v. California, 141 S. Ct. 2011, 2017 (2021) (citing Kentucky v. King, 563 U.S.452, 460 (2011)).  Law enforcement may " 'enter a home without a warrant to render emergency assistance to an injured occupant[,] to protect an occupant from imminent injury,' or ensure his own safety." Id. (citing Brigham City v. Stuart, 547 U.S. 398, 403 (2006).  Officers may "make a warrantless entry to 'prevent the imminent destruction of evidence' or to 'prevent a suspect's escape." Id. (quoting Brigham City, 547 U.S. 398, 403).

[33]    In the present case, there was no compelling reason for a warrantless search of the Defendant's vehicle.  No one was in the Honda Element stuck in the mud on the section line.  Thus, no one was injured, in peril, or trying to escape.  There was no threat that evidence would be destroyed, as the vehicle was locked and officers did not see anything illegal when they looked in the windows.  They saw men's clothing and boots in a vehicle that was stuck in the mud beside the section line, which eliminates the plain view exception, as well.  No other information was known to the officers at that time concerning the Honda.

[34]    Law enforcement did not have probable cause to search the Defendant's vehicle.  "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000).  As explained above, there was nothing illegal visible in the vehicle and no evidence or fair probability suggesting the vehicle was involved in any illegal activity.  Absolutely no physical evidence or witness accounts placed the Honda Element at the substation site.  Law enforcement's search of the vehicle was obviously not a search incident to arrest and no consent was given by the owner

or driver.  The landowner's alleged consent lacked authority and is completely irrelevant and ineffective, as is explained below.  It was also likely prompted by law enforcement.

[35]     The detectives' search of the Defendant's vehicle beside the section line was not an inventory search.  "[L]aw enforcement officers can exercise discretion when deciding whether to impound a vehicle 'so long as that discretion is exercised according to standard criteria and on the basis of **something other than suspicion of evidence of criminal activity**.' "  U.S. v. Duong, 336 F. Supp. 2d 967, 971 (D.N.D. 2004) (emphasis added) (citing Colorado v. Bertine, 479 U.S. 367, 375 (1987)).  "Some degree of 'standardized criteria' or 'established routine' must regulate such police actions, which may be conducted without the safeguards of a warrant or probable cause, to ensure that impoundments and inventory searches are not merely 'a ruse for general rummaging in order to discover incriminating evidence.' "  Id. at 971-72 (citing United States v. Petty, 367 F.3d 1009, 1012 (8th Cir.2004)).   Clearly law enforcement suspected the Honda to be connected to the crime at the power station.  They could see it from the power station, and they would not have diverted resources from the scene of the crime over to the Honda, at least a half mile away, if they did not suspect it was connected to the crime.

[36]     Per Duong, an inventory search must be on the basis of something **other than** suspicion of criminal activity.  Here, the detectives broke into and searched the Defendant's vehicle at the scene within the section line before even impounding the vehicle.  Their ruse for breaking into the Honda was that it was "abandoned" and obviously because they hoped to find something incriminating.  The Defendant's vehicle was not "abandoned" under North Dakota law.   The detectives in this case sought a tow to impound the Defendant's vehicle because of the rifle case and Bushmaster owner's manual they illegally found as a result of illegally breaking into a vehicle that had not been present on public or private property for the required 48 hours before a

governmental unit could tow the vehicle, as explained below.  Thus, the detectives' break-in and

search of the Defendant's vehicle beside the section line was not an inventory search.

> **A.  The Defendant's vehicle was not "abandoned" under North Dakota law, and law enforcement illegally broke into and searched the vehicle at the scene.**

N.D.C.C. Section 23.1-15 sets forth the definition of an abandoned motor vehicle.

> "Abandoned motor vehicle" means a **motor vehicle, as defined in section 39-01-01, that has remained for a period of more than forty-eight hours on public property illegally** or lacking parts that are essential to the mechanical functioning of the vehicle, including the motor, drive train, or wheels, **or is located on private property without consent of the person in control of the property** or in an inoperable condition such that it has no substantial potential further use consistent with its usual functions, unless it is kept in an enclosed garage or storage building. It also means a motor vehicle voluntarily surrendered by its owner to a permitted scrap iron processor. An antique automobile, as defined in section 39-04-10.4, and other motor vehicles to include parts car and special interest vehicles, may not be considered an abandoned motor vehicle within the meaning of this chapter.

N.D.C.C. § 23.1-15-01(1) (emphasis added).  N.D.CC. § 23.1-15 also sets forth the

circumstances under which law enforcement can take into custody and impound an abandoned

motor vehicle.

> Units of government may take into custody and impound or request and authorize commercial towing service to take into custody an abandoned motor vehicle. If requested by an owner, lessee, tenant, or occupant of private property, a commercial towing service may remove and take into custody an abandoned motor vehicle located on the private property.

N.D.C.C. § 23.1-15-03.

[37]   The Defendant's vehicle was not on private property.  It was on a public roadway.

N.D.C.C. Section 24-07 governs the designation of section lines.

> Section lines considered public roads open for public travel - Closing same under certain conditions.
> In all townships in this state, outside the limits of incorporated cities, and outside platted townsites, additions, or subdivisions recorded pursuant to sections 40-50.1-01 through 40-50.1-17 or recorded prior to July 1, 1987, under former chapter 40-50, the **congressional section lines are considered public roads**

**open for public travel to the width of thirty-three feet [10.06 meters] on each side of the section lines**.

N.D.C.C. § 24-07-03 (emphasis added).

[38]    In this case, law enforcement's photograph shows the Defendant's vehicle was about 15 feet off the section line.  Per N.D.C.C. § § 24-07-03,  33 feet on either side of the section line is considered a public road open for public travel.  The Defendant's Honda Element was on a public road and not on private property, as it was within 33 feet of the section line.  The unnamed landowner who allegedly gave "permission" to search the vehicle had no authority to do so, even if the Honda had been on his field.  N.D.C.C. § 23.1-15-01(1) dictates that "a vehicle that has remained for a period of more than forty-eight hours on public property illegally . . .  or is located on private property without consent of the person in control of the property" is considered "abandoned."  The landowner indicated that the vehicle was not there prior to the rain storm that morning, May 13th.  Thus, the Defendant's Honda Element was not "abandoned" under North Dakota law.    Furthermore, law enforcement was clearly suspecting the Honda to be connected to the crime and so it is irrelevant whether it was abandoned or whether it sat for 48 , per Duong  analysis, supra.

[39]    Even if, arguendo, the Defendant's vehicle had been parked on the landowner's property, there is no provision in North Dakota law allowing the landowner to give law enforcement or anyone else permission to break into a vehicle on his property.  N.D.C.C. § 23.1-15-01(1) still requires a 48-hour waiting period before a motor vehicle on private property can be considered "abandoned" and taken into custody by a unit of government via a towing service pursuant to N.D.C.C. § 23.1-15-03.  There is no provision authorizing a search of an abandoned vehicle in N.D.C.C. § 23.1-15 under the circumstances of this case.

**B.   The Defendant's vehicle was not "abandoned" under federal law, and law enforcement illegally broke into and searched the vehicle at the scene.**

[40]     As referenced above in <u>Loines</u>, the interior of an automobile is a constitutionally protected area, safeguarded by the Fourth Amendment, and the government must demonstrate that an exception to the warrant requirement applies.  None of the exceptions to the warrant requirement apply in this case, as explained above, including abandonment.

[41]     The issue of abandonment " 'is not abandonment in the strict property right sense, but rather, whether the defendant in leaving the property has relinquished her reasonable expectation of privacy so that the search and seizure is valid." <u>U.S. v. Tugwell</u>, 125 F.3d 600, 602 (8th Cir. 1997) (citing <u>United States v. Hoey</u>, 983 F.2d 890, 892-93 (8th Cir.1993)).  "Whether an abandonment has occurred is determined on the basis of the objective facts available to the investigating officers, not on the basis of the owner's subjective intent." <u>Id</u>.  "In determining whether property has been abandoned the Court must look at the totality of the circumstances and consider the following factors: (1) whether the suspect denied ownership of the property; and (2) whether he or she physically relinquished the property." <u>U.S. v. Duong</u>, 336 F. Supp. 2d 967, 971–75 (D.N.D. 2004) (citing <u>United States v. Caballero–Chavez, 260 F.3d 863, 866–67 (8th Cir.2001))</u>.

