002380

AO 93  (Rev. 11/13)  Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

District of North Dakota

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.    1:23-mj-281 |
| A Residence Located at 459 Alameda Avenue, Astoria, | ) | |
| Oregon 97103, rented by Cameron Monte Smith | ) | |
| | ) | |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ District of _____ Oregon _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B and Federal Rule of Criminal Procedure 41(b)(3)

**YOU ARE COMMANDED** to execute this warrant on or before _____ June 16, 2023 _____ *(not to exceed 14 days)*
☐  in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Clare R. Hochhalter _____ .
*(United States Magistrate Judge)*

☐  Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐  for ____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____

Date and time issued:    June 2, 2023 · 1146 hrs.     _____
                                                                                            Judge's signature

City and state:     Bismarck, ND     _____     Clare R. Hochhalter, United States
                                                                              *Printed name and*

EXHIBIT
**S**

002381

## ADDENDUM TO SEARCH WARRANT
## RE ELECTRONIC DEVICES, MEDIA, AND STORED INFORMATION

The following requirements shall apply to any (i) computer, printer, plotter, scanner, cell phone, camera, or other like electronic device capable of creating, displaying, transmitting, manipulating or storing electronic data ("Electronic Device"), (ii) any tapes, drives, cards, and other media capable of storing electronic data ("Storage Media"), and (iii) Electronically Stored Information seized pursuant to this warrant:

1. **Electronic Devices, Storage Media, and Electronically Stored Information *seized* pursuant to this warrant are subject to *search* only for the Electronically Stored Information that is specifically described in and that is the subject of this warrant.**

2. The search of any Electronic Device, Storage Media, or Electronically Stored Information authorized by this warrant shall be completed within **180 days** from the date of the warrant unless, for good cause demonstrated, such date is extended by order of the court.

3. Upon request of the owner, the government shall promptly provide a copy of any Electronically Stored Information on any seized Electronic Device or Storage Media unless the stored information is contraband or instrumentality of a crime or unless the government obtains an order from the court stating that a copy need not be provided.

4. Upon completion of the search, any seized Electronic Device or Storage Media shall be promptly returned to the owner unless the Device or Media, or it contents, is contraband or instrumentality of a crime, unless the government obtains an order from the court stating it need not be returned or unless the Federal Rules of Criminal Procedure authorize its retention.

5. Following the completion of the search authorized by this warrant, the government may not without first obtaining a court order use any retained Electronically Stored Information that is not the subject of the warrant for any purpose other than verifying the authenticity or the integrity of Electronically Stored Information that is the subject of the warrant. In addition, nothing in this warrant authorizes the government to retain any Electronically Stored Information that is not the subject of the warrant after any legitimate law enforcement purpose has ended with respect to Electronically Stored Information that is the subject of the warrant, except as otherwise permitted by the Federal Rules of Criminal Procedure.

6. Nothing in this warrant shall limit or prevent the government from seizing any Electronic Device, Storage Media, or Electronically Stored Information as contraband or instrumentality of a crime and commencing forfeiture proceedings against such property.

7. The government, the owner of the seized property, and/or the person from whom the property was seized may motion the court at any time for appropriate relief in the event of a dispute over the ownership, retention, or return of any Electronic Device, Storage Media, or Electronically Stored Information seized pursuant to this warrant, and the court retains jurisdiction to consider any such motions.

002382

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>1:23-mj-281 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| Certification |
|---|

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

002383

AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of North Dakota

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>A Residence Located at 459 Alameda Avenue, Astoria,<br>Oregon 97103, rented by Cameron Monte Smith | )<br>)<br>)<br>)<br>)<br>)    Case No.   1:23-mj-281 |

## APPLICATION FOR A SEARCH WARRANT

     I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ Oregon _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

     The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

     The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Sections 1366(a),<br>922(g)(5)(A), and 924(h) | Destruction of an Energy Facility; Possession of a Firearm and Ammunition by an<br>Illegal Alien; and Receipt of a Firearm and Ammunition Used to Commit a Felony |

     The application is based on these facts:

See attached application of FBI SA Daniel Lewis and Federal Rule of Criminal Procedure 41(b)(3)

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Daniel Lewis, FBI SA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____06/02/2023_____

_____
*Judge's signature*

City and state: Bismarck, ND

Clare R. Hochhalter, United States Magistrate Judge
*Printed name and title*

002384

## AFFIDAVIT

I, Daniel Lewis, being duly sworn on oath, depose and state as follows:

I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed since March 2017.   I am currently assigned to the Williston Resident Agency of the Minneapolis Field Office and primarily charged with investigating drug trafficking and firearms violations under Titles 18 and 21 of the United States Code.   Prior to my assignment to the Williston Resident Agency, I was assigned to the Los Angeles Metropolitan Task Force on Violent Gangs of the FBI Los Angeles Field Office.   I have received over twenty weeks of law enforcement training at the FBI Academy in Quantico, Virginia.   I have been involved in numerous investigations dealing with the possession and use of firearms.   Before becoming a Special Agent with the FBI, I was employed with Alabama Board of Pardons and Paroles as a State Probation and Parole Officer in Huntsville, Alabama.

