IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:23-cr-00118 |
| Plaintiff, | |
| | **UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND REQUEST FOR FRANKS HEARING** |
| v. | |
| CAMERON MONTE SMITH, | |
| Defendant. | |

The United States of America, by Mac Schneider, U.S. Attorney for the District of North Dakota, and David D. Hagler and Jonathan J. O'Konek, Assistant U.S. Attorneys, hereby responds to the defendant's motion to suppress and request for <u>Franks</u> hearing (Doc. No. 38).

## **PREFACE**

**i.    <u>Franks Hearing</u>**.

Based upon the facts contained within the defendant's motion, which are supported by attached reports and affidavits, the United States agrees with the defendant that it is appropriate for this Court to schedule a <u>Franks</u> hearing to coincide with the defendant's suppression motion hearing.

**ii.    <u>Interior Vehicle Search</u>**.

The United States agrees with the defendant that this Court should suppress all evidence that law enforcement located during their interior search of the defendant's Honda Element and all subsequent searches of the defendant's vehicle.

**iii.    <u>Microtel Room 123 Search</u>**.

The United States agrees with the defendant that this Court should suppress all evidence discovered by law enforcement inside the defendant's room (Room 123) at the Williston, North Dakota, Microtel Inn & Suites Hotel (Microtel).

#### iv.  <u>**Basis for Suppression of the Above Evidence**</u>.

The United States concedes, when law enforcement conducted their initial, May 13, 2023, interior search of the defendant's Honda Element, they did not have a search warrant and the vehicle did not constitute abandoned property under Eighth Circuit Court of Appeals' precedent. The United States also concedes that law enforcement's initial search of the defendant's Honda Element was not based upon probable cause and did not meet the automobile exception or another warrantless search exception. The United States further concedes that the search warrant application that law enforcement submitted in support of the May 13, 2023 search warrant for the defendant's Microtel hotel room did not contain probable cause to search this hotel room because it contained information obtained from the aforementioned warrantless search of the defendant's vehicle. Finally, the United States concedes that the May 15, 2023 search warrant for the defendant's Microtel hotel room was tainted by the circumstances of the previous May 13, 2023 hotel room search.  Consequently, the United States asks this Court to grant the defendant's motion to suppress evidence, in part, by excluding all evidence that law enforcement obtained from the interior of the defendant's vehicle and inside the defendant's hotel room.

#### v.  <u>**All Remaining Evidence is Admissible**</u>.

However, the United States requests that this Court deny the defendant's motion to suppress any other evidence obtained by law enforcement in this case. Specifically, the United States asserts: 1) probable cause existed in law enforcement's search warrant affidavit to obtain the defendant's DNA; 2) the bags law enforcement discovered in a Williston, North Dakota dumpster—which contained a .450 Bushmaster rifle and 9mm Sig Sauer pistol—are admissible under the inevitable discovery, independent source, attenuation, and abandonment exceptions;

and 3) the FBI's subsequent search warrants were supported by probable cause and are admissible under the independent source, attenuation, and good faith exceptions.

## I.   INTRODUCTION

### A.  Factual Background

On May 13, 2023, the defendant fired multiple rounds from a high-powered .450 Bushmaster rifle into key components of the Wheelock Substation located near Ray, North Dakota. At the time of this shooting, the defendant was a Canadian citizen residing, without proper authority, in the United States as an illegal alien. After the defendant engaged in the substation shooting, on May 13, 2023—as depicted in both hotel and business surveillance videos—the defendant possessed bags containing a .450 Bushmaster rifle and a 9mm Sig Sauer pistol and discarded these firearms into a dumpster in Williston, North Dakota. As explained in detail below, and pertinent to the United States' inevitable discovery, attenuation, independent source, and good faith arguments, law enforcement identified that the defendant was the person responsible for the shooting at the substation based upon multiple, independent sources, namely:

1. **Items and Information discovered at the Wheelock Substation**, **(Doc. Nos. 41-4 and 41-1)**:

   a. Bullet holes created by a high-powered rifle. (Bates 43-44);
   b. .450 Bushmaster shell casings. (Bates 43);
   c. At 10:56 a.m. WCSO Sergeant Justin Roberts took a timestamped photograph of a UR Next Towing Truck on the road outside of the substation. (Bates 202). Photograph of Tow Truck driving near substation. US Exhibit 01.

2. **Items and information visible on the outside, or within plain view through the windows, of the defendant's Honda Element, registered to Marie Miller**, **(Doc. No. 41-1)**:

   a. That the vehicle was stuck in the mud, and someone had attempted to extract the vehicle from the mud. (Bates 201);

    b.  That the vehicle had Oregon license plates and was registered to a woman named Marie Miller. (Bates 201). Photographs of Honda Element in Field. US Exhibit 02;

    c.  A USDA Forest Service proof of payment hangtag with handwritten "Date In: 5-12" and "Date Out: 5-13". (Bates 201);

    d.  Boots and male clothing. (Bates 203).

**3.** **Statements obtained from Lloyd Richard Bratrsovsky (Richard), UR Next Towing tow truck driver, (Doc. No. 41-1):**

    a.  Richard had picked up the defendant at the site where the Honda Element was stuck in the mud. (Bates 202);

    b.  The defendant had a backpack and duffel bags with him. (Bates 202)

    c.  Richard drove the defendant to the Williston, North Dakota, Microtel Inn and Suites (Microtel). (Bates 202); and

    d.  After dropping the defendant off at the Microtel, Richard later received a phone call from the defendant who informed Richard that his name was "Cam Smith." (Bates 203-04; 205-06).

**4.** **Statements obtained from, Mary Catherine Smith and Jacob Zawada, (Doc. No. 41-1):**

    a.  Both individuals informed law enforcement that they interacted with a man, matching the defendant's description, near the location where the Honda Element was stuck in the mud. (Bates 206-07).

**5.** **Items and information within the possession of the Williston, North Dakota, Microtel, (Doc. No. 41-4):**

    a.  Registration information showing that the defendant had checked-in as a guest at the Microtel. (Bates 45);

    b.  Surveillance videos showing the defendant at the hotel, and later leaving the hotel, with a luggage cart with two bags that law enforcement later found in a dumpster. (Bates 45-46). US Exhibit 03.

        i.  Timestamp 38:47 (05-13-2023 /11:38:46): The defendant enters frame with a dolly and goes into a room.

        ii.  Timestamp 39:32 (05-13-2023 / 11:39:31): The defendant takes bags from a dolly and puts them in a room.

        iii.  Timestamp 50:00 (05-13-2023 / 11:49:59): The defendant leaves room with bags on a dolly.

        iv.  Timestamp 51:26 (05-13-2023 / 11:51:25): The defendant pushes a black and red bag and a blue bag on a dolly out of frame. Law enforcement found these bags in a dumpster in Williston, North Dakota.

