IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case Nos. 1:23-cr-00118 and 1:24-cr-00104 |
| Plaintiff, | |
| v. | **UNITED STATES' SENTENCING MEMORANDUM** |
| CAMERON MONTE SMITH, | |
| Defendant. | |

The United States of America, by Jennifer Klemetsrud Puhl, Acting United States Attorney for the District of North Dakota, David D. Hagler and Jonathan J. O'Konek, Assistant United States Attorneys, hereby submit the United States Sentencing Memorandum in the defendant's case.

To promote brevity, the United States incorporates by reference the facts, legal authority, and arguments contained within the United States' Response to Defendant's Memorandum of Law Regarding Application Note 4 to USSG § 3A1.4, Loss & Restitution. (Doc. No. 120, Case Number 1:23-cr-118). Additionally, the United States requests that this Court consider the exhibits and witness testimony that the United States introduced at the defendant's January 27-28, 2025, evidentiary hearing to determine: 1) the proper loss calculations; 2) the appropriate restitution amounts; and 3) whether to apply USSG § 3A1.4, Application Note 4, the terrorism upward departure provision. (Doc. Nos. 124; 124-1 to 124-32). As noted in the amended plea agreement (PA)—and the United States prior filings with this Court—the United States specifically requests that this Court not apply the USSG § 3A1.4(a) Terrorism Victim Related Adjustment but

instead apply USSG § 3A1.4, Application Note 4, the terrorism upward departure provision.

## Sentencing Recommendation

At the defendant's sentencing hearing, the United States requests that this Court sentence the defendant to:

- Serve 151 months' imprisonment, to run concurrent in case numbers 1:23-cr-00118 and 1:24-cr-00104;
- Serve 3 years' supervised release;
- Pay $2,124,974.38 in restitution; and
- Pay $200 in special assessments.

## Sentencing Guideline Calculations

The Presentence Investigation Report (PSR) establishes the following Sentencing Guideline calculations:

- 7. Base offense level: (USSG § 2B1.1(a)(1)) (Agreed to in PA))
- +16. Loss of more than $1.5 million: (USSG § 2B1.1(b)(1)(I))
- +2. Dangerous weapon: (USSG § 2B1.1(b)(16)(B)) (Agreed to in PA)
- -3. Acceptance of Responsibility: (USSG § 3E1.1) (Agreed to in PA)
- **Final Offense Level**: 22
- **Criminal History Category**: I

The United States does not object to the above PSR calculations or to its established sentencing guideline range of 41 to 51 months' imprisonment. However, the

United States requests that this Court apply Application Note 4, USSG § 3A1.4, and impose a 12-level upward departure upon the defendant—which would create a final offense level of 34, place the defendant in criminal history category I, and establish a sentencing guideline range of 151-188 months' imprisonment.

## Loss Calculations

Pursuant to USSG § 2B1.1(b)(1)(I), the United States requests that this Court apply an actual loss amount of $2,124,974.38 and apply a 16-level enhancement for loss exceeding $1,500,000. At the defendant's evidentiary hearing, the United States admitted Government Exhibit 13, a summary exhibit that FBI Forensic Accountant Mark Danielson prepared and authenticated, which contains an itemized list of expenses that Basin Electric Power Cooperative (Basin), East River Electric Power Cooperative (East River), and Mountrail-Williams Electric Cooperative (Mountrail-Williams) incurred while repairing damages the defendant caused by shooting their substation equipment with a high-powered rifle. Mr. Danielson testified about the total loss calculations he tabulated for each entity, as noted below:

| Power Company | Compensable Damages – Materials and Third-Party Services | Not Compensable Damages | Total |
|---|---|---|---|
| Basin Electric Power Cooperative | $1,651,040.95 | $142,974.20 | $1,794,015.15 |
| East River Electric Power Cooperative | $402,139.48 | $106,877.85 | $509,017.33 |
| Mountrail-Williams Electric Cooperative | $71,793.95 | $49,536.20 | $121,330.15 |
|  |  |  |  |
| Grand Total | $2,124,974.38 | $299,388.25 | $2,424,362.63 |