[42]     <u>U.S. v. Smith</u>, 648 F.3d 654, (8th Cir. 2011) lists several examples of "abandonment" of a vehicle.  In <u>Smith</u>, the Court ruled that Smith abandoned his vehicle in a fast food drive-through lane when he fled from police on foot.  <u>Id</u>. at 660.  <u>Smith</u> mentions a similar case, <u>United States v. Walton</u>, 538 F.2d 1348, 1351 (8th Cir.1976), in which the defendant abandoned his vehicle when he fled police on foot, leaving his vehicle parked on the street, unlocked and with the windows rolled down.  <u>U.S. v. Smith</u>, 648 F.3d 654 at 660.  The other case examples of

vehicle abandonment in <u>Smith</u> likewise note defendants who leave their vehicles running on public roads or highways and flee police.  <u>Id</u>.

[43]    By contrast, in the present case the Defendant did not leave his vehicle to flee from police on foot.  Nor did he leave the vehicle with windows down, unlocked, and running.  At the time law enforcement deemed the Defendant's vehicle as "abandoned," the following was known to police:

- The vehicle was by a section line/prairie trail that bordered two fields. On maps, the section line/prairie trail showed 63rd St NW.
- The vehicle was obviously stuck approximately 15 feet off the section line.
- The vehicle was not occupied.
- Cpl. Tougas saw male clothing items were inside, namely large shoes/boots that appeared to be for hiking.
- The vehicle had an Oregon license plate
- Sgt. Roberts observed floor mats under the front tires in what appeared to be an attempt by the driver to get the Honda unstuck.
- The landowner of the field adjacent to the section line road said the vehicle was not there was not on their property prior to the rainstorm that morning.
- The vehicle was locked.

[44]    The above facts, known to law enforcement before they illegally broke into the Defendant's vehicle by breaking the driver's door window and confiscating several items, overwhelmingly show that the Defendant's intention was NOT to abandon his vehicle.  The Defendant did not deny ownership of the car, nor did he physically relinquish the car, pursuant to <u>Duong</u>.

[45]    According to the landowner, the vehicle had not been there very long, as it was not there earlier that morning.  A locked automobile indicates a desire to keep the contents of the car safe, secure, and private.  The mats under the front tires of the Honda show, by Sgt. Robert's own admission, that the driver had attempted to free the car from the mud unsuccessfully.  The driver's absence would indicate to a reasonable person that the driver had gone to get help to get

his car out of the mud.  Most importantly, law enforcement viewed nothing of an incriminating

or suspicious nature through the windows before breaking the driver's door window.  Based on

the objective facts known to law enforcement at the time of their determination of

"abandonment," the Defendant's vehicle was not abandoned.

### II.  The Exclusionary Rule applies to suppress all of the evidence in this case because law enforcement obtained the evidence from an initial illegal, unreasonable search and seizure of the Defendant's vehicle, in violation of the Fourth Amendment, and no exceptions apply.

[46]     "The Fourth Amendment protects '[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures,' but 'contains no

provision expressly precluding the use of evidence obtained in violation of its commands.' "

Herring v. U.S., 555 U.S. 135, 139 (2009) (quoting Arizona v. Evans, 514 U.S. 1, 10 (1995)).

"Nonetheless, our decisions establish an exclusionary rule that, when applicable, forbids the use

of improperly obtained evidence at trial."  Id.  "We have stated that this judicially created rule is

'designed to safeguard Fourth Amendment rights generally through its deterrent effect.' "  Id. at

139-140 (quoting U.S. v. Calandra, 414 U.S. 338, 348 (1974).  "In analyzing the applicability of

the rule, Leon admonished that we must consider the actions of all the police officers involved."

Id. at 140.  " 'It is necessary to consider the objective reasonableness, not only of the officers

who eventually executed a warrant, but also of the officers who originally obtained it or who

provided information material to the probable-cause determination.' "  Id. (quoting U.S. v. Leon,

468 U.S. 897, 923, n. 24 (1984)).

[47]      "The extent to which the exclusionary rule is justified by these deterrence principles

varies with the culpability of the law enforcement conduct."  Id. at 143.  "[E]vidence should be

suppressed 'only if it can be said that the law enforcement officer had knowledge, or may

properly be charged with knowledge, that the search was unconstitutional under the Fourth

Amendment.' " <u>Id</u>. (quoting <u>United States v. Peltier</u>, 422 U.S. 531, 542 (1975)).  "As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." <u>Id</u>. at 144.

[48]     The exclusionary rule "prohibits introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search." <u>Murray v. U.S.</u>, 487 U.S. 533, 536 (1988) (internal citations omitted).  "[T]he exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes "so attenuated as to dissipate the taint." <u>Id</u>. at 536-37 (citing <u>Nardone v. United States</u>, 308 U.S. 338, 341, (1939)).  "This results when the Government shows that the evidence was acquired through an independent, untainted, source." <u>Id</u>. (citing <u>Wong Sun v. United States</u>, 371 U.S. 471, 487, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).

[49]     "In applying the exclusionary rule, '[t]he sufficiency of a warrant affidavit which contains information from an unlawful search is evaluated after deleting that information.' " <u>U.S. v. Finley</u>, 155 F. Supp. 3d 962, 970 (D. Neb. 2015) (quoting <u>U.S, v. Davis</u>, 760 F.3d 901, 903 (8th Cir. 2014)).

> When faced with a warrant containing information obtained pursuant to an illegal search, a reviewing court must excise the offending information and evaluate whether what remains is sufficient to establish probable cause. <u>United States v. Dessesaure</u>, 429 F.3d 359, 367 (1st Cir.2005). If an affidavit in support of a search warrant "sets forth sufficient facts to lead a prudent person to believe that there is a 'fair probability that contraband or evidence of a crime will be found in a particular place,'" probable cause exists and a warrant may issue. <u>United States v. Warford</u>, 439 F.3d 836, 841 (8th Cir.2006) (quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

<u>Id</u>.

[50]    In this case, the facts and circumstances surrounding the illegal search of the Defendant's vehicle, as well as the law enforcement affidavits in support of the search warrants depicts the "deliberate, reckless, [and] grossly negligent conduct" from <u>Herring</u>.  First, key statements in Detective Dickerson's sworn Affidavit (Exhibit ) are plainly untrue and have wording which disguises the illegal actions of law enforcement.  The property owners in no. 3 and no. 6 of the detective's Affidavit are made to look as though the only property owners are the power substation owners, BEPC, MWEC, and their employees in charge of the substation.  The term "property owners" in no. 6 should have been specified as the landowner who owned the field next to the section line road, not the property owners of the substation.  None of law enforcement's reports state that the vehicle was "on the property where the shooting occurred" as both of Det. Dickerson's Affidavits state in no. 5, Det. Bernier's Affidavit states in nos. 4 and 10.  All reports state and law enforcement photographs show that the vehicle was beside a section line road in a field that was 1/2 to 3/4 of a mile off of 121st Ave. NW, **not** on the property of the power substation.  None of law enforcement's reports state that the "property owners notified law enforcement" as sworn to in no. 6.  Det. Dickerson's narrative states that "Det. Bernier contacted the landowner and advised him of the vehicle. The landowner gave permission to law enforcement to be on his property to investigate the abandoned vehicle."  (Exhibit D, Dickerson Narrative, p. 8)

[51]    In no. 9 of Det. Dickerson's sworn Affidavit, she states that "law enforcement checked inside the vehicle," finding the items listed above.  This is a willful misstatement of the facts.  Det. Dickerson, Det. Bernier, Sgt. Roberts, and Cpl. Tougas went to investigate the Honda Element.  Law enforcement "checked" the vehicle when they peered into the locked vehicle through the windows, seeing men's clothing and boots.  The alleged incriminating items were

found only <u>after Cpl. Tougas literally broke into the vehicle by breaking the driver's door window</u>, shattering glass into the vehicle.  Detectives Dickerson and Bernier then searched the vehicle and used the items they found to track down the defendant.  Only then did  law enforcement call a tow truck to put the vehicle into storage so a search warrant could be obtained for the vehicle they had already illegally broken into and searched.

[52]     The judge reading the sworn statements in Det. Dickerson's Affidavit was led to take as fact that the power substation owners reported damage to the substation; that a vehicle, which appeared to be abandoned, was on the substation property where the shooting damage occurred; that the power substation owners told law enforcement the vehicle was suspicious and should not have been on the property; that the vehicle was not on the property prior to the rainstorm that morning; and that law enforcement "checked" and "observed" items connecting the vehicle and its driver to the substation damage.  The detectives' deliberate false statements and disingenuous description of the break in of the vehicle were designed to mislead the judge from facts that would have given her pause in granting the search warrant, which is further explained in the Defendant's request for a <u>Franks</u> hearing below.