There is probable cause to believe that **Cameron Monte SMITH** ("SMITH") committed violations of Destruction of an Energy Facility, in violation of Title 18, United States Code, Section 1366(a); Receipt of a Firearm and Ammunition Used to Commit a Felony in violation of Title 18, United States Code, Section 924(h); and Possession of a Firearm and Ammunition by an Illegal Alien in violation of Title 18, United States Code, Section 922(g)(5)(A) in the District of North Dakota and elsewhere.   The statements contained in this affidavit are based in part on information provided to me from Williams County Sheriff's Office detectives, FBI agents, and other law enforcement officers.   This

002385

affidavit is being submitted for the limited purpose of establishing probable cause.   I have not included every detail of the investigation.   In addition, unless otherwise indicated, all statements contained in this affidavit are summarized in substance and in part.

This Affidavit is submitted in support of a search warrant for the following residence associated with the activities of SMITH:

### 459 Alameda Avenue, Astoria, Oregon 97103

Pursuant to Federal Rule of Criminal Procedure 41(b)(3), "a magistrate judge—in an investigation of domestic terrorism or international terrorism—with authority in any district in which activities related to the terrorism may have occurred has authority to issue a warrant for a person or property within or outside that district."   Rule 41(a)(2)(D) defines "domestic terrorism" as outlined in Title 18, United States Code, Section 2331, which:

(5)(A) "involve acts dangerous to human life that are a violation of the criminal laws of the United States or of any state;"

(5)(B) "appear to be intended—

(i) to intimidate or coerce a civilian population;

(ii) to influence the policy of a government by intimidation or coercion; or

(iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and"

(5)(C) "occur primarily within the territorial jurisdiction of the United States."

Therefore, pursuant to Rule 41(b)(3), the United States District Court for the District of North Dakota has venue to issue a warrant to search the aforementioned property, located

002386

outside the District of North Dakota, in Astoria, Oregon, because the FBI is investigating an offense of domestic terrorism committed by SMITH.   Specifically, the FBI is investigating SMITH, a Canadian citizen illegally residing in the United States, for engaging in the knowing destruction of an energy facility by purposefully discharging a firearm into an energy facility in Ray, North Dakota—which provided electricity necessary to sustain the lives and property of North Dakota residents—with the intent to intimidate or coerce the North Dakota civilian population based upon environmental extremist ideology, in violation of Title 18, United States Code, Section 1366(a), as further described *infra*.

## BACKGROUND – CARPENTER, SOUTH DAKOTA ATTACK

1.      On July 17, 2022, at 12:23am, a system operator for East River Electric Company received an indicator from a sensor that one of its transformers, located at 19051 415th Avenue, Carpenter, South Dakota 57322, had low nitrogen.   Three minutes later, at 12:26am, the system operator received a low oil indicator.   Low nitrogen and low oil are indicative of a leak in the cooling system of the transformer.   East River Electric Company's substation only services the TC (TransCanada) Energy's oil pipeline pumping station; this pipeline is known as the Keystone Pipeline.

2.      An employee for the East River Electric Company responded to the substation located at 19051 415th Avenue, Carpenter, South Dakota 57322, discovering that oil was leaking out of the transformer cooling system.   The leak was so severe that there were four to five inches of oil in the containment area of the transformer.   Upon further review, the employee discovered what appeared to be multiple bullet holes in the transformer cooling

002387

system.   The transformer had to be shut down to avoid further damage to the system.

3.      According to TC Energy's website, the Keystone Pipeline is 2,687 miles in length and plays a crucial role in delivering Canadian and U.S. crude oil supplies to markets around North America.   The pipeline enters the U.S. from Canada in North Dakota and runs through South Dakota into Nebraska, where it splits with one arm running east through Missouri for deliveries into Illinois and with the other running south through Oklahoma and onward to Texas.

4.      On July 17, 2022, law enforcement responded to 19051 415th Avenue, Carpenter, South Dakota 57322, and discovered approximately sixteen holes in the transformer's cooling system.   These holes were consistent with bullet holes.   On the gravel driveway leading to the substation, blue spray paint was discovered which stated, "Jane Sioux Land," with what appeared to be an hourglass figure with a circle around it. Open sources indicate that this symbol is the "Extinction Symbol," which has been used by environmental protesters around the world.   Also discovered were what appeared to be bullet projectile fragments from the area around the transformer.