6. **Multiple surveillance videos from Businesses in Williston, North Dakota, (Doc. No. 41-4):**

   a. The defendant walks down the streets of Williston, North Dakota, wheeling a dolly with the two bags depicted in the Microtel surveillance footage and that law enforcement later found in a Williston, North Dakota dumpster. (Bates 45-46);
   b. Thereafter, the defendant moves near a dumpster with the dolly and two bags. US Exhibit 04.
      i. <u>Timestamp 50:52</u>: The defendant enters the camera's field of view, from the left, wheeling a dolly with bags.
      ii. <u>Timestamp 51:50</u>: The defendant standing beside a dumpster.
      ii. <u>Timestamp 52:48</u>: The defendant walking on the opposite side of the street, closer to the camera.

7. **Items obtained from a dumpster in Williston, North Dakota, (Doc. Nos. 41-4; 41-1):**
   a. Two bags—identical to the two bags the defendant possessed in the above two surveillance videos—which contained a .450 Bushmaster rifle, ammunition, a 9mm Sig Sauer, spent .450 Bushmaster shell casings, and other items tying the defendant to the substation shooting. (Bates 46-47; 205).
   b. Photographs of items found in the dumpster and contents of the bags. US Exhibit 05.

8. **Statements obtained from Marie Miller**, US Exhibits 06-07.

   a. She purchased the Honda Element for the defendant;
   b. She purchased a .450 Bushmaster rifle and ammunition for the defendant; and
   c. At one point, her ex-husband owned a 9mm Sig Sauer

9. **The defendant's DNA was located on several items involved in the substation shooting**, US Exhibit 08.

   a. On the Sig Sauer and
   b. On portions of the .450 Bushmaster rifle

10. **Items and information located at the defendant's Astoria, Oregon Residence**, US Exhibit 09.

    a. A rifle scope and pistol box. US Exhibit 10.
    b. Environmentalist periodicals. US Exhibit 11.
    c. Maintenance receipt for the 2005 Honda Element. US Exhibit 12.
    d. Electronic devices.

11. **Invoices obtained from Cheaper than Dirt, a firearms dealer**, US Exhibits 13-14.

    a. An invoice showing that the defendant purchased .450 Bushmaster ammunition magazines on January 7, 2022. (Bates 1511).

    b. An invoice showing that Marie Miller purchased .450 Bushmaster ammunition on May 22, 2018. (Bates 1512).

12. **Information and items obtained from the defendant's Oregon storage unit**, US Exhibit 15.

    a. FBI receipt of property form showing a Sig Sauer Gun Case, Levpold Rifle Scope Box, and Tannerite.

13. **Information obtained from United States Citizenship and Immigration Services**, US Exhibit 16.

    a. USCIS Certificate of Non-Existence. "That after a diligent search was performed in these database systems, no record was found to exist indicating that the subject listed below obtained consent at any time prior to March 1, 2003."

The United States asserts, other than the interior search of the defendant's Honda Element and Microtel hotel room, every other law enforcement search was based upon a warrant supported by probable cause or represents evidence that law enforcement would have inevitably discovered or discovered from an independent source.

## B. Event Timeline

Based upon Williams County Sheriff's Office (WCSO) Sergeant Justin Roberts' report narratives (Doc. No. 41-1) (Bates 198-202; and 205-208), and subsequent FBI interview (US Exhibit 17) at 9:45 a.m., on May 13, 2023, the WCSO received a vandalism call for service with Basin Electric Power Cooperative and Mountrail Williams Electric Cooperative employees reporting that someone had discharged a firearm into transformers and equipment at the Wheelock Substation, located at the intersection of Highway 2 and 121st Avenue NW, near Ray, North Dakota. At approximately 10:21 a.m., Sergeant Roberts responded to this call, arrived at

the substation, and noted that the weather was overcast, steady rainfall, and strong sustained

winds. Sergeant Roberts walked along the outside substation fence and observed rocks spray

painted with markings, including XR and DAPL, and observed .450 Bushmaster shell casings, a

broken zip tie, and tire tracks. WCSO officers, including Detective Amber Dickerson, observed

multiple bullet holes throughout the substation.

    1. Tow Truck Vehicle Photograph.

While Sergeant Roberts walked along the east fence line, he observed a tow truck

travelling northbound on 121st Avenue NW toward Highway 2. Since Sergeant Roberts believed

this was unusual due to the lack of residences and limited amount of vehicle traffic in the area, at

10:56 a.m., he took a photograph of the tow truck. This photograph depicts UR Next Tow Truck

on the road outside of the substation. US Exhibit 01. Sergeant Roberts later recounted that "the

tow truck passing him earlier that morning was suspicious even before law enforcement located

the vehicle in the field. If the vehicle that was stuck had not been located in the field later that

day, then following up with the tow truck driver who drove passed [him] that morning would

have been the only lead on which [he] would have thought to follow up, because [he] did not

know why the tow truck was out there." US Exhibit 17.

Sergeant Roberts spoke to the general manager of MWEC who informed him that the

substation had sustained bullet strikes to three voltage regulators, an exterior light, transformers,

bushings, and circuit breaker door. Thereafter, WCSO Detective Dickerson observed a vehicle

located southeast of the substation in the middle of a field approximately one-half mile to three-

quarters of a mile east of 121st Avenue NW. Sergeant Roberts and Corporal Tanner Tougas

drove to the vehicle. Upon arrival at the vehicle site, Sergeant Roberts determined that the

vehicle was a black in color Honda Element, bearing Oregon license plate 273 LXW, with an

enclosed luggage container attached to the vehicle's roof rack. Sergeant Roberts noted that the vehicle was stuck in the mud, unoccupied, and locked.

Corporal Tougas looked through the vehicle's windows and observed clothing items, including large shoes or boots that appeared to be for hiking. Sergeant Roberts photographed the exterior of the Honda Element and noted a USDA Forest Service proof of payment form. After law enforcement ran the license plate number of the mud-stuck Honda Element, they learned that a woman named Marie Miller, of Oregon, was the vehicle's registered owner. After speaking with the Williams County States Attorney's Office, WCSO law enforcement determined that a search would be conducted of the Honda Element. Corporal Tougas broke a window to gain entry to the Honda Element and, inside the vehicle, law enforcement found an empty soft shell gun case, an owner's manual for a Bushmaster rifle, and a "Cheaper Than Dirt" receipt for the purchase of .450 Bushmaster ammunition, with the name Marie Miller as the purchaser.

2.  <u>UR Next Towing Tow Truck Driver</u>.

Thereafter, at approximately 2:58 p.m., Sergeant Roberts contacted Lloyd "Richard" Bratrsovsky, a Tow Truck Driver for UR Next Towing, out of Tioga, North Dakota, to request that he tow the Honda Element. However, prior to Sergeant Roberts finishing his explanation to Richard about the mud-stuck Honda Element, Richard advised Sergeant Roberts, earlier that day, he had been contacted to tow that same Honda Element. Additionally, Richard stated that he had given a male a ride from the scene of the stuck vehicle to the Microtel in Williston, North Dakota. Furthermore, Richard told Sergeant Roberts that he had received two separate phone calls from passerby's (later identified as Marie Smith and Jacob Zawada) who called him on behalf of a male requesting a tow in the vicinity of the Honda Element.