3

Mr. Danielson created Government Exhibit 13 based upon invoices and other financial documents provided by Basin (Government Exhibit 8), Mountrail-Williams (Government Exhibit 9), and East River (Government Exhibit 11), which this Court also received for its consideration. Since this Court is in a unique position to "assess the evidence and estimate the loss based upon that evidence," it "need only make a reasonable estimate of the loss." USSG § 2B1.1, Application Note 3(B). Moreover, this Court can specifically consider Government Exhibits 8, 9, 11, and 13 to determine the defendant's actual loss because they represent "[t]he cost of repairs to damaged property," which is as a factor in determining an estimation of loss. USSG § 2B1.1, Application Note 3(B)(iii).

While the defendant generally alleges that Basin exceeded "reasonable" repair costs by electing to move its damaged transformer (as opposed to fixing the transformer on site) and that East River was negligent in the design of its substation oil containment infrastructure, this Court should not consider these arguments because they do not represent exclusions from loss. See USSG § 2B1.1, Application Note 3(C) (generally describing "Exclusions from Loss" as finance charges, late fees, penalties, interest, costs to the government or costs to victims for aiding the government). Moreover, as noted above, at the defendant's evidentiary hearing, this Court received witness testimony and government exhibits that established a total loss amount of $2,124,974.38, which represented the costs Basin, East River, and Mountrail-Williams sustained to repair and replace equipment that the defendant damaged. Thus, a preponderance of the evidence establishes that the loss amount caused by the defendant's conduct exceeds $1,500,000.

**Restitution Calculation**

18 U.S.C. § 3663A, the Mandatory Victim Restitution Act (MVRA), applies to the defendant's case because his offense involves "an offense against property under this title," namely, destruction of an energy facility in violation of 18 U.S.C. § 1366(a). See 18 U.S.C. § 3663A(c)(1)(ii). Pursuant to 18 U.S.C. § 3663A, the United States requests that this Court enter a restitution judgment for the following entities[1]:

| Power Company | Compensable Damages - Materials and Third-Party Services |
|---|---|
| Basin Electric Power Cooperative | $1,651,040.95 |
| East River Electric Power Cooperative | $25,000.00 Insurance Deductible |
| Federated Rural Electric Insurance Exchange | $377,139.48 (Substitute Payee under 18 U.S.C. § 3664(j)(1) for insurance payment to East River) |
| Mountrail-Williams Electric Cooperative | $71,793.95 |
|  |  |
| **Grand Total** | **$2,124,974.38** |

Pursuant to the MVRA, the term "victim" is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2). Additionally, "[r]estitution includes amounts that were reasonably foreseeable as losses to victims." United States v. Rodriguez, 915 F.3d 532, 535 (8th Cir. 2019) (citing United States v. Alexander, 679 F.3d 721, 731 (8th Cir. 2012)). Therefore, to determine whether expenses from Basin, East River, and Mountrail-

---

[1] On January 27-28, 2025, this Court held an evidentiary hearing to determine appropriate victim loss and restitution amounts. At this hearing, the United States introduced evidence of each victim's ascertainable losses. Thus, the United States does not believe that a post-sentencing restitution hearing is required under 18 U.S.C. § 3664(d)(5).

Williams met this "proximate cause" and "foreseeability" test, the United States asked Mr. Danielson to tabulate each entity's submitted expenses under either compensable expenses or not compensable expenses categories, according to the restitution criteria outlined in 18 U.S.C. Section 3663A. See United States v. Clausen, 949 F.3d 1076, 1081–82 (8th Cir. 2020) (affirming a restitution judgment in a case where a defendant used a rifle to shoot a helicopter and stating that "[c]lean-up or repair costs may be ordered under the MVRA, provided the defendant is not required to compensate the victim twice for the same loss . . . [and] here, the helicopter pilot and Clark gave detailed testimony at the evidentiary hearing relating how the bullet damaged the helicopter and explaining the extensive repair efforts that were required."). Prior to submitting restitution amounts to the Court, the United States first asked Mr. Danielson to group expenses according to categories, which would determine whether the defendant's actions were foreseeably caused by the defendant's conduct. Specifically, based upon Mr. Danielson's creation of Government Exhibit 13, the United States excluded "$299,388.25" in restitution expense submissions from Basin, East River, and Mountrail-Williams because they related to "Internal Costs," like "Employee Salaries," "Employee Benefits," "Payroll Taxes," and "Fuel," because the United States believed that these "internal costs" were not foreseeable to the defendant's conduct. See Government Exhibit 13.