[53]     If the detectives and other officers were not trying to create a subterfuge, running afoul of the Fourth Amendment, why deliberately swear to the false statement that the vehicle was located on the property where the shooting occurred?  Why not state the truth, that the vehicle was located a half mile or more away from the substation property within a section line road?  Why swear to the blatantly misleading statement that officers "checked" and "observed" evidence tying the Defendant to the substation damage in the vehicle?  Why not state the truth instead, that law enforcement observed men's clothing and boots through the window and then broke the driver's door window to search the vehicle, finding the alleged incriminating items?

The likely answer to each question is the same, to whitewash the whole situation, so as not to arouse suspicion and assure the judge's signature on the warrants.

[54]     Under a <u>Finley</u> analysis, the information from law enforcement's unlawful search and seizure of the Defendant's vehicle would be excluded Detectives Dickerson and Bernier's three Affidavits in Support of Search Warrant would contain no probable cause to issue warrants under any of the three warrants.  Detective Dickerson's first Affidavit in support for the first search of Microtel room 123, dated May 13, 2023, would contain numbers 1-4; 5, with the deletion of "which appeared to be abandoned"; and 8 left after excising the offending information.  The Affidavit with that remaining information would not have established probable cause to search the hotel room.  The fruits of that search are suppressible for a second reason.  Detectives Dickerson and Bernier searched Microtel room 123 <u>an hour before the judge signed the warrant</u>. Likewise for the second warrant, Detective Bernier's Affidavit in support of a warrant to search the Defendant's vehicle dated May 13, 2023.  No. 1 of his Affidavit contains items illegally seized when he and Det. Dickerson illegally searched Microtel room 123 an hour before the judge signed the warrant.  His sworn Affidavit would contain numbers 2-3; and 4, with the deletion of "which appeared to be abandoned."  The remaining information on the Affidavit would not provide probable cause to search the Defendant's vehicle.  The last paragraph of Det. Berinier's Affidavit seeks a warrant to search the Honda, located at the power station site.

> 10. That law enforcement is seeking a warrant to search the Grey in color, Honda CRV bearing Oregon Plate #273 LXW, located on the property of the Ray power station, in Ray, Williams County, ND, for the following:  450 Bushmaster Rifle; ammunition for the 450 Bushmaster Rifle; DNA evidence; electronic devices that can depict GPS locations and devices with the ability to sync data to the vehicle; ID cards, spray paint, documents, and correspondence.

(Exhibit C at No. 10)  The Honda was not located on "the property of the Ray power station" and Det. Bernier could not have believed that to be a truthful statement, as he was present for the investigation of the Honda as it sat within the section line as explained above.  The Honda was an Element and not a CRV.  Furthermore, no. 7 of his Affidavit stated that the Honda had already been searched, so there was no need to even apply for the warrant.  Reading Det. Bernier's Affidavit as a whole, it is evident that he was applying to obtain a search warrant for the Honda based upon the items he and Det. Dickerson found in the Honda when they illegally searched it after Cpl. Tougas illegally broke the window to gain entry.  It is absurd to illegally search a vehicle and then apply for a search warrant to attempt to legitimately search the same vehicle based upon the fruits of the first illegal search.    The fact that they stopped the first search after finding some items so that they could get a warrant proves that they knew that they did not have legal access to begin with, otherwise, why would they stop the search?

[55]    The third Affidavit by Detective Dickerson dated May 15, 2023, has similar problems to the first two.  After excising the illegally obtained information garnered from illegal searches, seizures and the fruits thereof, the Affidavit would be left with numbers 1-4, and 17.  Like the other two Affidavits, the remaining information on the Affidavit would not provide probable cause to search any of the items the detective requested in number 21 of the Affidavit.

[56]    The initial search warrant for Microtel room 123, based on Det. Dickerson's Affidavit, was fully executed from 5:40-6:10 P.M., 21 minutes before Judge Sjue even signed the warrant at 6:31 P.M.  Such an obviously premature search is more proof of deliberate, reckless, and grossly negligent conduct on the part of law enforcement, specifically Detectives Bernier and Dickerson who conducted the search.

[57]    Earlier on May 13th, the illegal search of the Defendant's Honda Element within the

section line road was likewise deliberate, reckless, and grossly negligent.  Law enforcement

declared the vehicle "abandoned," apparently as an excuse to break into the Honda and search it

since they could think of no legal reason to gain access.  However, a reasonable officer would

know or have direct access to statutes concerning vehicle abandonment.  The North Dakota

Century Code has a whole chapter, Section 23.1-15, literally called "Abandoned Motor

Vehicles," which details the definition of an abandoned motor vehicle and when law

enforcement can remove such a vehicle.  The vehicle, whether it was on a public roadway or on

private property, can be towed by law enforcement after 48 hours.  Det. Bernier's sworn

Affidavit states that the "property owners also explained to law enforcement the vehicle was not

on their property prior to the rainstorm this morning."  Midmorning on Monday, May 15, 2023,

would have been a reasonable and safe tolling of the 48 hours the Honda Element had been

beside the section line road.

[58]    Just as with Detectives Dickerson and Bernier's premature execution of the first search

warrant of Microtel room 123, law enforcement prematurely broke into, searched, and seized the

Defendant's Honda Element on May 13, 2023, at some point between 2:03 P.M. and 3:14 P.M.,

pursuant to the Log entries and law enforcement narratives.  As is explained in detail in section

A. 1. below, law enforcement has a duty to know the laws they are to uphold.  Unbelievably,

none of the four officers who spent at least an hour and 15 minutes with the Honda Element by

the section line had any idea of what North Dakota law dictated about abandoned vehicles or

how much of the section line is considered public roadway.  Nor did any of them look up the

specifics of the code chapter labeled "Abandoned Vehicles" or recall what they may have told

people they arrested after traffic stops about how long their vehicles could remain on the roadside.

[59]    The deliberate, reckless, grossly negligent, and illegal actions of law enforcement in breaking into the Honda Element led directly to all the evidence gathered in this case.  But for the illegal entry into the Honda Element on the afternoon of May 13, 2023, law enforcement would not have viewed the Defendant's name, date of birth, or the gun case, Bushmaster rifle owner's manual, or .450 Bushmaster ammunition they allege ties the defendant to the damage at the substation.  But for the illegal seizure and towing of the Honda Element out on the section line road, law enforcement would not have obtained any information from the tow truck driver about picking up a person from the Honda out on the section line, the bags he was carrying, where he was staying, his name, or his telephone number. With none of that information available, state law enforcement would not have obtained any of the warrants they executed; would not have examined video from businesses around Microtel in Williston; and would not have recovered items from the dumpster.

[60]    But for all the evidence illegally obtained pursuant to the initial illegal search of the Honda Element and its illegal, premature seizure, and the fruits of those illegal search and seizure, federal authorities would not have any evidence with which to charge the Defendant. Nor would federal authorities have any evidence with which to apply for and receive the search warrants it produced and evidence derived therefrom.  Essentially this case would not exist.

[61]    In Mapp v. Ohio, 367 U.S. 643 (1961), one of the modern seminal cases applying the exclusionary rule and extending it to the states, officers forced open the door of the defendant's house after she would not allow entry without a search warrant.  Id. at 644.  Officers then forced open the door and would not allow the defendant's attorney entry or to see the defendant.  Id.

Officers then produced a paper they claimed was a warrant, but was not, and searched the home, finding "obscene" material.  Id. at 644-645.  The Court in ruling that the exclusionary rule would henceforth apply to the states, as well as the federal court system, reversed the Ohio Supreme Court's upholding of Mapp's conviction and stated that "[o]ur decision, founded on reason and truth, gives to the individual no more than that which the Constitution guarantees him, to the police officer no less than that to which honest law enforcement is entitled, and, to the courts, that judicial integrity so necessary in the true administration of justice."  Id. at 660.

[62]    The flagrant Constitutional violations of the officers in Mapp pale in comparison to those in this case.  As explained above, not only did law enforcement illegally break in to the Defendant's locked vehicle without probable cause by way of the ploy that it was "abandoned," they repeatedly made false and deliberately misleading statements in their sworn affidavits in order to guarantee the judges would grant the search warrants leading to most of the evidence in this case.  The flagrant falsehoods in the detectives' affidavits stating that the defendant's vehicle was located on power station property, that they "checked" the vehicle, and that the ill-gotten evidence they found after illegally breaking into the vehicle provided probable cause to obtain a search warrant for the vehicle is far worse conduct than the officers in Mapp waving around a fake search warrant and searching her home.   Suppression of all the evidence all the evidence  in this case is required in this case and would "serve[ ] to deter [the] deliberate, reckless, or grossly negligent conduct" exhibited by law enforcement, pursuant to Herring above.