5.      On July 18, 2022, ATF Resident Agent-in-Charge (RAC) Brent Fair responded to the crime scene.   RAC Fair initially examined a bag of projectile fragments which had been collected by the electric company responders before they could be washed away or otherwise destroyed by environmental mitigation. The projectile fragments were soaked in mineral oil, the primary coolant used in the substation radiators of which approximately 2,500 gallons were spilled.   RAC Fair examined the fragments and detected

002388

there were distinct copper jackets and soft lead splash from high velocity impacts with the soft steel structures of the electric substation.   Many of the fragments consisted of separated copper jackets or completely indistinguishable splashes of soft lead.   Three recovered projectiles with lead cores and copper jackets still attached were examined.   These projectiles had flat bases with measurable diameters as well as a few of the separated copper jackets could be examined for a consensus of approximate diameter.   RAC Fair measured the flat base projectile remnants to be between approximately .455 and .460 inches with an ATF micrometer.   All examples of the recovered projectiles were consistent in construction and therefore consistent with one caliber of weapon; specifically, noted as being a suitable caliber ammunition was the .450 Bushmaster, among others.

6.      In late May of 2023, an FBI Special Agent spoke with an employee of Kennebec KOA, located in Kennebec, South Dakota, based on this location having been marked in a map of South Dakota recovered from SMITH's vehicle.   The employee searched database records for any reservations associated with "Cameron Smith" for the month of July 2022.   The employee located a record for "Cam Smith", which is a known alias for SMITH, having stayed at the Kennebec KOA with a check-in date of July 15, 2022, and a check-out date of July 16, 2022.   Open-source research indicated that Kennebec, South Dakota is approximately two and one-half hours from Carpenter, South Dakota by vehicle.   As noted above SMITH's KOA check out date is the day before the July 17, 2022, Carpenter, South Dakota, energy facility shooting.

## PROBABLE CAUSE – RAY, NORTH DAKOTA ATTACK

002389

7.     On May 13, 2023, WCSO deputies were dispatched to the Wheelock Substation, located in Ray, North Dakota.   This facility is an electric power substation and is operated by Mountrail-Williams Electric Cooperative and Basin Electric Power Cooperative.   Employees at the substation stated they responded to the substation on May 13, in the morning, after alarms indicated that equipment was not working.   Once the employees arrived at the substation, they found bullet holes in multiple pieces of equipment, at which time they notified law enforcement.   Law enforcement officers from the WCSO responded to the substation.   The substation is enclosed by a barbed-wire fence approximately eight feet high.   Outside the fence line, law enforcement recovered approximately five empty .450 Bushmaster cartridge cases.   Law enforcement also determined that approximately fifteen bullets penetrated and damaged substation transformers and numerous electrical apparatuses.   As a result of the damage that the bullets caused to the substation, approximately 243 customers lost electrical service.   Based on a preliminary assessment by the Mountrail-Williams Electric Cooperative, the damages caused by the attack are expected to be well in excess of $100,000.

8.     During a canvass of the area surrounding the substation, law enforcement located a Honda Element with vehicle license plate 273LXW approximately one-half mile southeast of the substation in the middle of an agricultural field.   The vehicle appeared to be stuck in the mud and was not occupied.[1]   The owner of the land on which the vehicle

---

[1]     It was raining regularly in the area of the Wheelock Substation from Thursday (May 11) through Saturday evening (May 13).

002390

was located stated, in sum and substance, the following:   the vehicle was not his; he did not know the registered owner of the vehicle; the vehicle was not there a few days ago when he seeded his farm; and he did not want the vehicle on his property.   Law enforcement seized and entered the abandoned vehicle in an attempt to identify the owner and remove the vehicle from the property.   Inside the vehicle, law enforcement located, among other items, a pill bottle, medical paperwork bearing the name Cameron Smith, and a black rifle case. After seeing evidence in the vehicle that appeared to be related to the substation attack, law enforcement discontinued the search of the vehicle and applied for a search warrant through the Williams County State's Attorney's Office.   Law enforcement later executed the search warrant and completed its search of the vehicle.

9.     Law enforcement made contact with a tow truck driver (the "Tow Truck Driver") in an attempt to remove the vehicle from the property.   The Tow Truck Driver informed law enforcement that, at approximately 9:45 am on May 13, 2023, the Tow Truck Driver had responded to 119th Street Northwest, which was approximately one and one-half miles east of the location of the abandoned vehicle to pick up an individual (later identified as Smith, as detailed further below) who needed assistance. The Tow Truck Driver drove Smith to 121st Avenue Northwest, approximately one-half mile south of the substation, where Smith walked east of the roadway to a vehicle stuck in a field.   Smith entered the vehicle, removed two duffel bags and a collapsible wheeled cart, then returned to the tow truck with those items.   The Tow Truck Driver drove Smith to a local hotel in Williston, North Dakota, and the driver left Smith at the hotel.   A few hours later, the Tow Truck

002391

Driver received a phone call from Smith from a restricted number.  Smith asked for assistance in recovering his vehicle from the field.  The Tow Truck Driver stated that he would only assist Smith if Smith provided the Tow Truck Driver with Smith's name and telephone number.  Smith provided the Tow Truck Driver with the name "Cam Smith" and a telephone number with a 647 area code (the "647 Cellphone").[2]

      10.    Law enforcement responded to the hotel and made contact with hotel staff. Hotel staff indicated they had a guest obtain a room at the hotel earlier that morning under the name Cameron Smith and provided law enforcement with a copy of Smith's Canadian passport, as well as a copy of Smith's guest registration, on which Smith provided the hotel with the 647 Cellphone.