Richard further told Sergeant Roberts that he did not have the male's name or phone number but described him as approximately 50 years old, with partial gray hair, round face, approximately 200 pounds, and with nice equipment. Additionally, Richard informed Sergeant Roberts that the male had a backpack and some duffel bags with him. Finally, Richard explained to Sergeant Roberts that he told the male he would not be able to tow him until Monday when it was dry so, instead, Richard stated he gave the male a ride to the Microtel in Williston. After speaking with Richard, Sergeant Roberts recalled taking the picture of the mid-sized tow truck earlier in his investigation.

Corporal Tougas remained at the site of the Honda Element and met with Richard from UR Next Towing. According to Corporal Tougas' report, (Doc. No. 41-1) (Bates 203-04), he learned from Richard the following additional information: 1) UR Next Towing had responded to assist the male and arrived at the field access around 10:09 a.m. when they told the male they could not tow the vehicle due to the muddy conditions caused by the recent rain; 2) they provided the male with a ride to Microtel in Williston, North Dakota; 3) the male was identified as "Cam Smith" with a phone number of 647-559-8790; and 4) when they had initially responded to assist the male they told him they would not attempt the recovery and the male said he would pay "triple." Once UR Next Towing towed the vehicle, based upon Detective Bernier's affidavit, law enforcement obtained a search warrant to further search the Honda Element. (Doc. No. 41-9) (Warrant No. 2023-01181). As noted above, the United States concurs with the defendant that this Court should suppress the evidence located during the interior search of the Honda Element, so will not further address this search warrant affidavit or search execution.

3. <u>Williston Microtel Guest Information</u>.

After law enforcement learned from Richard from UR Next Towing that Richard had transported a man from the site of the stuck Honda Element to the Williston, North Dakota Microtel, members of the WCSO travelled to the Microtel to gather additional information. Thereafter, law enforcement learned from hotel staff that a man named "Cameron Smith" had checked into the Microtel, was provided room 123, and that he had used a Canadian passport image for check-in bearing the name Cameron Monte Smith. Law enforcement located Cameron Smith at the Microtel and arrested him. Based upon Detective Dickerson's affidavit, a search warrant was issued to search the defendant's hotel room (room 123) for a .450 Bushmaster Rifle, ammunition, ID cards, spray paint, documents, and correspondence. (Doc. No. 41-6) (Warrant No. 2023-01180). As noted above, the United States concurs with the defendant that this Court should suppress law enforcement's two searches of Microtel room 123, so will not further address this search warrant affidavit or search execution.

The next day, on May 14, 2023, Sergeant Roberts formally interviewed Richard of UR Next Towing. During this interview, Richard provided the following additional information to Sergeant Roberts. At approximately 08:56 a.m., on May 13, 2023, he received a phone call from a woman named Mary (later identified as Mary Smith) requesting a tow for a male she had located on 119th Avenue NW approximately one and one-half miles south of Highway 2. While responding to the request for the tow, he received a second call, at approximately 09:38 a.m., from an unknown male (later identified as Jacob Zawada) requesting a tow for a male he had located at the same location Mary had previously described. When Richard arrived at the male's location, he saw the male standing on an approach off of 119th Avenue NW. The male got into Richard's tow truck, and they drove to the site of the stuck vehicle. After a short assessment of

the situation, Richard told the male he could not tow the vehicle due to the muddy conditions. At this time, the male offered Richard triple his normal rate to tow the vehicle. The male requested Richard and his son, Chris, who was assisting with the tow, walk to the vehicle to grab belongings. Richard told the male he would not walk to the vehicle but would wait for the male to fetch his belongings. The male walked to his vehicle, spent time gathering items, and returned with several bags and a cart, which Richard described as a blue/black duffel bag, a tan duffel-style bag, an orange duffel bag, and a backpack-style bag. Richard drove the male to the Microtel where the male exited his tow truck, retrieved a luggage cart from the hotel, and placed his bags from the tow truck onto the luggage cart. At this time, Richard did not obtain the male's name or phone number. However, after Richard spoke with Sergeant Roberts, he received a phone call from the male that Richard drove to the Microtel. The male asked Richard if he could pay for the tow once completed on Monday with a credit card over the phone. Richard told the male he would need his name and phone number so Richard could communicate with the male about the tow. The male provided the name Cam Smith with a phone number of 647-559-8790 which Richard's son Chris logged into the note section of his iPhone.

    4. <u>Williston Microtel and Business Surveillance Footage</u>.

Thereafter, law enforcement returned to the Microtel to review surveillance video and discovered a Microtel camera which depicted the defendant, at approximately 11:50 a.m., on May 13, 2023, leaving the hotel with a cart and bags. US Exhibit 03. Law enforcement located active cameras on the exterior of Astro Chem-Lab at 4102 2nd Ave. W., Williston, North Dakota, which showed the defendant walking east on 42nd Street then crossing 42nd Street toward a dumpster in the Hollen Auto Body shop parking lot. This video depicted the defendant

pulling a small cart with the two bags that he had taken with him from the Microtel. US Exhibit 03.

     5.  <u>Bags Abandoned in a Williston, North Dakota Dumpster</u>.

     Thereafter, law enforcement began searching dumpsters in the area depicted in the above video footage. Later that day, WCSO Deputy Hayden Kuchler and Sergeant Roberts located two duffel bags in a dumpster at Williston Garden Apartments. Deputy Kuchler advised Sergeant Roberts that she had located in the dumpster a bag, gray in color with a red zippered area, consistent with the bag depicted on the Microtel surveillance image. Sergeant Roberts unzipped the bag and found a .450 Bushmaster rifle and loose 450 Bushmaster ammunition rounds. Shortly thereafter, Deputy Kuchler located a blue bag in the same dumpster, which was buried under several trash bags and was consistent with the second bag depicted in the Microtel surveillance image. Sergeant Roberts retrieved the bag from the dumpster and, therein, located magazines for a .450 Bushmaster, .450 Bushmaster ammunition, a 9mm Sig Sauer handgun with several magazines, several boxes of ammunition, and spent .450 Bushmaster shell casings.

     On May 15, 2023, based upon an affidavit authored by Detective Dickerson, law enforcement received an additional warrant for the defendant's Microtel hotel room (room 123) for documents, correspondence, and/or other writings whether in paper or electronic format, cash/currency, and financial related documentation electronic devices (Doc. No. 41-11, pg. 2) (Warrant No. 2023-01187) and a warrant for the defendant's DNA (Doc. No. 41-11, pg. 1) (Warrant No. 2023-01185). As noted above, the United States concurs with the defendant that this Court should suppress law enforcement's two searches of Microtel room 123, so will not further address the Microtel search warrant or search execution. However, the United States

asserts that Detective Dickerson's affidavit establishes probable cause to search and obtain the defendant's DNA, even after removing any inadmissible statements.

6.   Det. Dickerson's DNA Search Warrant Affidavit. (Doc. No. 41-13).

In Detective Dickerson's affidavit, she sets forth the following facts, which the United States has amended by striking through what it states constitutes erroneous information or information obtained as a result of searches lacking probable cause or a warrantless search exception:

1.   That she has knowledge and information regarding the following:

2.   That at approximately 9:45 AM on May 13, 2023, the Williams County Sheriff's Office received a report of significant damages observed at power station shared by Mountrail Williams Electric Cooperative and Basin Electric Power Cooperative in/near Ray, in Williams County, ND.