However, it was reasonably foreseeable that the defendant's conduct would cause damages to the substation equipment, require specialized repairs and replacement parts, and require specialized transportation to make those repairs and obtain those parts.

Similar to the facts of the defendant's case, the Eighth Circuit specifically held in Clausen:

> Here, the pilot testified that Clausen's rifle shot activated a fuel system warning light, which required an emergency landing in Fosston, Minnesota. Maintenance officer Clark testified that maintenance workers removed the helicopter's blades to store it in the airport hangar and then hired a trucking company to haul the helicopter seventy miles to its base in Grand Forks, North Dakota, using a crane to lift it over the fence and onto a trailer. In Grand Forks, some of the wiring was remanufactured and replacement parts were obtained from Texas and France. A team from Great Falls, Montana repaired the area where the bullet exited the cabin. These costs, Clark testified, cost the government "roughly $19,600." The district court did not clearly err in finding that Clausen's offense caused the claimed losses.

Id. at 1081.

Thus, where a defendant intentionally causes damage to specialized equipment, as the defendant did in the present case, it is foreseeable that restitution costs will include specialized replacement parts and transportation to make repairs.

If Basin and East River had either neglected to make repairs or waited days to clean up the oil draining from their equipment— and this either exacerbated or caused further damages—it is possible that these types of costs would be unforeseeable. However, this is not what occurred here. In fact, testimony at the evidentiary hearing showed the opposite, namely, that both Basin and East River attempted to immediately repair their equipment and contain the oil drainage.

Therefore, since the defendant's actions of disabling two electrical substations with a high-powered rifle were both the proximate cause of the harm to Basin, East River, and Mountrail-Williams, and were foreseeable, this Court should determine that defendant owes restitution in the amount of $2,124,974.38, as noted above.

**Terrorism Enhancement – USSG § 3A1.4 / Application Note 4**

The United States requests that this Court apply USSG § 3A1.4, Application Note 4 and impose a 12-level upward departure for the defendant committing the offense of destruction of an energy facility with a "terrorist motive "to "intimidate or coerce a civilian population." USSG § 3A1.4, Application Note 4. As noted below, USSG § 3A1.4 and Application Note 4 have separate criteria and distinct applicability.

1.      USSG § 3A1.4(a) Terrorism Enhancement

At the January 28, 2025, evidentiary hearing, the Court inquired of the United States' position regarding the full application of USSG § 3A1.4. The United States responded, in part, that it could see the Court's point of inquiry, but that "it is our position that we're ultimately asking the Court to apply application Note 4 and not the full departure, if you will, under 3A1.4." Transcript of Evidentiary Hearing Day 2 at p. 243:12-14. The United States wishes to clarify that it did not intend those comments to be any sort of advocation for full application of § 3A1.4. The United States' position is that the facts and circumstances of this case support only Application Note 4 of USSG § 3A1.4 and not the full application of USSG § 3A1.4.

The United States requests that this Court not fully apply USSG § 3A1.4(a), which is a Terrorism "Victim Related Adjustment," and applies a 12-level enhancement that increases a defendant's criminal history category to VI, if the offense of conviction "is a felony that involved, or was intended to promote, a federal crime of terrorism." USSG § 3A1.4. This enhancement does not focus on a defendant, but rather on whether the offense a defendant commits is "calculated" to influence the government's conduct by

8

"intimidation or coercion." See United States v. Ali, 799 F.3d 1008, 1031 (8th Cir. 2015) citing United States v. Mohamed, 757 F.3d 757, 760 (8th Cir. 2014) (stating that "Ali and Hassan also urge that the § 3A1.4 enhancement was improperly applied because their offenses were not calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct . . . [but] [w]e recently explained that this standard does not focus on the defendant but on his offense, asking whether it was calculated, i.e., planned—for whatever reason or motive—to achieve the stated object.") (internal quotations omitted); see also Mohamed, 757 F.3d at 760–61 (explaining for the USSG § 3A1.4 "sentencing enhancement to apply, Mohamed's felony must be 'calculated to influence or affect the conduct of the government intimidation or coercion' . . . [but] "Section 2332b(g)(5)(A) does not require proof of a defendant's particular motive.").