### A.   None of the exceptions to the exclusionary rule apply in this case.

[63]    "There are three general exceptions to the exclusionary rule."  U.S. v. Garreau, 735 F. Supp. 2d 1155, 1165 (D.S.D. 2010), aff'd, 658 F.3d 854 (8th Cir. 2011).  "[T]he 'attenuated connection' exception, applies when the chain between the challenged evidence and the primary

taint of illegality is so long or only linked by sophisticated argument such that exclusion is not warranted." Id. (citation omitted). "Second, the 'independent source' exception makes the evidence admissible if the Government can show that it derived the evidence from a lawful source independent of the illegal conduct creating the primary taint." Id. (citation omitted). "Third, the 'inevitable discovery' exception applies when the Government can establish that the challenged evidence would have been inevitably discovered without reference to the illegal conduct creating the primary taint." Id. (citation omitted).

[64]      Another exception to the warrant requirement is the "good faith" exception.  In U.S. v. Leon, 468 U.S. 897 (1984), the Court recognized this "good faith" exception to the exclusionary rule for "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," reasoning that "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations."  Id. at 920-21.

> As we observed in Michigan v. Tucker, 417 U.S. 433, 447, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182 (1974), and reiterated in United States v. Peltier, 422 U.S., at 539, 95 S.Ct., at 2318:
>
> > "The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. **By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused**. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force."
>
> The Peltier Court continued, id., at 542, 95 S.Ct., at 2320:
>
> > "If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer

> had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."

Leon, 468 U.S. 897, 919 (emphasis added).

[65]    Later, the Court extended the good faith rule to searches not involving defective search warrant issues.  "[W]e extended these holdings to warrantless administrative searches performed in good-faith reliance on a statute later declared unconstitutional."  Herring, 555 U.S. 135, 142 (citing Illinois v. Krull, 480 U.S. 340, 349-350).  "[W]e applied this good-faith rule to police who reasonably relied on mistaken information in a court's database that an arrest warrant was outstanding."  Id. (citing Arizona v. Evans, 514 U.S. 1 (1995)).  Heien v. North Carolina, 574 U.S. 54 (2014) applied the good faith rule to an officer's reasonable mistake of law concerning an unclear and confusing state statute concerning tail light requirements, as officers "must make factual assessments on the fly" when suddenly faced with "a situation in the field."  Heien at 54 and 66.

### 1.  The good faith exception to the exclusionary rule does not apply in this case.

[66]    "As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence."  Herring at 144.  "We have already held that 'our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.' "  Id. at 145 (citing Leon, 468 U.S. at 922).

[67]    " '[O]fficers have an obligation to understand the laws that they are entrusted with enforcing, at least to a level that is objectively reasonable.' "  U.S. v. Forjan, 66 F.4th 739, 746 (8th Cir. 2023) (quoting U.S. v. Washington, 455 F.3d 824, 827 (8th Cir. 2006)).  Any mistake of

law that results in a search or seizure, therefore, must be *objectively* reasonable to avoid running

afoul of the Fourth Amendment." U.S. v. Rodriguez-Lopez, 444 F.3d 1020, 1022 (8th Cir. 2006)

(emphasis in the original) (quoting U.S. v. Martin, 411 F,3d 998, 1001 (8th Cir. 2005))

(abrogated on other grounds by Webster v. Westlake, 41 F.4d 1004 (8th Cir. 2022)).

[68]     Law enforcement in this case cannot claim that they in "good faith" thought the Honda

Element was abandoned under North Dakota law, nor can they claim that they did not know they

needed a warrant prior to breaking into the Honda that they suspected was connected to the crime

at the power station.  Unlike Heien in which the North Carolina statute concerning tail light

requirements was unclear and confusing, North Dakota statues concerning abandoned vehicles

on public roads and private property are clear and concise.  A vehicle is abandoned if it remains

on public or private property for more than 48 hours illegally and a government unit can

impound and/or have the abandoned vehicle towed after that 48-hour period.  A section line and

33 feet on each side of the line is a public road open for public travel.  Williams County is not an

urban sprawl.  Much of the county is farmland or pasture land with many miles of section lines.

The law enforcement officials in this case cannot claim that they have no idea about which roads

are public and which are not.  Nor can they claim they have no idea when and how a vehicle is

considered abandoned and can be towed or that they could not quickly access the applicable

statutes.

[69]     Unlike Heien, the officers in this case were not making split second decisions about

whether to stop a vehicle because it passed by with only one tail light illuminated.  As explained

above, law enforcement in this case had time to ascertain whether the Defendant's vehicle was

"abandoned," although it is very difficult to believe that the officers had no experience with

abandoned vehicles.  Per the Log entries and narratives, Detective Dickerson, Det. Bernier, Sgt.

33

Roberts, and Cpl. Tougas were on the section line road with the Honda Element for over an hour. Even if the above-named officers did not know North Dakota law concerning abandoned vehicles, they had ample time to look it up in the code while Det. Bernier contacted the landowner of the field.  Better yet, they had ample time to <u>try</u> to get a warrant to search the Honda.  Law enforcement vehicles are equipped with laptops mounted right to the dash and most officers have cell phones.  Certainly, a quick search would have provided officers with the statutes needed for this instance.  Such inquiry would satisfy an officer's "obligation to understand the laws that they are entrusted with enforcing," pursuant to <u>Forjan</u>.  Furthermore, there was no rush, as the vehicle was stuck for the time being and there was no eminent threat.

[70]    As in <u>Herring</u>, a "reasonably well trained officer would have known that the search of the Defendant's vehicle was illegal in light of all of the circumstances."  This is especially apparent in light of the detectives' decision to get a warrant to search a vehicle that that law enforcement had already illegally broken into and searched.  Regardless of whether the Defendant's vehicle was located on public or private property, the vehicle had to remain on the property for 48 hours before it could be considered "abandoned" and towed away.

[71]    Law enforcement conduct in this case was "deliberate, reckless, [and] grossly negligent" pursuant to <u>Herring</u>.  Law enforcement's "mistakes" of law were blatant and unreasonable under <u>Rodriguez-Lopez</u>, and their actions pursuant to those mistakes absolutely ran afoul of the Fourth Amendment.  Det. Dickerson's and Det. Bernier's three Affidavits in support of the search warrants for Microtel room 123 and the Defendant's vehicle provide additional proof of this.  As explained above, the detectives' sworn statements declare that the vehicle "was located on the property where the shooting occurred" and they "checked" and "observed" inside the Defendant's vehicle and found evidence tying him to the substation damage.  If the detectives

34

and other officers were not running afoul of the Fourth Amendment, why deliberately swear to the false statement that the vehicle was located on the property where the shooting occurred? Why not state the truth, that the vehicle was located a half mile or more away from the substation property beside a section line road?  Why swear to the blatantly misleading statement that officers "checked" and "observed" evidence tying the Defendant to the substation damage in the vehicle?  Why not state the truth instead, that law enforcement observed men's clothing and boots through the window and then broke the driver's door window to search the vehicle, finding the alleged incriminating items?  The likely answer to each question is the same, to whitewash the whole situation, so as not to arouse suspicion and assure the judge's signature on the warrants.

[72]     The original good faith exception which applies to law enforcement acting with objective good faith from a judge's error, rather than his own, is inapplicable to this case, and actually works in reverse.  Here, it was not the magistrate's error that contributed to the Fourth Amendment violations under <u>Leon</u>, but the detectives' willful errors that contributed to the violations, as explained above.  This is just the egregious law enforcement behavior <u>Leon</u> and <u>Peltier</u> aim to exclude "[b]y refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused."  <u>Leon</u>, 468 U.S. 897, 919.

### 2. The attenuated connection exception to the exclusionary rule does not apply in this case.

[73]     "Under the "attenuated connection doctrine," the challenged evidence is admissible if the causal connection between the constitutional violation and the discovery of the evidence is so attenuated as to rid the taint."  <u>U.S. v. Reinholz</u>, 245 F.3d 765, 779 (8th Cir. 2001) (citation omitted).

The notion of the 'dissipation of the taint' attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost. Application of the Wong Sun doctrine will generate fact-specific cases bearing distinct differences as well as similarities, and the question of attenuation inevitably is largely a matter of degree.

Brown v. Illinois, 422 U.S. 590, 609 (1975).

We use a three-part test to determine whether the attenuation doctrine applies. "First, we look to the temporal proximity between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. Second, we consider the presence of intervening circumstances. Third, and particularly significant, we examine the purpose and flagrancy of the official misconduct."

U.S. v. Lowry, 935 F.3d 638, 642–43 (8th Cir. 2019) (quoting Utah v. Strieff, 579 U.S. 232

(2016) (citation omitted).