      11.    Law Enforcement obtained and executed a search warrant for Smith's hotel room and person through the Williams County State's Attorney's Office.  Smith was detained and transported to the Williams County Correctional Center on suspicion of Criminal Mischief.  Law enforcement located two identification cards inside Smith's hotel room with the name "Cameron Smith" on each identification card.

      12.    Due to adverse weather conditions, including heavy rain, law enforcement executed the search warrant for the vehicle recovered in the field at the Williams County Sheriff's Office Cold Storage garage.  Inside the vehicle, among other items, law enforcement located approximately 166 live rounds of .450 Bushmaster ammunition and two muddy shoes.

---

[2]    The full telephone number for the 647 Cellphone is known to your affiant.

002392

13.     On May 14, 2023, law enforcement was able to review the hotel's security camera footage to determine that Smith departed the hotel at approximately 11:50 am on May 13, 2023, carrying two duffel bags and a collapsible wheeled cart.   One bag appeared to be grey in color with a red zipper, and the other bag appeared to be green and blue in color.   Law enforcement continued reviewing security camera footage from businesses in the area of the hotel to track Smith's movements.   Smith was seen pacing around the parking lot and surrounding property of a local business in Williston, North Dakota.   At approximately 12:50 pm, Smith was seen on security camera footage walking west on 42nd Street, away from the local business, carrying the duffel bags and collapsible wheeled cart. Smith left the view of the security cameras at approximately 12:57 pm, at which time he can be seen walking east on 42nd Street, towards the same local business, but he was not carrying the duffel bags.   Law enforcement canvassed the area surrounding the local business.   Law enforcement later obtained additional security camera footage showing Smith walking east on 42nd Street on the north side of an apartment building.   Smith can be seen turning south into the eastern-most parking lot of the apartment building—between an apartment building and a row of garage buildings.

14.     Law enforcement located a dumpster on the property of the apartment building and accessible by the public.   The dumpster was located directly south of the northeastern-most garage building.   Inside the dumpster, law enforcement located a grey REI-brand duffel bag with a red zipper and a green and blue duffel bag.   Both bags located in the dumpster matched the description of the bags that Smith was seen carrying on the

002393

hotel's security camera footage.   Inside the grey duffel bag, law enforcement located a

black .450 Bushmaster rifle bearing serial number BK5091719 and two live rounds of .450

Bushmaster ammunition.   Inside the green and blue duffel bag, law enforcement located

sixteen .450 Bushmaster rifle magazines, approximately 135 live rounds of .450 Bushmaster

ammunition, a 9mm Sig Sauer pistol bearing serial number 58C012701, four pistol

magazines for the Sig Sauer pistol, and approximately 104 live rounds of 9mm ammunition.

15.     Law enforcement conducted an additional canvass of the area in which

Smith's vehicle was recovered.   Law enforcement located tire tracks through the fields

between 119th Avenue Northwest and the location in which Smith's vehicle was recovered.

Law enforcement also located footprints on the ground between where Smith's vehicle was

recovered and 119th Avenue Northwest, indicating an eastern direction of travel, towards

119th Avenue Northwest.

16.     On May 15, 2023, an FBI Special Agent spoke via telephone with a

Deportation Officer from the United States Immigration and Customs Enforcement

("Officer-1").   Officer-1 attempted to perform an immigration inspection of Smith.   During

the immigration inspection of Smith, Smith admitted that he and his parents are citizens of

Canada.   Smith refused to say when he last entered the United States.   Officer-1 queried

databases and found no evidence that Smith had legally entered the United States since last

departing the United States in 2018, in which he traveled from Portland, Oregon, to

Vancouver, British Columbia, Canada, via Amtrack train.   Officer-1 also found no

evidence that Smith had any applications or petitions pending or approved before the United

States Citizenship and Immigration Services, or that Smith had applied for a visa through the United States Department of Homeland Security to enter the United States legally. Immigration officials have placed a detainer on Smith alleging that he is removable due to his status as unlawfully present in the United States.

17.     On May 15, 2023, an FBI Special Agent spoke with a Special Agent from the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) regarding the .450 Bushmaster rifle and 9mm Sig Sauer pistol that were recovered from Smith's duffel bags. The ATF Special Agent indicated that those firearms were manufactured outside the State of North Dakota and, therefore, traveled in or affected interstate commerce, since they were recovered inside the State of North Dakota.