3.   That upon arrival at the reported location, law enforcement was informed that various transformers and other equipment on the property had been shot by a firearm. The property owners indicated to law enforcement that the damage to the Ray power station from the shooting is estimated to exceed $100,000.00. Law enforcement was informed that two power boxes were damaged on the site and said power boxes are estimated to cost between one million and four million dollars.

4.   That upon investigation, law enforcement recovered 450 Bushmaster shell casings at the scene. Law enforcement observed the words "DAPL" and other symbols spray painted in the rocks outside of the power station. The property owners told law enforcement the rocks were not spray painted prior to this incident.

5.   That a vehicle~~, which appeared to be abandoned,~~ was located ~~on the property where the shooting occurred,~~ and was identified as a Honda Element bearing Oregon Plates: 273LXW. ~~The property owners notified law enforcement that the vehicle was suspicious and should not have been on the property.~~ Law enforcement observed that the vehicle appeared to have gotten stuck in the mud.

~~6.   That law enforcement observed the vehicle to contain an empty rifle case with correspondence/documentation of the name "Cameron Smith", as well as a receipt for the same caliber of ammunition/casings which matched the 450 Bushmaster Rifle casings found at the power station shooting site.~~

7.   That law enforcement contacted a tow truck company to come and remove the vehicle from the property, and the tow truck driver told law enforcement that

he picked up a male that morning and gave the male a ride to Microtel Inn, due to his vehicle being stuck in the mud. It should be noted that the vehicle was located approximately one mile from the site of the shooting.

8.      That law enforcement responded to the Microtel Inn and spoke with hotel management. Management provided a roster of all guests and Cameron Smith was listed on the roster as a guest in Room 123 at the motel. Motel management also confirmed that Cameron Smith provided a Canadian ID card at time of check-in.

9.      That law enforcement located Cameron Smith at the Microtel Inn. Mr. Smith was placed under arrest and transported to the Williams County Correctional Center.

10.     ~~That Det. Dickerson subsequently applied for and received a search warrant for the Microtel Inn room rented by Cameron Smith. Upon execution of the search warrant, various items were located and secured as evidence, including live rounds matching the ammunition used at the power substation scene.~~

11.     ~~That while in the room, Det. Dickerson observed written documents relating to travel plans and/or other plans. Det. Dickerson noted that maps had been previously observed within Smith's motor vehicle, which related to other power substations/sites. Det. Dickerson observed additional writings, which appeared to be journaling-style handwritten documentation.~~

12.     ~~That Det. Dickerson also observed multiple envelopes, a number of which contained $400.00, that appeared to be in $SO-bill increments. Said envelopes were labeled $400.00" and some envelopes were empty.~~

13.     That upon additional investigation, including the viewing of video surveillance footage in the area of the Microtel Inn, and the foot path taken by Cameron Smith after the shooting, law enforcement observed that Mr. Smith was in possession of a dolly/cart-like apparatus which contained various duffel bags.

14.     That upon review of the footage, law enforcement observed that Cameron Smith appeared to have deposited the duffel bags in the vicinity. Upon conducting a search of the foot path of Cameron Smith after the shooting, law enforcement located multiple duffel bags. One or more of the duffel bags were located within garbage dumpster(s).

15.     That Det. Dickerson observed the duffel bags to contain various casings and/or live rounds of ammunition matching the ammunition used at the power substation scene, and a 450 Bushmaster rifle.

16.     That Cameron Monte Smith willfully damaged property at the power substation belonging to Mountrail Williams Electric Cooperative and Basin

Electric Power Cooperative by shooting a firearm at power boxes and other equipment. Said power substation sustained damages in excess of $10,000.00.

17.     That on May 15, 2023, Det. Dickerson received information from Basin Electric Power Cooperative and was informed that the damages are currently estimated between eight million and ten million dollars, however damage estimates are ongoing at this time, and final figures are currently unknown.

18.     ~~That as a result of the ongoing investigation, law enforcement has secured various pieces of evidence from the scene, the hotel room of Cameron Smith, and the motor vehicle of Cameron Smith, to be sent to the North Dakota Crime Lab for analysis.~~

19.     That Det. Dickerson is requesting a search warrant requesting for production of DNA evidence in the form of blood and/or saliva and/or hair fibers from the person of an individual identified as Cameron Monte Smith, DOB: 09-30-1974, currently located at the Williams County Correctional Center, in the city of Williston, in Williams County, ND.

20.     That the request is made in an effort to test the DNA of Cameron Smith against evidence located during the investigation.

21.     ~~That Det. Dickerson is requesting a search warrant for the Microtel Inn & Suites, Room #123, identified as a four story, multi-room hotel, tan/ in color, located at 3820 4th Avenue West, Williston, Williams County, ND, to locate the following items: documents, correspondence, and/or other writings, whether in paper or electronic format; cash/currency and financial related documentation; electronic devices.~~

Based on the information contained in Detective Dickerson's affidavit, the search warrant was signed by Magistrate Joshua Rusted on May 15, 2023.

7.  Marie Miller Interviews (US Exhibits 06 and 07).

On May 21 and June 14, 2023, FBI special agents interviewed Marie Miller, the defendant's former girlfriend, and the individual law enforcement identified as the listed registered owner of the Honda Element. Miller told agents that she purchased the Honda Element for the defendant and, based upon the defendant's request, agreed to register it under her name. Miller confirmed that the defendant paid her back for the cost of the car and told law enforcement that the vehicle was the defendant's car. Additionally, Miller stated that the

defendant asked her to buy him a black Bushmaster rifle, which she purchased for the defendant, at a gun store in Corvallis, Oregon. Furthermore, Miller stated she and her ex-husband used to have a Sig Sauer 9mm handgun and a 12-gauge shotgun.

8.  FBI Search Warrant Applications.

Between May 22 and October 10, 2023, the FBI obtained six federal search warrants for:

i.   The defendant's electronic devices (case number 1:23-mj-262)

(Doc. No. 41-15);

ii.   AT&T cell towers (case number 1:23-mj-270) (Doc. No. 41-16);

iii.  Verizon cell towers (case number 1:23-mj-274) (Doc. No. 41-17);

iv.   T-Mobile cell towers (case number 1-23-mj-278) (Doc. No. 41-18);

v.   A residence located at 459 Alameda Avenue, Astoria, Oregon 97103,

rented by Cameron Smith (case number 1:23-mj-281) (Doc. No. 41-19); and

vi.   A search of the Honda Element for additional DNA evidence (case

number 1:23-mj-547).

Each of these warrants are supported by probable cause through affidavits presented to the court by FBI SA Randy Larkin or FBI SA Daniel Lewis.