  2.  USSG § 3A1.4, Application Note 4

The United States requests that this Court instead apply USSG § 3A1.4, Application Note 4, which imposes a 12-level upward departure—as contemplated in paragraph 13 of the Plea Agreement—because evidence introduced at the defendant's evidentiary hearing demonstrates by a preponderance of the evidence that the defendant's "terrorist motive was to intimidate or coerce a civilian population," rather than government conduct. USSG § 3A1.4, Application Note 4; see also United States v. Mustafa, 695 F.3d 860, 862 (8th Cir. 2012) (holding, since United States v. Booker, 543 U.S. 220 (2005), "we have repeatedly held that due process never requires applying more than a preponderance-of-the-evidence standard for finding sentencing facts, even where

9

the fact-finding has an extremely disproportionate impact on the defendant's advisory guidelines sentencing range.") (cleaned up).

Pursuant to USSG § 3A1.4, Application Note 4, this Court must make two findings prior to applying the upward departure:

> 1) That the defendant's "offense involved, or was intended to promote, one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B);" and
>
> 2) That the defendant's "terrorist motive" was to intimidate or coerce a civilian population."

USSG § 3A1.4, Application Note 4, citing 18 U.S.C. § 2332b(g)(5)(B); see also United States v. Jordi, 418 F.3d 1212, 1213, 1217 (11th Cir. 2005) (determining that "[u]nlike § 3A1.4, Application Note 4 to that section does not require an interpretation of the term 'federal crime of terrorism' at all. Instead, by its own terms, it applies to situations where 'the offense involved, or was intended to promote, *one of the offenses specifically enumerated* in 18 U.S.C. § 2332b(g)(5)(B), but the terrorist motive was to intimidate or coerce a civilian population, rather than to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.'") (emphasis in the original); United States v. Garey, 546 F.3d 1359, 1360, 1361–62 (11th Cir. 2008) citing USSG § 3A1.4, Application Note 4 and 18 U.S.C. § 2332b(g)(5).

      *i.*      *Destruction of an Energy Facility is Enumerated in 18 U.S.C. § 2332b(g)(5)(B)*

Since this Court has accepted the defendant's guilty pleas to two counts of Destruction of an Energy Facility, in violation of 18 U.S.C. § 1366(a), and since 18 U.S.C. § 2332b(g)(5)(B) specifically defines "Federal crime of terrorism" to include violations of "[18 U.S.C. §] 1366(a) (relating to destruction of an energy facility)," the United States has established that the defendant's guilty pleas to two counts of Destruction of an Energy Facility, in violation of 18 U.S.C. § 1366(a) meet the enumerated criteria for a "Federal crime of terrorism."

      *ii.*      *Terrorist Motive*

As noted in the amended plea agreement, the defendant has admitted, between on or about July 16, 2022, and July 17, 2022, that he fired multiple rounds from a high-powered .450 Bushmaster rifle into a transformer and pumpstation of the Keystone Pipeline located near Carpenter, South Dakota, causing damage to that energy facility. (Amended Plea Agreement, Doc. No. 88, pg. 3). Additionally, between on or about May 12, 2023, and May 13, 2023, the defendant has admitted in the amended plea agreement that he fired multiple rounds from a high-powered .450 Bushmaster rifle, into key components of the Wheelock Substation located near Ray, North Dakota, causing damage to this energy facility. Id. Moreover, as circumstantial evidence established at the defendant's evidentiary hearing, the defendant spray painted environmentalist symbols at the sites of both substation shootings, including the "Extinction Rebellion" symbol. See Government Exhibit 12.