[74]    Applying the three-prong test to this case, the attenuation doctrine does not apply.  First,

the temporal proximity between the multiple instances of unconstitutional conduct and the

discovery of the evidence was close in time.  The first instance of unconstitutional conduct was

law enforcement breaking of the Defendant's driver's door window without legal authority of

any kind to do so, as explained above.  The second instance was the illegal search of the Honda

Element after breaking the driver's door window.  Next was the illegal seizure and towing of the

vehicle, as it had not been been illegally parked on public or private property for more than 48

hours. After that was the detectives' blatantly false and grossly misleading statements in their

sworn Affidavits in support of the three search warrants.  Then law enforcement entered and

fully searched Microtel room 123 before the judge had even signed the warrant.   Next, law

enforcement searched Microtel room 123 a second time and the Honda Element, then located in

police storage, a second time, pursuant to two warrants based on Detectives Hendrick's and

Bernier's Affidavits in which they made false and highly misleading statements.  Had the

detectives put the actual facts into their warrants, it is unlikely they would have been granted in the first place.

[75]    Each instance of illegal law enforcement action led directly and cumulatively to the discovery of evidence within a short time.  The illegal break-in and search of the Honda Element led directly to the Defendant's identifying information and ammunition found in the vehicle which police allege tie the Defendant to the substation damage.  The illegal seizure of the vehicle led to the information from Richard of UR Next Towing that he had given a male a ride from the area of the substation and section line a ride to Microtel with some bags.  The tow driver's information combined with the information from the Honda break-in led within a few hours to law enforcement swarming the Microtel, obtaining a warrant for room 123, and gathering surveillance video from Microtel, and later, other nearby businesses.  All three state warrants, based upon false and highly misleading statements, led to more evidence being recovered from room 123 and the Honda Element, not to mention the judge did not issue the first warrant until after law enforcement searched the room.  The accumulation of all of these illegal actions by law enforcement led directly to law enforcement viewing business surveillance tapes and searching the dumpster at the apartment complex the next morning.  The bags and evidence in the dumpster allegedly tied the Defendant to the substation damage via the aforementioned illegal actions by law enforcement.

[76]    The accumulative illegality as described above then led federal authorities to obtain warrants to search within the electronic devices found in all the other illegal searches and seizures and obtain information on the Defendant's rental home in Oregon, for which federal agents obtained a warrant, as well.

[77]     The second prong of <u>Lowry</u> addresses intervening circumstances.  Unlike <u>Lowry</u> and <u>Strieff</u>, there were no intervening circumstances here.  In <u>Strieff</u>, the Court ruled that although the officer lacked reasonable suspicion to stop the defendant, the intervening circumstance that there was a prior, valid warrant for the defendant's arrest, for which the officer had to make the arrest, and the evidence procured in the initial illegal stop could not be suppressed.  <u>Lowry</u> at 644 (quoting <u>Strieff</u> at 2059-63).  In <u>Lowry</u>, similar to <u>Strieff</u>, the officer's stop of the defendant was illegal, but the officer found illegal items in a search incident to arrest after he was informed the defendant had an outstanding warrant, again the intervening factor, and was a felon.  No such intervening factors are present in this case.  If any intervening circumstances occurred here, it was the intervening circumstances of the law enforcement officers' further instances of unlawful behavior, as detailed directly above, **after** the initial illegal break-in to the Honda Element.

[78]     As for <u>Lowry</u>'s third prong, the purpose and flagrancy of the official misconduct, that issue has been thoroughly discussed in detail in the above sections and will not be repeated yet again.  In sum, the details of the multiple, consecutive illegal searches, seizures, and outright false statements and flagrantly whitewashed versions of events on detectives' sworn Affidavits analyzed above, show the egregious behavior of law enforcement in this case.  Thus, application of the three prongs of <u>Lowry</u> weigh heavily in the favor of the Defendant.

### 3.  The independent source exception to the exclusionary rule does not apply in this case.

[79]     "The 'independent source' doctrine permits the introduction of evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from lawful activities untainted by the initial illegality."  <u>Murray v. U.S.</u>, 487 U.S. 533, 533–34 (1988) (citation omitted).

> Our cases have used the concept of "independent source" in a more general and a more specific sense. The more general sense identifies *all* evidence acquired in a fashion untainted by the illegal evidence-gathering activity. Thus, where an unlawful entry has given investigators knowledge of facts *x* and *y,* but fact *z* has been learned by other means, fact *z* can be said to be admissible because derived from an "independent source."

Id. at 537-38.  "To prevail under the independent source doctrine, the government must show that: (1) law enforcement would have sought a warrant to seize the evidence even if the unlawful search never occurred, and (2) probable cause supported the warrant after excluding all information obtained by the unlawful search."  U.S. v. Green, 39 F.4th 510, 513 (8th Cir. 2022) (citation omitted).

[80]    The two step analysis as applied to this case will not preclude suppression of the evidence in this case.  As to step one, the government cannot claim that law enforcement would have sought a warrant to seize the evidence in Honda Element as it sat within the section line road, because they **did not**.  A locked Honda Element with Oregon plates and men's clothing and boots in view through the window was not going to provide probable cause to issue a warrant.  As discussed above, law enforcement illegally broke into the Honda.  Based on what they found after illegally breaking the driver's side window and illegally searching the vehicle, law enforcement illegally seized the vehicle, had it towed.  **Then** Det. Bernier applied for a search warrant to further search the Honda Element with a sworn Affidavit containing untruths, mistakes, flagrant misstatements, and physical evidence found inside the vehicle, as described at length above, which the judge relied upon.  The government cannot hang its hat upon either step one or two of Green under these circumstances.

[81]    Likewise, step two will not avoid suppression of the evidence in this case either.  Not even withstanding the untruths, and egregious whitewashing of the officers' actions in the Affidavit, the items found in the illegal search of the vehicle would be stricken from the affidavit

and there would be no probable cause for the judge to issue the warrant.  The same applies to the other state and federal warrants that contain the identical information obtained in the illegal break-in at the section line (that would be stricken from the Affidavits), as well as the detectives' egregious errors, with each Affidavit building on the other and adding inculpatory evidence.

### 4.  The inevitable discovery exception to the exclusionary rule does not apply in this case.

[82]    Closely associated with the independent source doctrine is the inevitable discovery doctrine.  "The inevitable-discovery doctrine is based upon the concept that illegally obtained evidence that is sufficiently purged of its original taint is not subject to the exclusionary rule." U.S. v. Barth, 288 F. Supp. 2d 1021, 1030 (D.N.D. 2003) (citing United States v. Madrid, 152 F.3d 1034, 1037 (8th Cir.1998)).

> To successfully invoke the inevitable discovery doctrine, the government "must prove by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation."

U.S. v. Barth, 288 F. Supp. 2d 1021, 1030 (D.N.D. 2003) (citing United States v. Hammons, 152 F.3d 1025, 1029 (8th Cir.1998)).

[83]    The government cannot meet either of the two steps required to avoid suppression of the evidence.  There is no reasonable probability that the evidence would have been discovered by lawful means absent the police misconduct.  If there had been no police misconduct, the vehicle would have remained within the section line.  **If** the vehicle was still there on Monday morning, May 15, 2023, law enforcement may have legally declared the Honda Element abandoned and called one of the various towing services in the area.  If the vehicle was still there on Monday morning, officers may or may not have contacted Richard from UR Next Towing.  Had they

contacted Richard on Monday morning, only then would law enforcement have learned the information concerning the male who requested a tow on the morning of May 13th.  The vehicle may well have been gone by then.

[84]    There is a reasonable probability that the Defendant would have found someone to tow the vehicle before Monday morning, as there was no rain in the area on Sunday the 14th or Monday the 15th.  The Defendant, after retrieving his vehicle, could well have been far away from North Dakota and absolutely no evidence, even if later found, could be tied to him, especially since none of it would have been located.

[85]    Step two is inapplicable, as well.  The government was **not** actively pursuing any substantial, alternative lines of investigation at the time of the constitutional violation,  The break-in and search of the vehicle was not based upon any evidence known to officers at the time which connected the Defendant to the substation damage.  Law enforcement's illegal entry into the vehicle and search of its interior stymied any other routes of investigation, as did their continuous line of illegal actions, one building upon the other to try and legitimize their actions through false statements, statements recklessly disregarding the truth of the matter, deliberate omissions, and vague explanations.

### III.  The fruit of the poisonous tree doctrine extends the exclusionary rule and applies to suppress all of the evidence later discovered in this case as a derivative of the illegal, unreasonable search and seizure of the Defendant's vehicle.

[86]    " 'Under the fruit of the poisonous tree doctrine, the exclusionary rule bars the admission of physical evidence and live witness testimony obtained directly or indirectly through the exploitation of police illegality.' "  U.S. v. Garreau, 735 F. Supp. 2d 1155, 1168 (D.S.D. 2010), aff'd, 658 F.3d 854 (8th Cir. 2011) (citing United States v. Simpson, 439 F.3d 490, 493 (8th Cir.2006) (internal citations omitted)).