18.     On May 19, 2023, a detailed search of Smith's vehicle was conducted, pursuant to a state search warrant issued on May 13, 2023.   Law enforcement located multiple items of evidence, including the following:

a.   A Columbia Gorge Honda invoice billed to Marie Miller, address 459 Alameda Avenue, Astoria, OR 97103, for Smith's vehicle, dated January 17, 2023

b.   A PNW Automotive Inc. invoice billed to Marie Miller with the 647 Cellphone, for Smith's vehicle, dated April 21, 2023

c.   A statement from Bay Side Self Storage in Nehalem, OR dated April 18, 2023 indicating that "Cam Smith" had rented storage unit A051 and paid $80.00 rent through June 30, 2023.

002395

    d.  Two boxes of Hornady Black .450 Bushmaster ammunition.

19.     On May 21, 2023, FBI SAs interviewed Marie Miller (Miller) at the Portland International Airport.   During that interview, Miller state that SMITH's current address was 459 Alameda Avenue, Astoria, OR 97103.   Miller also stated that she bought Smith his current vehicle several years ago, and SMITH had paid her back for it.

20.     On May 23, 2023, FBI SA Francisco Rivera and SA Benjamin Braverman interviewed Casey Corkrey, Manager of Bay Side Storage in Nehalem, OR, and Tara Corkrey, who ran the operations for Bay Side Storage, which was located at 36180 North Highway 101, Nehalem, Oregon 97131.   They informed the Agents that SMITH had rented unit A051 at Bay Side Self Storage since April 3, 2019 and was current on his rent.

21.     On May 24, 2023, FBI SA Rivera and SA Braverman interviewed Susan Hardin (Hardin) via telephone.   Hardin stated that she owned the residence located at 459 Alameda Avenue, Astoria, OR 97103 but had rented the residence to SMITH for the last four or five years.

22.     On May 26, 2023, FBI SA Daniel Lewis reviewed recordings of jail communication made to and by SMITH while in custody at the Williams County Correctional Center (WCCC), as well as documents uploaded to Homewav.com, which the WCCC utilizes for inmates to communicate with non-inmates.   Upon review of SMITH's May 25, 2023 video call with Miller, SA Lewis was able to view a photograph and copy of a driver's license that Miller had uploaded to Homewav.com.   On Miller's California driver's license, issued October 30, 2019, her current residence address was listed as Lincoln,

California 95648.

23.  On May 31, 2023, SA Lewis reviewed information provided to him, pursuant to a subpoena, by Cheaper Than Dirt! Comptroller Bill Robinson.   That information included invoices which indicated the following:

   a.  Invoice 13877725* from Cheaper Than Dirt!, dated May 22, 2018, indicated that "Marie Miller, [Redacted Street Address], Bay City, OR 97107" purchased three, twenty-round boxes of Hornady Black .450 Bushmaster ammunition and one Bulldog Extreme Scoped Rifle Case.

   b.  Invoice 13905274* from Cheaper Than Dirt!, dated June 8, 2018, indicated that "Marie Miller, [Redacted Street Address], Bay City, OR 97107" purchased seven, twenty-round boxes of Hornady Black .450 Bushmaster ammunition and two ten-round .223/5.56 caliber firearm magazines.

   c.  Invoice 14040999* from Cheaper Than Dirt!, dated September 6, 2018, indicated that "Marie Miller, [Redacted Street Address], Bay City, OR 97107" purchased two, five-round .450 Bushmaster firearm magazines.

   d.  Invoice 17671666* from Cheaper Than Dirt!, dated December 7, 2022, indicated that "Cam Smith, 459 Alameda Avenue, Astoria, OR 97103-6301" purchased, via check, seventeen five-round .450 Bushmaster firearm magazines.   SMITH subsequently returned ten of those magazines to Cheaper Than Dirt!.

24.  As noted in Invoice 17671666*, SMITH, who is a Canadian citizen illegally

002397

residing in the United States, purchased .450 Bushmaster rifle magazines, on December 7, 2022, and had them sent to his residence at 459 Alameda Avenue, Astoria, OR 97103-6301, which is the residence subject to this search warrant affidavit.   This December 7, 2022 date is between the dates of the similar Carpenter, South Dakota, and Ray, North Dakota, energy facility shootings.   Additionally, as noted above, law enforcement located a black .450 Bushmaster rifle, live rounds of .450 Bushmaster ammunition, and .450 Bushmaster rifle magazines inside duffel bags that SMITH abandoned in a Williston, North Dakota dumpster, on May 13, 2023, after utilizing the .450 Bushmaster rifle to discharge ammunition into the Ray, North Dakota, energy facility.