9.  Inevitable Discovery, Independent Source, Attenuation, and Abandonment.

Based upon the above information, even without learning of the contents of the defendant's vehicle, law enforcement would have taken steps to interview both Richard from UR Next Towing and Marie Miller, the defendant's former girlfriend, who would have inevitably provided law enforcement information linking the defendant:

i.       As the person driving the Honda Element which law enforcement

discovered stuck in the mud on May 13, 2023;

16

ii.      To the Microtel where law enforcement found surveillance video showing the defendant departing the hotel with two bags later found in a Williston, North Dakota dumpster containing a .450 Bushmaster rifle and 9mm Sig Sauer; and

iii.     To the .450 Bushmaster rifle and the 9mm Sig Sauer located in those two bags, which the defendant abandoned in a Williston, North Dakota dumpster.

Consequently, with the exception of law enforcements interior searches of the Honda Element and law enforcements searches of Microtel hotel room 123, law enforcement would have had independent sources linking the defendant to, or would have inevitably discovered, all evidentiary items identified or seized in this case.

## II.      ARGUMENT

### A.  There Was Not a <u>Franks</u> Violation[1] in Detective Dickerson's Search Warrant Affidavit to Obtain the Defendant's DNA

The United States agrees with the defendant that WCSO Detective Dickerson's DNA Search Warrant Affidavit includes both erroneous statements and statements based upon prior illegitimate searches of the defendant's Honda Element and Microtel hotel room; however, the United States also asserts, even after removing the contested language, probable cause exists within the affidavit to obtain a search warrant for the defendant's DNA. (Doc. No. 41-13). According to both Supreme Court and Eighth Circuit Court of Appeals' precedent, this Court must conduct a two-step analysis to determine the existence of a <u>Franks</u> violation.  <u>See</u> <u>United</u>

---

[1] Since the United States concurs with the defendant that this Court should suppress the evidence obtained from law enforcement's three state search warrants for the interior of the defendant's Honda Element and the defendant's Microtel hotel room, the United States will only address the fourth state search warrant for the defendant's DNA.

States v. Finley, 612 F.3d 998, 1002 (8th Cir. 2010) citing Franks v. Delaware, 438 U.S. 154,

155–56 (1978) (explaining that "[t]o void a search warrant under Franks, a defendant must show

by a preponderance of evidence that (1) the affiant included in the warrant affidavit 'a false

statement knowingly and intentionally, or with reckless disregard for the truth,' and (2) 'the

affidavit's remaining content is insufficient to establish probable cause.'"). Moreover, to prevail

on a challenge to a warrant affidavit under Franks, 438 U.S. 154, for omissions of fact, the

defendant must show: "(1) that facts were omitted with the intent to make, or in reckless

disregard of whether they make, the affidavit misleading; and (2) that the affidavit, if

supplemented by the omitted information, could not support a finding of probable cause." United

States v. Conant, 799 F.3d 1195, 1200 (8th Cir. 2015). Specifically, reckless disregard requires

showing that the officer "must have entertained serious doubts as to the truth of his statements or

had obvious reasons to doubt the accuracy of the information." Id. Recklessness can be inferred

from the omission "when the material omitted would have been clearly critical to the finding of

probable cause." Id.

Regarding the first step, the United States asserts that Detective Dickerson did not

knowingly or intentionally lie in her affidavit. However, without specifically agreeing that the

erroneous statements included in Detective Dickerson's affidavit were made in "reckless

disregard for the truth," the United States does concede that it is appropriate for this Court to

proceed to the second step and excise the erroneous statements and the statements from prior

illegitimate searches contained within this affidavit. However, as noted below, even after

removing any erroneous, misleading, or otherwise inadmissible language from Detective

Dickerson's affidavit, there still exists probable cause within this affidavit warranting the

issuance of a search warrant for the defendant's DNA.

18

1.     **Det. Dickerson's Revised Affidavit.** (Doc. No. 41-13).

In the United States' "Event Timeline" (paragraph 2.B.6, *supra*), it outlined Detective Dickerson's, May 15, 2023, affidavit but "struck through" the portions of this affidavit that were either inaccurate, misleading, or based upon prior disputed searches. In the below paragraphs, the United States has removed this "struck through" language and consolidated the remaining portions of Detective Dickerson's affidavit into one continuous, unbroken format so that this Court can conduct a *de novo* probable cause review. Consequently, Detective Dickerson's affidavit now reads:

1.     That she has knowledge and information regarding the following:

2.     That at approximately 9:45 AM on May 13, 2023, the Williams County Sheriff's Office received a report of significant damages observed at power station shared by Mountrail Williams Electric Cooperative and Basin Electric Power Cooperative in/near Ray, in Williams County, ND.

3.     That upon arrival at the reported location, law enforcement was informed that various transformers and other equipment on the property had been shot by a firearm. The property owners indicated to law enforcement that the damage to the Ray power station from the shooting is estimated to exceed $100,000.00. Law enforcement was informed that two power boxes were damaged on the site and said power boxes are estimated to cost between one million and four million dollars.

4.     That upon investigation, law enforcement recovered 450 Bushmaster shell casings at the scene. Law enforcement observed the words "DAPL" and other symbols spray painted in the rocks outside of the power station. The property owners told law enforcement the rocks were not spray painted prior to this incident.

5.     That a vehicle was located and was identified as a Honda Element bearing Oregon Plates: 273LXW. Law enforcement observed that the vehicle appeared to have gotten stuck in the mud.

6.     That law enforcement contacted a tow truck company to come and remove the vehicle from the property, and the tow truck driver told law enforcement that he picked up a male that morning and gave the male a ride to Microtel Inn, due to his vehicle being stuck in the mud. It should be noted that the vehicle was located approximately one mile from the site of the shooting.

7.      That law enforcement responded to the Microtel Inn and spoke with hotel management. Management provided a roster of all guests and Cameron Smith was listed on the roster as a guest in Room 123 at the motel. Motel management also confirmed that Cameron Smith provided a Canadian ID card at time of check-in.

8.      That law enforcement located Cameron Smith at the Microtel Inn. Mr. Smith was placed under arrest and transported to the Williams County Correctional Center.

9.      That upon additional investigation, including the viewing of video surveillance footage in the area of the Microtel Inn, and the foot path taken by Cameron Smith after the shooting, law enforcement observed that Mr. Smith was in possession of a dolly/cart-like apparatus which contained various duffel bags.

10.     That upon review of the footage, law enforcement observed that Cameron Smith appeared to have deposited the duffel bags in the vicinity. Upon conducting a search of the foot path of Cameron Smith after the shooting, law enforcement located multiple duffel bags. One or more of the duffel bags were located within garbage dumpster(s).

11.     That Det. Dickerson observed the duffel bags to contain various casings and/or live rounds of ammunition matching the ammunition used at the power substation scene, and a 450 Bushmaster rifle.

12.     That Cameron Monte Smith willfully damaged property at the power substation belonging to Mountrail Williams Electric Cooperative and Basin Electric Power Cooperative by shooting a firearm at power boxes and other equipment. Said power substation sustained damages in excess of $10,000.00.

13.     That on May 15, 2023, Det. Dickerson received information from Basin Electric Power Cooperative and was informed that the damages are currently estimated between eight million and ten million dollars, however damage estimates are ongoing at this time, and final figures are currently unknown.