While the defendant correctly states that law enforcement did not see the defendant make these spray paintings and did not find spray paint amongst the defendant's belongings, circumstantial evidence established that the defendant created these spray paint markings. Specifically: 1) an "Extinction Rebellion" symbol was spraypainted at the sites of both substation shootings; 2) the defendant had images of this "Extinction Rebellion" symbol on his electronic device; 3) the "Communique," which law enforcement located on the defendant's computer, refers to Extinction Rebellion; 4) the defendant admitted that he is deeply concerned about climate change and global warming; and 5) the defendant admitted that he disabled both substations to "warn" others about global warming, which has a direct nexus to both the "Communique" and Extinction Rebellion's goals.

In addition, at the defendant's January 27-28, 2025 evidentiary hearing, the United States introduced evidence establishing that the defendant shot multiple rounds at both the Wheelock, North Dakota, and Carpenter, South Dakota, substations based upon this environmentalist terrorism motive. Specifically, FBI Special Agent Daniel Lewis testified that he located a handwritten note about environmentalism concerns and environmentalism literature during a search of the defendant's Oregon residence. Additionally, during the search of the defendant's residence, SA Lewis obtained the defendant's 1TB hard drive and his HP laptop, which contained a panoply of environmentalist documents, particularly focused on global warming and climate change. The United States introduced evidence located from the defendant's Oregon residence in Government Exhibit 12.

On the defendant's 1TB hard drive, law enforcement located an environmentalist policy paper, notes about global warming with the last sentence stating, "What is to be done?" a photograph of individuals holding a "Climate Emergency" banner with the Extinction Rebellion symbols located on the corners of this banner, and a map containing locations of pipelines juxtaposed with tribal homelands. As SA Lewis testified, Extinction Rebellion is an environmentalist extremist group, and the same Extinction Rebellion symbol depicted on the aforementioned photograph was spraypainted at the sites of both the Wheelock and Carpenter substation shootings.

Finally, SA Lewis located the "releases30.odt" "Communique" document on the defendant's laptop computer, which—in detail—advocates for the destruction of energy facilities. See Government Exhibit 3. As noted by SA Breitenbach, based upon his digital forensic testing, this Communique was auto saved onto the defendant's laptop computer and last accessed on October 17, 2019. See Government Exhibit 1. As SA Lewis testified at the defendant's evidentiary hearing, the Communique: 1) contains language supporting environmentalist extremist groups "Earth Liberation Front" (EARTH L F) and "Extinction Rebellion;" 2) advocates the destruction of energy facilities; and 3) celebrates prior attacks upon energy facilities. Notably, key passages from this Communique advocate:

- "Only total resistance which aims to shut down the system by destroying the various pieces of critical infrastructure which produce and distribute energy;" and

- "We urge all those who wish to maintain a habitable planet to attack and destroy fossil fuel energy infrastructure from where it is produced to how it is transported and distributed which enables the destruction of our beloved Mother Earth."

Exhibit 3.

Moreover, the Communique describes "two acts of armed resistance" where "operatives" used a high-powered rifle to shoot an "electrical substation" and a "natural gas compressor station," and then spraypainted an "XR" on the ground to support "Extinction Rebellion." Id. The facts described in the Communiques' "two acts of armed resistance" mirror the facts of the defendant's case. Specifically, the defendant used a high-powered .450 Bushmaster rifle to shoot and disable key components of both the Wheelock and Carpenter substations and then spraypainted Extinction Rebellion symbols on the ground to support this organization's cause.

Furthermore, FBI SA Troy Breitenbach's digital forensic report, admitted as Exhibit 1 at the defendant's evidentiary hearing, established that this Communique was located on the defendant's computer and last accessed on October 17, 2019, which infers that defendant accessed this document—and acted with a terrorist motive—prior to his 2022 and 2023 attacks against the Wheelock and Carpenter substations. Thus, the location of the Communique on the defendant's computer, and his actions which mirror the energy facility attacks described in this Communique, demonstrate the defendant acted with an environmentalist terrorist motive when he disabled the Wheelock and Carpenter substations.