The Eighth Circuit recently articulated the "fruit of the poisonous tree" doctrine: The exclusionary rule extends to evidence later discovered and found to be derivative of an illegality or "fruit of the poisonous tree." If the defendant establishes a nexus between a constitutional violation and the discovery of evidence sought to be excluded, the government must show the challenged evidence did not arise by exploitation of that illegality ... [but] instead by means sufficiently distinguishable to be purged of the primary taint. The illegality must be at least a but-for cause of obtaining the evidence.

U.S. v. Cheng Kong Yang, 432 F. Supp. 3d 957, 976–77 (D.N.D. 2020) (citing United States v.

Tuton, 893 F.3d 562, 568 (8th Cir. 2018) (internal citations and quotation marks omitted), cert.

denied, —— U.S. ——, 139 S. Ct. 1192, 203 L.Ed.2d 223 (2019)).

We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

Wong Sun v. U.S., 371 U.S.471, 487-88 (1963) (citing Maguire, Evidence of Guilt, 221 (1959)).

[87]     Per Cheng Kong Yang, the nexus between the constitutional violation and the discovery

of the evidence in this case is documented in the sections above.  The initial Fourth Amendment

violations occurred on the afternoon of May 13, 2023, when law enforcement illegally broke into

the Defendant's vehicle, illegally searched the vehicle, then illegally seized the vehicle by calling

a tow truck to take it to a police storage area.  As a direct result of contacting the tow truck driver

to illegally seize the Honda Element, law enforcement obtained information about the driver of

the vehicle by the section line road and his whereabouts, and what he took out of the vehicle.

That information, which would not have been know to police but for the illegal seizure and

towing of the vehicle, led directly to law enforcement going to the Microtel in Williston,

obtaining surveillance footage from the area businesses, and all of the evidence found in the

dumpster.  The exploitation of the prior illegality under <u>Wong Sun</u> continued and extended into a whole new series of violations.

[88]    As explained above, Detectives Dickerson and Bernier submitted three sworn Affidavits to Williams County judges and were granted three warrants, two for searches of Microtel room 123 and one for the Defendant's vehicle in police cold storage.  The Affidavits not only contained evidence obtained as a result of the illegal break-in, search, and seizure of the vehicle, but deliberate false statements and deceptively whitewashed versions of events surrounding law enforcement's initial illegal actions with the Honda Element.  The exploitation continued when law enforcement conducted the search of Microtel room 123 before the judge even signed the warrant.  All of the evidence obtained illegally was then used to indict the Defendant federally, as well as used in affidavits to obtain federal warrants.  None of the evidence gathered by law enforcement in this case is sufficiently distinguishable to be purged of the primary taint or the taint of the multiple illegal actions of law enforcement after the initial violations, pursuant to <u>Wong Sun</u>.  All of the evidence garnered from the first illegal break-in, illegal search, and illegal seizure and towing of the Honda Element on the section line must be suppressed, as well as the fruits of those illegal actions and the deceptive attempts to legitimize them.  As a result, no state or federal charges could have been filed against the Defendant.

### IV.  The Defendant is entitled to a Franks Hearing on the three state warrants issued in this case.

[89]    "A search warrant may be invalid if the issuing judge's probable cause determination was based on an affidavit containing false or omitted statements made knowingly and intentionally or with reckless disregard for the truth."  <u>U.S. v. Reinholz</u>, 245 F.3d 765, 774 (8th Cir. 2001) (citing <u>Franks v. Delaware</u>, 438 U.S. 154, 171 (1978)).  "If a defendant asserts a search warrant was

invalid because of false statements in the supporting affidavit, he may be entitled to a *Franks*

hearing." U.S. v. Jones, 74 F.4th 941, 948 (8th Cir. 2023).

> But first, he must "satisf[y] two criteria: (1) 'a substantial preliminary showing
> that a false statement knowingly and intentionally, or with reckless disregard for
> the truth, was included by the affiant' in the supporting affidavit, and (2) 'the
> allegedly false statement is necessary to the finding of probable cause.' "

Id. at 948-49 (quoting Franks at 155-56). The Franks Court further specified the requirements

that would bring about what is now known as a Franks hearing:

> To mandate an evidentiary hearing, the challenger's attack must be more than
> conclusory and must be supported by more than a mere desire to cross-examine.
> There must be allegations of deliberate falsehood or of reckless disregard for the
> truth, and those allegations must be accompanied by an offer of proof. They
> should point out specifically the portion of the warrant affidavit that is claimed to
> be false; and they should be accompanied by a statement of supporting reasons.

Franks at 171. The 8th Circuit "has extended Franks to allow challenges to affidavits based on

deliberate or reckless omissions. U.S. v. Gater, 868 F.3d 657, 659 (8th Cir. 2017) (citing United

States v. Reivich, 793 F.2d 957, 960–61 (8th Cir. 1986)). "Others have followed Reivich, while

noting that the extension of Franks to alleged omissions 'potentially opens officers to endless

conjecture about investigative leads, fragments of information, or other matter that might, if

included, have redounded to defendant's benefit.' " Id. (quoting United States v. Colkley, 899

F.2d 297, 300–01 (4th Cir. 1990)).

[90]   After a defendant makes a showing that he is entitled to a Franks hearing, he can then

prevail at the Franks hearing in the following manner:

> If the defendant "proves by a preponderance of the evidence that (1) a law
> enforcement officer knowingly and intentionally, or with reckless disregard for
> the truth, included a false statement in the warrant affidavit, and (2) without the
> false statement, the affidavit would not have established probable cause," the
> search warrant must be voided and the fruits of the search must be suppressed.
> United States v. Neal, 528 F.3d 1069, 1072 (8th Cir.2008) (citing Franks, 438
> U.S. at 155–56). "This rationale also applies to information that the affiant
> deliberately or with reckless disregard for the truth omits from the affidavit such

that the affidavit is misleading and insufficient to establish probable cause had the omitted information been included." Id.

U.S. v. Nelson, No. CR. 09-40130-01-KES, 2010 WL 2746400, at *6 (D.S.D. July 12, 2010).

> Probable cause to issue a search warrant exists when an affidavit in support of the warrant sets forth sufficient facts to establish that there is a "fair probability that contraband or evidence of" criminal activity will be found in the particular place to be searched. Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); see Clapp, 46 F.3d at 801. Probable cause determinations are made in light of the totality of the circumstances. Clapp, 46 F.3d at 801.

U.S. v. Davis, 471 F.3d 938, 946 (8th Cir. 2006).

[91]   U.S. v. Nelson is also instructive as to supplemental correct information being added to correct the false information.  The Nelson Court rejected that premise.  "[T]he Eighth Circuit has rejected the proposition that information possessed by the affiant but not included in the affidavit can overcome a Franks violation: "In any case, retroactively supplementing the affidavit with material omissions bolstering probable cause would undermine the deterrent purpose of the exclusionary rule."  Nelson at *11 (quoting Reinholz, 245 F.3d at 775 (internal citation omitted)).  Nelson also cites Wayne LaFave on this matter:

> The Eighth Circuit's approach to false statements regarding the source of information contained in an affidavit is echoed by a leading authority on the Fourth Amendment:
>> [A]n affidavit with knowing falsehoods in it ... should not be open to rehabilitation by a process of substituting for the affiant's lies other information which is really the truth from which he deliberately departed. To treat the case as an omission situation and then substitute that which was "omitted" fails to recognize that such addition to the affidavit is appropriate only as to omitted information tending to cast some doubt on the probable cause otherwise shown.

Id. at *12-13 (quoting 2 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 4.4 (4th ed.) (citing State v. Nielsen, 727 P.2d 188 (Utah 1986)).

[92]    The three state warrants in this case were based upon the affidavits of Det. Dickerson and

Det. Bernier.  All three affidavits had false statements, omitted information, and deliberate and

reckless omissions.  Det. Dickerson's Affidavit in support of obtaining the first warrant for

Microtel room 123 contained the following false information:

> 5.    That a vehicle, **which appeared to be abandoned**, **was located on the property where**
>
>        **the shooting occurred** was a **Grey** Honda CRV, with Oregon Plates: 273LXW.

(Exhibit  H, No. 5, May 13, 2023, Dickerson Affidavit).  Most importantly, the Honda Element,

was **not** located on the property where the shooting occurred.  The alleged shooting damage to

the power station equipment was on the power station property, over a half mile away from the

Honda beside the section line road.  Det. Dickerson could not possibly have believed this to be

true because her report states she saw a vehicle in the distance when she was at the power

station.  She also drove down the section line road, watched Cpl. Tougas break the driver's

window of the Honda Element to gain entry, and took part in an illegal search of the vehicle on

the scene.  As for the vehicle appearing to be "abandoned," that determination could not be made

without law enforcement investigation of the duration of time it had been either on public or

private land, as explained in detail above.  There was nothing in the Affidavit to even suggest the

vehicle was illegally abandoned.  The Honda was unoccupied.