25.     On June 1, 2023, SA Lewis reviewed audio recordings of multiple conversations that occurred during recorded phone calls placed by SMITH, at WCCC, to Miller; Marilyn Smith (Marilyn), SMITH's mother; and Caroline (Caroline), who was determined to be SMITH's sister.   The following conversations occurred during the phone calls:

     a.   During the conversation with Miller, which occurred on May 26, 2023, at approximately 7:39pm, Miller stated that she was pulled aside and questioned by law enforcement at the airport after arriving in the United States from Canada.   Miller expressed frustration, because she believed that she was questioned by law enforcement because of SMITH's current criminal charges. Miller stated the following:

         i.   "All I ever tried to do was help you.   I asked you over and over, 'Is

this gonna, like, bite me?'  You said 'nope.'"

    ii.  "All of this shit is happening because, because, because, I was trying to be nice and didn't understand what you couldn't…I don't know, like, I don't know what Canadian citizens can do here.  I have no idea. Right, so, I mean, but those are the things, that I feel like I was trying to be nice, and, like, help, like, help, and like, all this shit is just fucking, but, like, I feel like you don't take it seriously."

b.  During the conversation with Caroline, which occurred on May 25, 2023, at approximately 7:09pm, SMITH stated that he would like Caroline to draft an email to "Becky", who was previously identified in this investigation as being Yasmin Jehan Malik, SMITH's personal assistant.  The email to Becky was to provide instructions for Becky to send to "Sue" regarding SMITH's personal possession inside his residence.  Law enforcement believes that "Sue" refers to SMITH's landlord, Hardin.  SMITH wanted Hardin to dispose of most of SMITH's personal property items.  SMITH wanted Hardin to ship, via United Parcel Service, multiple items from inside his residence to his mother's residence in Canada.  Notable among those items were:

    i.  A large purple Patagonia suitcase in the closet

    ii.  A large green backpack from the bedroom

    iii.  The router from the living room

    iv.  A laptop and charger from the living room

002399

     v. A manila envelope on the kitchen island containing Bahamas government documents

    c. During the conversation with Marilyn, which occurred on May 26, 2023, at approximately 6:49pm, SMITH directed Marilyn to draft a second email to Becky, with instructions on additional items that SMITH wanted Hardin to ship to Marilyn's residence in Canada, to include:

       i. USB drives from the coffee table

      ii. A USB drive from the television

     iii. A black iPhone in the kitchen drawer beside the cutlery

26.     Based on the facts of the case, I know that Smith is a Canadian citizen, was in possession of a Canadian passport, and was driving a car with state of Oregon plates. It is reasonable to believe that Smith traveled from outside of the state to commit criminal activity inside the states of South Dakota and North Dakota. From my training and experience, I know that individuals who travel will utilize Global Positioning Systems (GPS) in order to obtain turn by turn directions to arrive at a location. I know that GPS devices store location information and specific addresses. A search of the device is expected to provide law enforcement with additional addresses and locations related to the criminal activity.

27.     From training and experience, I know that individuals that commit criminal activity will use computers and tablets to, among other things, download maps, research and plan additional locations for criminal activity, communicate with co-conspirators, download

propaganda that promotes extremist ideology, and purchase items to facilitate the criminal activity. I know that Smith was in possession of firearms and ammunition, ski masks, duffel bags, flashlights, ear protection, and other various tools. A search of the computer and phone devices is expected to yield additional evidence of the research and purchase of the aforementioned items related to the criminal activity. Based on training and experience, an attack of a power substation of this nature was likely not a spur of the moment crime of opportunity. Instead, the attack was likely planned well in advance, including by researching the specific substation to attack, the best route to travel to arrive at the substation, acquiring and transporting firearms and ammunitions to the substation, and where, precisely, to shoot at the substation for the attack to be successful. Accordingly, there is probable cause to believe that Smith's electronic devices will contain evidence of the subject offenses, including his advanced planning and the means and methods by which he planned and carried out this attack.

28.     From training and experience, I know that individuals utilize USB drives (removable media) to transfer and store photos and documents between devices. A search of the USB drives is expected to yield additional photos and documents related to the criminal activity.

## TECHNICAL TERMS

29.     Based on my training and experience, I use the following technical terms to convey the following meanings:

     a. Wireless telephone:  A wireless telephone (or mobile telephone, or cellular

002401

telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard

002402

drives.   Most digital cameras also include a screen for viewing the stored images.   This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:   A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.   However, a portable media player can also store other digital data.   Some portable media players can use removable storage media.   Removable storage media include various types of flash memory cards or miniature hard drives.   This removable storage media can also store any digital data.   Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:   A GPS navigation device uses the Global Positioning System to display its current location.   It often contains records the locations where it has been.   Some GPS navigation devices can give a user driving or walking directions to another location.   These devices can contain records of the addresses or locations involved in such navigation.   The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.   Each satellite contains an extremely accurate clock.   Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.   These signals

are sent by radio, using specifications that are publicly available.   A GPS antenna on Earth can receive those signals.   When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:   A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.   Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.   PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.   Removable storage media include various types of flash memory cards or miniature hard drives.   This removable storage media can store any digital data.   Most PDAs run computer software, giving them many of the same capabilities as personal computers.   For example, PDA users can work with word-processing documents, spreadsheets, and presentations.   PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.   An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g.,

002404

121.56.97.178).   Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.   Most Internet service providers control a range of IP addresses.   Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

   g.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.   Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

   h.  SIM Card: A Subscriber Identity Module (SIM) card contains a unique serial number, which is used to identify and authenticate subscribers on a mobile network. Phones, smart watches, cameras, and computers all may contain SIM cards, depending on the device's ability to connect to a mobile network.