14.     That Det. Dickerson is requesting a search warrant requesting for production of DNA evidence in the form of blood and/or saliva and/or hair fibers from the person of an individual identified as Cameron Monte Smith, DOB: 09-30-1974, currently located at the Williams County Correctional Center, in the city of Williston, in Williams County, ND.

15.     That the request is made in an effort to test the DNA of Cameron Smith against evidence located during the investigation.

2.        **Det. Dickerson's Amended Affidavit Contains Probable Cause**.

Specifically, "[p]robable cause exists when a 'practical, common-sense' inquiry that considers the totality of the circumstance set forth in the information before the issuing judge yields a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Stevens, 530 F.3d 714, 718 (8th Cir. 2008) (quoting Illinois v. Gates, 462 U.S. 213, 218 (1983)). Moreover, "[a]n issuing judge's 'determination of probable cause should be paid great deference by reviewing courts' and should be upheld if the judgment had a 'substantial basis for ... conclud[ing] that a search would uncover evidence of wrongdoing." Id. As noted above, Detective Dickerson's, May 15, 2023, affidavit now states that a tow truck driver told law enforcement that he picked up a male the morning of the substation shooting and transported him to the Microtel Inn; that hotel management confirmed a man named Cameron Smith was a guest; that hotel video surveillance showed the defendant, Cameron Smith, in possession of various duffel bags; and a subsequent search of the defendant's footpath led law enforcement to the Williston, North Dakota, dumpster with the duffel bags, which contained the .450 Bushmaster rifle, 9mm Sig Sauer pistol, and ammunition. These facts demonstrate probable cause for a search warrant to obtain the defendant's DNA for comparison to the items the defendant abandoned in dumpster. Consequently, Detective Dickerson's May 15, 2023 affidavit contains probable cause and there was no Franks Violation.

**B.  All remaining evidence is admissible under exceptions to the Fourth Amendment's exclusionary rule**

The defendant argues that the WCSO law enforcement search warrants for the Honda Element and the Microtel were not supported by probable cause, and that the fruits of these searches and seizures, should be suppressed. Specifically, the defendant asserts that federal authorities would not have obtained any evidence with which to charge the defendant had they

not seized evidence from the defendant's Honda Element and Microtel hotel room. In summary, the defendant asserts that any additional evidence that law enforcement obtained in this case, including the defendant's subsequent statements to police while in custody, must be suppressed. However, apart from the interior search of the Honda Element and the search of Microtel hotel room 123, all other evidence obtained by law enforcement is admissible under the inevitable discovery; independent source; or attenuation exceptions.

### 1.       The Inevitable Discovery Exception applies in this case

Law enforcement would have inevitably determined the defendant's identity, inevitably located the bags that the defendant abandoned in a Williston, North Dakota dumpster, which contained a .450 Bushmaster rifle, a 9mm Sig Sauer, ammunition, multiple rifle magazines, and spent .450 Bushmaster shell casings, and inevitably obtained all remaining evidence even if law enforcement would not have accessed the contents of the defendant's vehicle and hotel room. The Eighth Circuit has repeatedly held that "[e]vidence obtained in violation of the Fourth Amendment is subject to the exclusionary rule and, therefore, cannot be used in a criminal proceeding against the victim of the illegal search and seizure." United States v. Smith, 21 F.4th 510, 517 (8th Cir. 2021) citing United States v. Miller, 11 F.4th 944, 954 (8th Cir. 2021). However, the inevitable discovery doctrine is an exception to the exclusionary rule, which prevents exclusion of evidence, if the government proves by a preponderance of evidence that: "(1) there was reasonable probability that evidence would have been discovered by lawful means in absence of police misconduct; and (2) that the government was actively pursuing substantial, alternative line of investigation at the time of the Constitutional violation." Id. citing United States v. Conner, 127 F.3d 663, 667 (8th Cir. 1997).

Eighth Circuit case law on the inevitable-discovery doctrine divides into two strands. The first strand aligns with the view that the Supreme Court has endorsed since Nix v. Williams. Within this view, for evidence acquired unlawfully and not reacquired lawfully to be admissible under the inevitable-discovery doctrine, it is sufficient that the evidence would have been acquired lawfully but for the constitutional violation. See Nix v. Williams, 467 U.S. 431, 444 (holding that "evidence that would inevitably have been discovered" is admissible because excluding it would "put the government in a worse position" than "if no misconduct had taken place"); Hudson v. Michigan, 547 U.S. 586, 592 (2006) (reiterating that "a necessary ... condition for suppression" is "that a constitutional violation was a 'but-for' cause of obtaining [the] evidence"). From the Eighth Circuit's adoption of the inevitable-discovery doctrine in United States v. Apker, 705 F.2d 293 (8th Cir. 1983), until their decision in Conner, 127 F.3d 663, the Eighth Circuit articulated the doctrine in a way that is consistent with this view. See, e.g., Apker, 705 F.2d at 306 (holding that the inevitable-discovery doctrine "allows illegally obtained evidence to be admitted if it would have been discovered in the course of a proper investigation"); United States v. Durant, 730 F.2d 1180, 1185 (8th Cir. 1984) (holding that the inevitable-discovery doctrine applies "when the evidence would have been inevitably discovered absent the illegal conduct"); Hamilton v. Nix, 809 F.2d 463, 465–66 (8th Cir. 1987) (en banc) (explaining that evidence is admissible under the inevitable-discovery doctrine if "it inevitably would have been discovered by lawful means" and stating that "there is no reason to exclude ... evidence" if "police misconduct is not even a 'but for' cause of its discovery"); United States v. Dickson, 64 F.3d 409, 410 (8th Cir. 1995) (quoting Hamilton, 809 F.2d at 463, 465–66).

In Conner, however, the Eighth Circuit held that the inevitable-discovery doctrine applies only if the government shows not only (1) "that the evidence would have been discovered by

23

lawful means in the absence of police misconduct" but also (2) "that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." 127 F.3d at 667; cf. United States v. Thomas, 524 F.3d 855, 860–62 (8th Cir. 2008) (Colloton, J., concurring) (pointing out the differences between the Supreme Court's approach in Nix and the Eighth Circuit's approach in Conner).

      Since Conner, the Eighth Circuit's practice has been inconsistent. In some cases, the Eighth Circuit has repeated Conner's two-condition test. See, e.g., United States v. Glenn, 152 F.3d 1047, 1049 (8th Cir. 1998) (citing Conner); Thomas, 524 F.3d at 858 (citing Glenn); United States v. Munoz, 590 F.3d 916, 923 (8th Cir. 2010) (citing Thomas). In other cases, the Eighth Circuit has repeated the one-condition test from Nix and their earlier caselaw. See, e.g., United States v. Reinholz, 245 F.3d 765, 779 (8th Cir. 2001) (citing Eighth Circuit caselaw prior to Conner); United States v. Craddock, 841 F.3d 756, 760 (8th Cir. 2016) (citing Nix); United States v. Sallis, 920 F.3d 577, 582–83 (8th Cir. 2019) (citing Nix). In one case, the Eighth Circuit even applied the inevitable-discovery doctrine despite acknowledging that there was no contemporaneous alternative line of investigation. See United States v. Chandler, 197 F.3d 1198, 1201 (8th Cir. 1999).