### iii. Intent to Intimidate or Coerce a Civilian Population

Since Basin, Mountrail-Williams, and East River are all private entities, this consideration supports applying Application Note 4 rather than the full USSG § 3A1.4 enhancement, which applies to influencing government conduct. Notably, the Eleventh Circuit Court of Appeals affirmed the use of Application Note 4 where, as here, a defendant targeted a civilian operated enterprise. See Jordi, 418 F.3d at 1214, 1214–17 (applying an upward departure under Application Note 4 to a defendant who "concocted a plan whereby he would destroy abortion clinics using explosive devices . . . [because] Jordi's conduct involved an offense that was specifically enumerated in 18 U.S.C. 2332b(g)(5)(B) and the district court found that the defendant sought through his actions to intimidate or coerce a civilian population by fire bombing . . ."). Moreover, in the Eighth Circuit, at least one defendant has attempted to argue that USSG § 3A1.4 did not apply where her terrorist actions were "directed at a private company." See United States v. Reznicek, 2022 U.S. App. LEXIS 15461, at *3 (8th Cir. 2022) (finding harmless error in a district court's application of § 3A1.4 to a violation of 18 U.S.C. § 1366 even though the defendant argued "the enhancement should not have applied because her actions were directed at a private company, rather than the government" because "[t]he district court expressly stated that its sentence would be the same sentence imposed if the Court did not apply the terrorism adjustment.") (internal quotations omitted).

Moreover, the defendant's actions directly targeted and affected civilians. As noted at the defendant's evidentiary hearing, both substations were private companies and, because the defendant disabled the substations, civilian customers lost power.

15

Additionally, as noted by this Court at the defendant's evidentiary hearing, the defendant had a map of oil pipelines juxtaposed against traditional tribal homelands. And, when the defendant disabled the Carpenter, South Dakota, substation, his actions shut down power to a TransCanada pipeline pumping station. After the defendant shot both the Wheelock, North Dakota and the Carpenter, South Dakota substations, he left "Extinction Rebellion" spray paint markings to further intimidate the owners, operators, and employees running these substations. Therefore, since the defendant targeted three private entities to "intimidate or coerce" them—and the civilian customers they served—into abating their use of carbon energy, USSG § 3A1.4, Application Note 4, applies against the defendant.

      3.      <u>Potential United States Sentencing Commission Amendments</u>

At the defendant's sentencing hearing, this Court must apply the current applicable sentencing guideline provisions. <u>See</u> USSG § 1B1.11(a) (stating that "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced."). Moreover, both the Eighth Circuit Court of Appeals and the Sentencing Guidelines mandate that "district courts must use the Guidelines Manual in effect at the time of sentencing, unless doing so would violate the *Ex Post Facto* Clause." <u>United States v. Williams</u>, 899 F.3d 659, 666 (8th Cir. 2018) citing USSG § 1B1.11. Therefore, while the defendant cites to possible amendments to the United States Sentencing Guidelines, which would remove USSG § 3A1.4, Application Note 4, the United States asks this Court to apply the current 2024 United States Sentencing Commission Guidelines Manual on the defendant's sentencing hearing date.

4.     <u>Nationwide Sentences for Violations of 18 U.S.C. § 1366(a)</u>

Pursuant to 18 U.S.C. § 3553(a)(6), this Court must consider the "the need to avoid unwarranted sentence disparities." Therefore, listed below, the United States has outlined sentences imposed against other defendants throughout the United States convicted of Destruction of an Energy Facility, in violation of 18 U.S.C. § 1366(a).

- 216 months' imprisonment for conspiring to destroy multiple electrical substations. (<u>United States v. Sarah Beth Clendaniel</u>, United States District Court, District of Maryland, case number JKB-23-0056) (guilty plea);

- 180 months' imprisonment for "destruction of an energy facility, use of fire to commit a felony, and possession of a firearm/ammunition by an unlawful user of a controlled substance." <u>United States v. Woodring</u>, 35 F.4th 633, 634 (8th Cir. 2022) (guilty plea).