        No. 6 of the Affidavit is false on two levels.

> 6.    **That the property owners notified law enforcement the vehicle was suspicious and**
>        **should not have been on the property**.

(Id., No. 6)  First, the "property owners" were referenced in no. 2 of the Affidavit as being the

owners and agents of the power station.  The "property owners" in no. 6 are the alleged owners

of the field beside the section line road.  Second, the field's property owners never "notified" law

enforcement of a suspicious vehicle by the section line.  As explained in the fact section above,

46

Det. Bernier allegedly contacted the landowners about the Honda and claimed he had obtained permission to search and tow the vehicle.  However, there is **no** record in the Log, in Det. Bernier's narratives, or in any other officer narratives concerning how the landowner was identified, the exact time of this contact, whether it was by phone or in person, or the contents of the detective's discussion with the landowner.  Further, this purported 'permission' is irrelevant to the analysis on whether law enforcement illegally broke into the Honda, as explained, supra.

[93]     No. 7 is false. It conflicts with Det. Bernier's sworn Affidavit to obtain the search warrant for the Honda Element after it was towed to cold storage.

> 7.  **That the property owners also explained to law enforcement the vehicle was not on the property prior to the rainstorm**.

(Id., No. 7 (emphasis added))  Det. Bernier allegedly spoke to the owner of the field adjacent to the section line.  His Affidavit states that "the property owners also explained to law enforcement the vehicle was not on their property prior to the rainstorm this morning."  (Exhibit C, No. 6, May 13, 2023, Bernier Affidavit)  Det. Dickerson's Affidavit is missing the critical words "this morning," which establish a narrowed down time that the Honda Element had been present on the section line.  From that morning's rainstorm to the time the detectives located the vehicle on the section line was six hours or less, which is an important factor in determining whether it was abandoned.

[94]     No. 9 of Det. Dickerson's Affidavit was made with "reckless disregard for the truth," under Reinholz, Jones, Franks, and Gator, as well as with "deliberate or reckless omissions" under Gator and Reivich.

> 9.  **That law enforcement checked inside the vehicle and located an empty rifle case, documentation with the name of Cameron Smith, (DOB 9/30/1974) and located a receipt for the same caliber of ammunition/casings which matched the 450 Bushmaster Rifle casings found at the power station shooting site**.

47

(Exhibit H, No. 9, May 13, 2023, Dickerson Affidavit)  As noted above, law enforcement did not "check" inside the vehicle.  Cpl. Tougas broke the driver's side door window to gain entry and the detectives searched the Honda Element, locating the items listed in no. 9.  The word "checked" is a deliberate omission of the break-in of the vehicle without probable cause.  The only reason Det. Dickerson could possibly have to use the euphemism "checked" instead of the accurate description is to mask law enforcement's forced entry to make it appear as though maybe the doors were unlocked and to steer the judge away from an analysis of whether law enforcement had probable cause to breach the Honda.

[95]    The remainder of Det. Dickerson's Affidavit, nos. 10-14, are based upon her Affidavit's false statements, statements made with reckless disregard for the truth, and both deliberate and reckless omissions.  The combination of those statements provided the ruse to legitimize "checking" the Honda Element beside the section line and the items Detectives Dickerson and Bernier found in the illegal search of the Honda Element.  The judge reading the Affidavit would believe that the Honda Element was located right beside the power station on power station property, that the power station owners or their agents had contacted police about the damage and Honda at the station, that the Honda was open because the Affidavit did not state the truth of Cpl. Tougas' shattering of the driver's door glass to gain entry to illegally obtain the items listed in no. 9.

[96]    Nos. 10-14 of Det. Dickerson's Affidavit are based upon the fallacy that the Honda Element was "abandoned" and could be towed away.  Her Affidavit deliberately omitted that the vehicle was locked and had floor mats behind the tires to try to free it from the mud.  Also deliberately omitted was that law enforcement made no analysis of whether the Honda had been "abandoned" under N.D.C.C. § 23.1-15 was done.  This left the judge considering the Affidavit

to believe the conclusory statement that the vehicle was "abandoned" indicated that it was

abandoned under North Dakota law, especially since the Affidavit falsely stated the Honda was

on the power station's property.  Thus nos. 10-14 of the Affidavit must also be excised from the

document.

[97]     After excising a portion of no. 5, and nos. 6-7 and 9-14, the following statements in the

Affidavit remain:

1.   That she has knowledge and information regarding a shooting incident that
     occurred in Ray, Williams County, ND, in the early morning hours ofg (sic) May
     13, 2023, and testifies as follows:

2.   That a shooting incident occurred at the Ray power station located at 121st Ave
     NW, in Ray, Williams County, ND.

3.   The property owners indicated to law enforcement that the damage to the Ray
     power station from the shooting is estimated between one million and four
     million dollars in damage.

4.   That law enforcement recovered 450 Bushmaster shell casings at the
     scene of the shooting.

5.   That a vehicle, was a Grey Honda, with Oregon Plates: 273LXW.

8.   That during the investigation, law enforcement observed the words "DAPL"
     and other symbols spray painted in the rocks outside of the power station.
     That the property owners told law enforcement the rocks were not spray
     painted prior to this incident.

The remaining statement above would not provide probable cause to search Microtel room 123.

[98]     The second State Affidavit containing Det. Bernier's sworn statements to obtain a search

warrant to search the Honda, has many of the same issues as Det. Dickerson's Affidavit.  No. 1

of Det. Bernier's Affidavit is based on the premise that Det. Dickerson's Affidavit in support of

the search of that room was valid.  Det. Bernier's statement deliberately omits the fact that the

search of Microtel room 123 was illegal because the search was performed an hour before the

judge signed the warrant, as documented above.  Det. Bernier would most certainly know this, as

he and Det. Dickerson searched room 123.

       Nos. 2-5 are similar to Det. Dickerson's Affidavit nos. 1-2, 4-7, and 9.

2.  That a shooting incident occurred at the Ray power station located at 121st Ave NW, in Ray, Williams County, ND.

3.  That law enforcement recovered 450 Bushmaster shell casings at the scene of the shooting.

4.  That a vehicle, which appeared to be abandoned, was located on the property where the shooting occurred, and is a Grey in color 2005 Honda Element, with Oregon Plates: 273LXW, VIN# 5J6YH28615L010424.

5.  That the property owners notified law enforcement the vehicle was suspicious and should not have been on the property.

6.  That the property owners also explained to law enforcement the vehicle was not on their property prior to the rainstorm this morning.

7.  That law enforcement checked inside the vehicle and located an empty rifle case, documentation with the name of Cameron Smith, (DOB 9/30/1974) and located a receipt for the same caliber of ammunition/casings which matched the 450 Bushmaster Rifle casings found at the power station shooting site.

(Exhibit C, Nos. 2-7, May 13, 2023, Bernier Affidavit)  Det. Bernier's Affidavit corrects the

model of the Honda to an Element and adds the VIN number.  His Affidavit also adds "this

morning" to when the the alleged property owners noticed the vehicle, indicating it was not

present before that morning's rainstorm.

[99]    For the same law and analysis applied to Det. Dickerson's Affidavit above, Det. Bernier's

Affidavit must be similarly redacted because he made false statements, omitted information, and

made deliberate and reckless omissions within his sworn document.  Det. Bernier worked in

tandem with Det. Dickerson investigating this case and both were present on the section line

when law enforcement illegally broke into the Honda and they, themselves illegally searched the

vehicle.

[100]   Just as in Det. Dickerson's May 13, 2023 Affidavit, the only reason Det. Bernier could

possibly have to use the euphemism "checked" instead of the accurate description is to mask law

enforcement's forced entry to make it appear as though maybe the doors were unlocked and to

steer the judge away from an analysis of whether law enforcement had probable cause to breach

the Honda.  The last paragraph of Det. Berinier's Affidavit seeks a warrant to search the Honda,

located at the power station site.

> 11.  That law enforcement is seeking a warrant to search the Grey in color, Honda
>       CRV bearing Oregon Plate #273 LXW, located on the property of the Ray
>       power station, in Ray, Williams County, ND, for the following:  450
>       Bushmaster Rifle; ammunition for the 450 Bushmaster Rifle; DNA evidence;
>       electronic devices that can depict GPS locations and devices with the ability
>       to sync data to the vehicle; ID cards, spray paint, documents, and
>       correspondence.