30.    Based on my training, experience, and research, I know that the Subject Devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, PDA, and an internet enabled device with IP addresses. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

002405

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

31.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.   Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.   This information can sometimes be recovered with forensics tools.

32.    Forensic evidence.   As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.   There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device.   This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their

use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a
storage medium that is necessary to draw an accurate conclusion is a dynamic
process.   Electronic evidence is not always data that can be merely reviewed
by a review team and passed along to investigators.   Whether data stored on a
computer is evidence may depend on other information stored on the
computer and the application of knowledge about how a computer behaves.
Therefore, contextual information necessary to understand other evidence also
falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use,
who used it, and when, sometimes it is necessary to establish that a particular
thing is not present on a storage medium.

f.   I know that when an individual uses an electronic device to communicate
with victims, the individual's electronic device will generally serve both as an
instrumentality for committing the crime, and also as a storage medium for
evidence of the crime.   The electronic device is an instrumentality of the
crime because it is used as a means of committing the criminal offense.   The
electronic device is also likely to be a storage medium for evidence of crime.
From my training and experience, I believe that an electronic device used to
commit a crime of this type may contain: data that is evidence of how the
electronic device was used; data that was sent or received; and other records

that indicate the nature of the offense.

33.     Nature of examination.   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.   The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## ACCESSIBILITY OF THE DEVICES

34.     Your Affiant knows from training and experience, as well as from information found in publicly available materials, that Apple Inc. ("Apple"), Motorola, and Samsung, among other companies, produce devices (such as phones and tablets) that can be unlocked via the use of a fingerprint or thumbprint (collectively, "fingerprint") or facial recognition in lieu of a numeric or alphanumeric passcode or password. Different companies have different names for their fingerprint sensor feature or facial recognition feature; for example, Apple's fingerprint recognition feature is called "Touch ID" and its facial recognition feature is called "Face ID."

35.     Once a user has set up the fingerprint sensor feature or facial recognition feature in the security settings of the device, the user can unlock the device by placing a finger or thumb on the device's fingerprint sensor or simply holding the camera in front of the user's face. If the fingerprint sensor recognizes the fingerprint or the camera recognizes the face, the device unlocks. Most devices can be set up to recognize multiple prints, so that

002408

different prints, not necessarily from the same person, will unlock the device. Some devices with the facial recognition feature can also be set up to recognize more than one user's face. Your Affiant has learned that users of devices with a fingerprint sensor feature or facial recognition feature often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user of the device is engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

36.     In some circumstances, fingerprint sensors or facial recognition will not work, and a passcode must be entered to unlock the device. For example, with Apple Touch ID and Face ID, a passcode or password must be used when: (1) more than 48 hours has passed since the last time the device was unlocked and (2) the device has not been unlocked via Face ID in 4 hours and the passcode or password has not been entered in the last 6 and a half days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID or Face ID are made. Other brands have similar restrictions.

37.     The passcode or password that would unlock the devices found during the search are not known to law enforcement. Thus, it will likely be necessary to hold the camera in front of the users or press the fingers of the users of any facial recognition or

fingerprint sensor-enabled devices, which fall within the scope of the warrant, in an attempt to unlock the devices for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant devices with the use of the fingerprints of the users is necessary because the agents may not otherwise be able to access the data contained on those devices for the purpose of executing the searches authorized by this warrant.

38.    Although Your Affiant does not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on training and experience Your Affiant knows that it is common for a user to unlock a fingerprint sensor-enabled device via the fingerprints on thumbs or index fingers. In the event that law enforcement is unable to unlock any devices as described above, successive failed attempts will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

39.    Due to the foregoing, I request that the Court authorize law enforcement to use reasonable force, if necessary, to press the fingers (including thumbs) of the devices user to the device or hold the device in front of the face of the user.

## CONCLUSION

40.    Based upon the foregoing, I believe probable cause exists to believe that evidence exists inside Cameron Monte Smith's residence that he has committed the offenses of Destruction of an Energy Facility, in violation of Title 18, United States Code, Section 1366(a); Receipt of a Firearm and Ammunition Used to Commit a Felony, in violation of Title 18, United States Code, Section 924(h); and Possession of a Firearm and Ammunition by an Illegal Alien in violation of Title 18, United States Code, Section 922(g)(5)(A).