      Due to the information law enforcement would have inevitably obtained about the defendant, from Richard from UR Next Towing and Marie Miller, the defendant's case is similar to Durant, 730, F.2d 1180. In Durant, the defendant—charged with bank robbery—challenged the admission of evidence that he drove a blue Oldsmobile, which the police had acquired by unlawfully interrogating him while arresting him for an unrelated offense. Id. at 1184–85. The police did not realize the significance of the car until "[l]ater," "when [the defendant] was linked to the bank robbery." Id. The Eighth Circuit held that the evidence was admissible under the

inevitable-discovery doctrine because, if the police had not known already that the defendant drove a blue Oldsmobile, then they would have found out by tracing the driver's license and traffic citation that they had obtained from the defendant when he was arrested. Id. at 1185. Furthermore, it is more plausible that a contemporaneous alternative line of investigation was present here than in Durant. In United States v. Hammons, the Eighth Circuit held that it was enough to constitute "actively pursuing a substantial, alternative line of investigation" for officers to have in mind "an alternative plan" that they would have executed if the constitutional violation had not occurred. 152 F.3d 1025, 1030 (8th Cir. 1998).

        i.   UR Next Towing (Richard).

In the present case, even before law enforcement found the defendant's Honda Element or requested any search warrants, Sergeant Roberts took a photograph of a mid-sized tow truck earlier in the investigation as it drove northbound on 121st Ave. NW. US Exhibit 01. Consequently, even if the law enforcement would never have searched the defendant's mud-stuck Honda Element, Sergeant Roberts stated he would have contacted the tow truck companies to discover who was in that location, and inevitably would have learned from Richard, the tow truck driver with UR Next Towing, that Richard had given the defendant a ride to the Microtel after the defendant's vehicle became stuck in the field. This confirms that Sergeant Roberts was at least disposed to execute an alternative plan even if law enforcement had not searched the interior of the defendant's Honda Element. Consequently, the information Richard provided to law enforcement was "discovered by lawful means in the absence of police misconduct" and Sergeant Roberts "was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation" because Sergeant Roberts would have inevitably contacted Richard and learned that the defendant was staying at the Williston Microtel. From there, law

enforcement would have obtained guest information and surveillance footage from the Microtel showing that the defendant was a Microtel hotel guest and that he had left the hotel with two bags that law enforcement later found in a dumpster. These two bags contained two firearms, a .450 Bushmaster rifle and a 9mm Sig Sauer—both of which were illegal for the defendant to obtain as an illegal alien—and live and spent .450 Bushmaster ammunition, like the .450 Bushmaster spent shell casings found at the site of the substation shooting. This information and evidence provided the FBI with probable cause, as noted in their probable cause affidavits, to request search warrants for the defendant's electronics, cell tower data, and the defendant's Oregon residence.

       ii.  <u>Marie Miller</u>.

Moreover, in addition to Richard from UR Next Towing, Marie Miller provided an additional inevitable discovery basis because once law enforcement ran the Honda Element's license plate number, they learned that the vehicle was registered to a Marie Miller from Oregon. Thus, law enforcement would have interviewed Miller to determine why her vehicle was stuck in a muddy field close to the site of a substation shooting. Thereafter, Miller would have provided information to law enforcement that the Honda Element belonged to the defendant and that she had purchased a Bushmaster rifle for the defendant.

       iii.  <u>The Defendant's Illegal Status</u>.

Additionally, the defendant is a Canadian citizen who was illegally residing in the United States. After law enforcement identified the defendant's lack of immigration applications or petitions pending before U.S. Citizenship and Immigration Services, they would have had an independent basis to arrest the defendant and question him about his activities in the United States, including about his vicinity to the substation shooting. Consequently, law enforcement

would have obtained statements from the defendant regardless of their arrest basis. Therefore, since law enforcement would have inevitably discovered all evidence except for the interior of the defendant's Honda Element and his Microtel hotel room, this Court should not apply the Fourth Amendment's exclusionary rule.

### 2.    The Independent Source Exception applies in this case

The independent source exclusionary rule exception applies to the five FBI search warrants in this case because multiple independent sources established probable cause to search and seize the evidence outlined in these warrants. The Eighth Circuit has held that "[t]he independent source doctrine allows admission of evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality." United States v. Green, 9 F.4th 682, 693 (8th Cir. 2021)) (internal quotation marks omitted) quoting United States v. Anguiano, 934 F.3d 871, 874 (8th Cir. 2021). To prevail under the independent source doctrine, the United States must show that: (1) law enforcement would have sought a warrant to seize the evidence even if the unlawful search never occurred, and (2) probable cause supported the warrant after excluding all information obtained by the unlawful search. Id.; accord United States v. Swope, 542 F.3d 609, 613–14 (8th Cir. 2008).

In the present case, the FBI sought the following search warrants after the improper search of the defendant's Honda Element and Microtel hotel room, as noted below:

i. The defendant's electronic devices (case number 1:23-mj-262) (Doc. No. 41-15);

ii. AT&T cell towers (case number 1:23-mj-270) (Doc. No. 41-16);

iii. Verizon cell towers (case number 1:23-mj-274) (Doc. No. 41-17);

iv. T-Mobile cell towers (case number 1-23-mj-278) (Doc. No. 41-18);

v.  A residence located at 459 Alameda Avenue, Astoria, Oregon 97103,

rented by Cameron Smith (case number 1:23-mj-281) (Doc. No. 41-19); and

vi.  A search of the Honda Element for additional DNA evidence (case

number 1:23-mj-547).

Moreover, probable cause supports the FBI's five search warrant applications for the

defendant's electronics, cell tower information, and Oregon apartment, independent of any

tainted information gathered during the search of the interior of defendant's Honda Element or

the search of the defendant's Microtel hotel room.[2] As the Eighth Circuit has noted, "[p]robable

cause exists, when, given the totality of the circumstances, a reasonable person could believe

there is a fair probability that contraband or evidence of a crime would be found in a particular

place." United States v. Keck, 2 F.4th 1085, 1089 (8th Cir. 2021) (quoting United States v.

Murillo-Salgado, 854 F.3d 407, 418 (8th Cir. 2017)). A thorough review of each of the FBI's

five search warrant affidavits demonstrate that they establish probable cause by including

information from multiple independent sources. As explained earlier, Lloyd "Richard"

Bratrsovsky, the tow trucker driver for UR Next Towing, provided law enforcement with the

details of his transfer of the defendant to the Microtel Suites, which led law enforcement to the

site of the dumpster where the defendant abandoned his firearms. Additionally, evidence law

enforcement recovered from the site of the substation shooting, the surveillance footage

demonstrating that the defendant discarded two bags, and the content of those two bags found in

a nearby dumpster, all provided probable cause for these five search warrants irrespective of any

reference to law enforcements search of the defendant's vehicle and hotel room. Finally,

---

[22] Since Case  Number 1:23-mj-547 pertains to a search of the defendant's Honda Element for additional DNA evidence, the United States concurs that this Court should suppress the results of this search.

although not included in the warrant affidavits, Marie Miller told law enforcement that she purchased both the Honda Element and a .450 Bushmaster rifle for the defendant.