- 96 months' imprisonment for slowing "construction on the Dakota Access Pipeline by committing arson and acts of vandalism, including using a blowtorch to cut holes in the pipeline." <u>Reznicek</u>, 2022 U.S. App. LEXIS 15461, at *2 (guilty plea);

- 96 months' imprisonment for "travel[ing] to an energy facility in Kane County, Utah, and fir[ing] several rifle shots into the facility's cooling fins." <u>United States v. McRae</u>, 845 Fed. Appx. 804, 805 (10th Cir. 2021) (guilty plea);

- 84 months' imprisonment for stealing "candy from a vending machine in the office building at the Arch Coal Hobet 21 coal mine set . . . [and] then

17

set[ting] fire to the building, causing approximately $4,500,000 in damage." United States v. Holeston, 2000 U.S. App. LEXIS 24909, at *1-2 (4th Cir. 2000) (guilty plea); and

- 18 months' imprisonment for damaging an electrical substation in Pierce County, Washington (United States v. Jeremy Crahan, Western District of Washington, case number 3:23-cr-05167, December 8, 2023) (guilty plea).

Consequently, a 151-month sentence, is within the range of sentences imposed by other courts around the country for violations of 18 U.S.C. § 1366(a).

5. The 18 U.S.C. § 3553(a) Factors Support a 151-Month Sentence

Prior to imposing sentence, the United States asks that this Court consider the following 18 U.S.C. § 3553(a) factors in support of a 151-month imprisonment sentence:[2]

- The Nature, Circumstances, and Seriousness of the Offense. The defendant attacked and disabled two electrical substations with a high-powered rifle that caused extensive damages to both stations. To accomplish these attacks, the defendant travelled great distances from Oregon to South and North Dakota.

---

[2] Should this Court determine that USSG § 3A1.4, Application Note 4, does not apply, the United States will argue that the § 3553(a) factors support a sentence of 151 months' imprisonment. See Doc. No. 88, case number 1:23-cr-118, ¶ 15(a), explaining under the language of the amended plea agreement, "the United States will recommend a sentence of imprisonment within the Guideline sentencing range as the United States will advocate for in paragraphs 11-13 of this plea agreement"); PSR, Doc. No. 128, pg. 16 (Impact of Plea Agreement section states, "[t]he Government will recommend a sentence of imprisonment within the guideline range after a 12-level departure, and the defendant may seek a downward variance/departure).

- <u>The Defendant's History and Characteristics</u>. The defendant committed both substation shootings while illegally present in the United States. Furthermore, the defendant had illegally entered the United States, and lived in Oregon, for years prior to committing these offenses.

- <u>Just Punishment</u>. The defendant fled the scene of both substations and, after the Wheelock substation shooting, attempted to dispose of the firearm and other evidence he used to commit the offense.

- <u>Adequate Deterrence to Criminal Conduct and Respect for the Law</u>. The defendant intentionally disabled both substations to promote an environmentalist extremism agenda. Due to the interconnectivity of the United States' electrical substations, the defendant's actions could have led to disastrous results that endangered our nation's power grid. Consequently, A 151-month sentence will promote respect for the law and deter others from engaging in similar dangerous conduct.

## Conclusion

The United States requests that this Court determine that the facts introduced at the defendant's evidentiary hearing support: 1) a 16-level enhancement for loss of more than $1.5 million; 2) $2,124,974.38 in restitution to the above entities; and 3) application of the USSG § 3A1.4, Application Note 4, departure provision for a 12-level enhancement and sentence the defendant to 151-months' imprisonment.

Dated: February 26, 2025.

                                 JENNIFER KLEMETSRUD PUHL
                                 Acting United States Attorney

By:     */s/ David D. Hagler*
          DAVID D. HAGLER
          Assistant United States Attorney
          ND Bar ID 04696
          david.hagler@usdoj.gov

          */s/ Jonathan J. O'Konek*
          JONATHAN J. O'KONEK
          Assistant United States Attorney
          ND Bar ID 06821
          jonathan.okonek@usdoj.gov

          P.O. Box 699
          Bismarck, ND  58502-0699
          (701) 530-2420
          Attorneys for United States