(Id. at No. 10)  First, the Honda was not a CRV, but an Element.  Second, the Honda was not

located on "the property of the Ray power station" and Det. Bernier could not have believed that

to be a truthful statement, as he was present for the investigation of the Honda as it sat within the

section line as explained above.  Furthermore, no. 7 of his Affidavit stated that the Honda had

already been searched, so there was no need to even apply for the warrant, except perhaps to

retrieve DNA with equipment that may not have been available in their patrol unit.  Reading Det.

Bernier's Affidavit as a whole, it is evident that he was applying to obtain a search warrant for

the Honda based upon what he and Det. Dickerson found in the Honda when they illegally

searched it in the first place!

[101]   Additionally, the Affidavit skips illogically from no. 7 to no. 8.  Under no reasoning

would no. 7 lead to motel management identifying the Defendant at check-in.  All of the

information in statements in nos. 7-10 were part of the same ruse contained in Det. Dickerson's

Affidavit to legitimize "checking" the Honda Element beside the section line and the items found

in the illegal search of the Honda Element.  All of this was staged so the judge reading the

Affidavit would issue the warrant without having to question the ugly truths behind the

deliberate falsehoods and whitewashing of law enforcements' conduct in this case, as explained

above.

[102]   Applying the same law and analysis of Det. Dickerson's Affidavit to Det. Bernier's

Affidavit will leave no probable cause upon which a judge could issue the second warrant.  Det.

Bernier's Affidavit with the required redactions would read as follows:

> 2.   That a shooting incident occurred at the Ray power station located at 121st Ave
>       NW, in Ray, Williams County, ND.
>
> 3.   That law enforcement recovered 450 Bushmaster shell casings at the scene
>       of the shooting.
>
> 4.   That a vehicle is a Grey in color 2005 Honda Element, with Oregon Plates:
>       273LXW, VIN# 5J6YH28615L010424.
>
> 6.   That the vehicle was not on their property prior to the rainstorm this morning.

Those statements contain no probable cause to obtain a search warrant for the Honda Element.

[103]   The third state warrant was issued pursuant to Det. Dickerson's May 15, 2023 Affidavit

to obtain a warrant for DNA evidence from the Defendant in the form of blood, saliva, and hair

fibers from his person, and to once again search Microtel room 123.  (Exhibit M, nos. 19 and 21)

Det. Dickerson's second Affidavit again contains false statements, statements with reckless

disregard for the truth, as well as deliberate and reckless omissions.

> 5.   That a vehicle, which appeared to be abandoned, was located on the
>       property where the shooting occurred, and was identified as a Honda
>       Element bearing Oregon Plates: 273LXW. The property owners notified
>       law enforcement that the vehicle was suspicious and  should not have been
>       on the property. Law enforcement observed that the vehicle appeared to
>       have gotten stuck in the mud.
>
> 6.   That law enforcement  observed the vehicle to contain an empty rifle case
>       with correspondence/documentation of the name "Cameron Smith", as

well as a receipt for the same caliber of ammunition/casings which matched the 450 Bushmaster Rifle casings found at the power station shooting site.

7.  That law enforcement contacted a tow truck company to come and remove the vehicle from the property, and the tow truck driver told law enforcement that he picked up a male that morning and gave the male a ride to Microtel Inn, due to his vehicle being stuck in the mud. It should be noted that the vehicle was located approximately one mile from the site of the shooting.

8.  That law enforcement responded to the Microtel Inn and spoke with hotel management. Management provided a roster of all guests and Cameron Smith was listed on the roster as a guest in Room 123 at the motel. Motel management also confirmed that Cameron Smith provided a Canadian ID card at time of check-in.

9.  That law enforcement located Cameron Smith at the Microtel Inn. Mr. Smith was placed under arrest and transported to the Williams County Correctional Center.

10. That Det. Dickerson subsequently applied for and received a search warrant for the Microtel Inn room rented by Cameron Smith. Upon execution of the search warrant, various items were located and secured as evidence, including live rounds matching the ammunition used at the power substation scene.

11. That while in the room, Det. Dickerson observed written documents relating to travel plans and/or other plans. Det. Dickerson noted that maps had been previously observed within Smith's motor vehicle, which related to other power substations/sites. Def. Dickerson observed additional writings, which appeared to be journaling-style handwritten documentation.

12. That Det. Dickerson also observed multiple envelopes, a number of which contained $400.00, that appeared to be in $SO-bill increments. Said envelopes were labeled "$400.00" and some envelopes were empty.

13. That upon additional investigation, including the viewing of video surveillance footage in the area of the Microtel Inn, and the foot path taken by Cameron Smith after the shooting, law enforcement observed that Mr. Smith was in possession of a dolly/cart-like apparatus which contained various duffel bags.

14.  That upon review of the footage, law enforcement observed that Cameron Smith appeared to have deposited the duffel bags in the vicinity. Upon conducting a search of the foot path of Cameron Smith after the shooting, law enforcement located multiple duffel bags. One or more of the duffel bags were located within garbage dumpster(s).

15. That Det. Dickerson observed the duffel bags to contain various casings and/or live rounds of ammunition matching the ammunition used at the power substation scene, and a 450 Bushmaster rifle.

16. That Cameron Monte Smith willfully damaged property at the power substation belonging to Mountrail Williams Electric Cooperative and Basin Electric Power Cooperative by shooting a firearm at power boxes and other equipment. Said power substation sustained damages in excess of $10,000.00.

18. That as a result of the ongoing investigation, law enforcement has secured various pieces of evidence from the scene, the hotel room of Cameron Smith, and the motor vehicle of Cameron Smith, to be sent to the North Dakota Crime Lab for analysis.

(Exhibit M, Nos. 5-16, and 19)

[104]   As explained in the analysis of Det. Dickerson's first Affidavit, in no. 5, the Honda Element was **not** abandoned and **not** located on the power station property and the owners of the property did not notify law enforcement that the vehicle was there.  In no. 6, Det. Dickerson abandons her wording from the earlier sworn Affidavit that states law enforcement "checked" inside the vehicle, and in this Affidavit simply states that law enforcement "observed" the vehicle to contain an empty rifle case, 450 Bushmaster Rifle casings and correspondence bearing the Defendant's name.  The effect was the same, however.

[105]   Again, Det. Dickerson's Affidavit provided the ruse to legitimize "observing" the Honda the items Detectives Dickerson and Bernier found in the illegal break-in and search of the Honda Element.  Curiously, the detectives and other law enforcement apparently knew enough about the North Dakota Abandoned Vehicle chapter of the code to know towing was appropriate in some instances.  However, none of them could recall or even look up the Abandoned Vehicle section to avoid breaking the law.  All of the statements in nos. 7-15 and 18 of Det. Dickerson's May 15, 2023 Affidavit are based upon two things, 1) the evidence gained illegally from law enforcement's illegal entry and search of the Honda Element (which was covered up and

54

legitimized so the judge would sign the warrant) and 2) law enforcement illegally having Richard from UR Next tow the Honda to police cold storage, a tow that is entirely contrary to North Dakota law.  The combination of the statements in the three state Affidavits were to provide false statements together with conclusory statements of law enforcement action that would not alert the judges issuing the warrants that an illegal break-in, search, and seizure had occurred, the fruits of which provided all the the alleged evidence against the Defendant.

[106]   Pursuant to Nelson and Reinholz, the three state Affidavits cannot be doctored and the contents retroactively supplemented to contain the material omissions that would bolster probable cause in attempts to save the documents and create probable cause after the fact.  The Defendant has made more than a substantial preliminary showing that false statements and statements with reckless disregard for the truth were included in Detectives Dickerson's and Bernier's three Affidavits in support of the three issued warrants.  The Defendant has also made clear that the false statements and statements made with reckless disregard for the truth were necessary to the finding of probable cause in each of the three Affidavits.  Therefore, the Defendant is entitled to a Franks hearing concerning all three state warrants.

## CONCLUSION

[107]   Given the facts, law, and analysis set forth above, all of the evidence garnered as a result of the illegal break-in, search, and seizure of the Defendant's Honda Element, as well as the fruits thereof, must be suppressed.  The actions and deliberate deception of law enforcement as outlined above was egregious and designed to circumvent the law.  Additionally, the Defendant is entitled to a Franks hearing concerning the state warrants in this case.  **The Defendant requests an in-person hearing on his Motion.**

Respectfully Submitted this 6th day of December, 2023.


/s/ Kevin J. Chapman
Kevin J. Chapman, # 05076
Attorney for the Defendant
417 First Ave. E, Suite 5
PO Box 1920
Williston, ND 58802-1920
(701) 572-3966
kevin@chapmanlawoffice.com