002410

The foregoing is true to the best of my knowledge and belief.

Dated at Williston, North Dakota, this 2nd day of June, 2023.

Daniel Lewis, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this ____ day of June, 2023.

CLARE R. HOCHHALTER
United States Magistrate Judge

002411

## ATTACHMENT A

## PROPERTY TO BE SEARCHED

1.  459 Alameda Avenue, Astoria, Oregon 97103, is a duplex and is described as a light blue house with horizontal siding, white trim, and a black roof that sits on a slight hill, upward from Alameda Avenue.   The front door of the residence leading into the common area protrudes from the house towards Alameda Avenue and the numbers "459" are affixed vertically along the white trim to the right of the door.   There is white railing along the deck that extends off the southeast corner of the house.   Located directly adjacent to the southwest of the residence is a two-car garage, matching the residence with light blue horizontal siding and white trim.

2.  Specifically, the door to SMITH's residence is located to the right of the interior common area of the building, directly across from a staircase that leads to the separate unit located on the second floor.

002412

## ATTACHMENT B

## PROPERTY TO BE SEIZED

1.    Journal, records, receipts, notes, ledgers and other papers relating to the transportation, ordering, and purchase of firearms and/or ammunition.

2.    Papers, tickets, notes, receipts, and other papers relating to domestic and international travel;

3.    Books, records, invoices, receipts, records of real estate transactions, tax returns, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts and cashier's checks, safe deposit keys, money wrappers and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transfer, concealment, and/or expenditure of money;

4.    Computers, computer tablets such as iPads, cellular telephones, media storage devices associated with computers or cellular telephones, cellular telephone accessories, and any other items used to facilitate the use of cellular or other wire communications. This shall include the digital contents of any computer, computer tablet, cellular telephone, media storage device, or electronic device located, to be seized via photographic imaging, electronic imaging, or otherwise, either on scene or at a separate location.   The search of the digital contents of such devices shall include a search for any of the following information:

      a.   All records, data, and images, in whatever form and by whatever means

they have been created or stored on such devices, for evidence relating to violations of Title 18, United States Code, Section 1366(a) (destruction of an energy facility); Title 18, United States Code, Section 922(g)(5)(A) (possession of a firearm and ammunition by an illegal alien); and/or Title 18, United States Code, Section 924(h) (receipt of a firearm and ammunition used to commit a felony), CAMERON MONTE SMITH, his co-conspirators, and/or any unknown, or yet to be identified subjects, including the following: (a); information relating to the South Dakota or North Dakota attach sites and/or and previous or future attack sites; (b) any information related to sources of firearms and/or ammunition; (c) photographic or video images of firearms and/or ammunition, money or monetary instruments, money wire transactions or receipts; (d) any information recording the travels CAMERON MONTE SMITH, his co-conspirators and/or any unknown, or yet to be identified subjects; (e) any financial account and transaction information;   (f) electronic message documentation and content, including sent, unsent, received, or attempted messages whether they are texts, chats, tweets, images, videos, emails, or some other form of electronic message involving firearms, ammunition or the South Dakota or North Dakota attach sites and/or and previous or future attack sites; and, (g) digital documents, messages, or other information tending to show dominion and control over the electronic

device at the time of its use.

b.  During the execution of the search of seized electronic communication devices as described in Paragraph 5, law enforcement personnel are authorized to press the fingers (including thumbs) of individuals found at the Subject Premises to the Touch ID sensor of electronic communication devices, such as an iPhone or iPad, found at the Subject Premises for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

5.   United States currency, precious metals, jewelry, and financial instruments, including stocks and bonds;

6.   Photographs, including still photos, negatives, video tapes, films, electronic images, undeveloped film and the contents thereof, slides, and in particular photographs, etc., of co-conspirators, of assets, and/or firearms and ammunition;

7.   Address and/or telephone books, electronic contact records, and any papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers, email or other electronic contact information, and/or telex numbers of co-conspirators, sources of supply, customers, financial institutions, and other individuals, businesses and institutions with whom a financial relationship exists;

8.   Indicia of occupancy and/or residency, rental and/or ownership of the premises, including utility and telephone bills, rental, purchase or lease agreements, and keys;

002415

9.      Firearms and ammunition. Firearm parts. Firearm Accessories. Tools or equipment to manufacture firearms. Any and all receipts, invoices, notes, ledgers and other papers relating to the transporting, ordering, purchase, acquisition or distribution of firearms, parts for firearms and accessories for firearms.

10.     Packaging associated with firearm and/or ammunition.

11.     Records or other documents pertaining to bank accounts, tracking information, and other documents pertaining to deliveries or shipments of packages via express or priority mail or common carrier such as United Parcel Service or Federal Express.