### 3.    The Attenuation Exception applies in this case

There was sufficient attenuation to dissipate the taint of the defendant's seizure. As the Eighth Circuit has held, "[t]he attenuation doctrine is a well-established exception to the exclusionary rule. A mere causal connection between information gained during an illegal search and evidence prepared for trial does not require automatic exclusion of the evidence. 'Such connection may have become so attenuated as to dissipate the taint.'" United States v. Watson, 950 F.2d 505, 507 (8th Cir. 1991) citing Nardone v. United States, 308 U.S. 338, 341 (1939). When determining if sufficient attenuation exists, we must focus on three specific factors: (1) the time elapsed between the illegality and acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. Brown v. Illinois, 422 U.S. 590, 603–04 (1975).

In the present case, law enforcement obtained evidence days to months after the initial improper search of the defendant's vehicle and hotel room. Moreover, as noted above the information Richard from UR Next Towing and Marie Miller provided to law enforcement were intervening circumstances that dissipated the taint of the vehicle and hotel room searches. Finally, WCSO law enforcement were, at most, negligent in searching the defendant's vehicle and including erroneous statements in their three state search warrant affidavits. Consequently, the above three factors weigh in favor of not excluding any evidence apart from the interior search of the defendant's vehicle and the searches of the defendant's hotel room.

4.  **The items that the defendant discarded in a Williston, North Dakota dumpster were abandoned property, and do not constitute "fruit of the poisonous tree"**

The defendant relinquished his ownership and expectation of privacy rights within the two bags—which contained a .450 Bushmaster rifle, a 9mm Sig Sauer pistol, ammunition, and spent .450 Bushmaster shell casings—when he discarded these bags in a Williston, North Dakota dumpster. The fruit of the poisonous tree doctrine does not apply to bar admission of this evidence because, generally, abandoned property may be recovered by police and used for evidentiary purposes. See Hester v. United States, 265 U.S. 57, 58 (1924); United States v. Hollman, 541 F.2d 196, 199 n. 8 (8th Cir. 1976) (explaining that "[t]he jettison of the packets was not an attempt to prevent a search following a pretextual arrest . . . nor did it follow an illegal entry . . . It was rather an abandonment of the evidence outside the area protected by the Fourth Amendment."). When determining if evidence has been abandoned, courts must consider whether the defendant relinquished his reasonable expectation of privacy over the objects. See United States v. Hoey, 983 F.2d 890, 892–93 (8th Cir. 1993). This determination is made based on the objective facts available to the officers at the time they recovered the evidence, taking into account the totality of the circumstances. United States v. Tugwell, 125 F.3d 600, 602 (8th Cir. 1997). Under this test, courts typically consider two critical factors—whether the defendant physically relinquished, and denied ownership over, the challenged evidence. Id. In the present case, the defendant threw the bags containing the firearms and ammunition in a dumpster and concealed these bags under trash located within this dumpster. The defendant's act of discarding property in a dumpster suffices to establish that he physically relinquished his expectation of privacy in said property because he did it shortly after shooting the substation, becoming unexpectedly stranded in Williston, North Dakota, and, thereafter, decided to dispose of the

evidence he possessed to distance himself from this crime. See United States v. Simpson, 439 F.3d 490, 494 (8th Cir. 2006) (holding that "[h]ere, Simpson threw the rifle and magazines on the ground while being chased by police. This act suffices to establish the evidence was physically relinquished. Further, the district court found, and we agree, that at the time Simpson discarded the rifle and magazines, he was attempting to disclaim ownership over this evidence so authorities could not trace the objects back to him.").

### 5.   The Good Faith Exception applies in this case

The Supreme Court has identified four circumstances in which an officer's reliance on a search warrant would be objectively unreasonable: (1) when the affidavit or testimony in support of the warrant included a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) when the warrant is "so facially deficient" that the executing officer could not reasonably presume the warrant to be valid. United States v. Leon, 468 U.S. 897, 923 (1984) (citations and quotations omitted); see United States v. Puckett, 466 F.3d 626, 630 (8th Cir. 2006).

The Eighth Circuit has recognized that "[t]he good-faith inquiry is confined to the objectively ascertainable question [of] whether a reasonably well trained officer would have known that the search was illegal despite the issuing judge's authorization [and] when assessing the officer's good faith reliance on a search warrant . . ., we can look outside the four corners of the affidavit and consider the totality of the circumstances, including what the officer knew but

did not include in the affidavit." United States v. Dickerman, 945 F.3d 1060, 1065 (8th Cir. 2020).

The good-faith exception also may apply when, as in the present case, the defendant argues that evidence contained in the affidavit that gave rise to a probable cause determination was gathered in violation of the defendant's Fourth Amendment rights. United States v. Cannon, 703 F.3d 407, 413 (8th Cir. 2013). In this situation, the good-faith exception applies if the officers' prewarrant conduct is "close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable." Id. quoting Conner, 127 F.3d at 667. If, on the other hand, the officers' prewarrant conduct is 'clearly illegal,' the good-faith exception does not apply." Id. If the case presents a "close question," the good-faith exception should be considered. United States v. Fletcher, 91 F.3d 48, 51 (8th Cir. 1996).

As noted in the independent source exception paragraphs, the FBI's five search warrant affidavits were made and executed in good faith. Although these affidavits contain references to improper searches of the defendant's Honda Element and Microtel hotel room, these affidavits do not contain false statements. Moreover, even after removing any reference to these two searches from the five FBI affidavits, each affidavit establishes probable cause based upon independent sources or evidence, namely the statements made by Richard and the surveillance footage depicting the defendant with the bags later located in a dumpster, inevitably discovered by law enforcement, which was not based upon either of these improper searches. Consequently, this Court should find that the good faith exception applies and not exclude evidence obtained from the five FBI search warrants.

III.    **CONCLUSION**

The United States asks this Court to grant, in part, the defendant's motion to suppress by excluding all evidence that law enforcement obtained from its search of the interior of the defendant's Honda Element and its search of the defendant's Microtel hotel room. However, since all remaining evidence that law enforcement obtained would have been inevitably discovered, was based upon independent sources, was attenuated, was abandoned, or was obtained based upon good faith reliance, the United States requests that this Court deny the defendant's motion to suppress any other evidence.

Dated:  January 3, 2024.

MAC SCHNEIDER
United States Attorney


By:     */s/ David D. Hagler*
        DAVID D. HAGLER
        Assistant United States Attorney
        ND Bar ID 04696
        david.hagler@usdoj.gov

        */s/ Jonathan J. O'Konek*
        JONATHAN J. O'KONEK
        Assistant United States Attorney
        ND Bar ID 06821
        jonathan.okonek@usdoj.gov

        P.O. Box 699
        Bismarck, ND  58502-0699
        (701) 530-2420
        Attorneys for United States